Brian E. Pastuszenski (*pro hac vice*)
Deborah S. Birnbach (*pro hac vice*)
Sarah Heaton Concannon (*pro hac vice*)
Katherine G. McKenney (*pro hac vice*)
GOODWIN PROCTER LLP
53 State Street
Boston, MA 02109
Tel: (617) 570-1000

Liza M. Walsh
Peter J. Pizzi
CONNELL FOLEY LLP
85 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 535-0500

*Counsel for Prudential Financial, Inc., Arthur F. Ryan,*
*Richard J. Carbone, Peter B. Sayre, Dennis G. Sullivan,*
*Frederic K. Becker, Gordon M. Bethune, Gaston Caperton,*
*Gilbert F. Casellas, James G. Cullen, William H. Gray III,*
*Jon F. Hanson, Constance J. Horner, Karl J. Krapek,*
*and James A. Unruh*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KAREN M. BAUER, Individually and on Behalf of All Others Similarly Situated, | ) ) ) Civil Action No. 09-01120 (JLL) |
| Plaintiff, | ) ) CONSOLIDATED ACTION |
| v. | ) |
| PRUDENTIAL FINANCIAL, INC., et al., | ) Honorable Jose L. Linares ) |
| Defendants. | ) Return Date: January 19, 2010 ) |
| | ) Oral Argument Requested |

## MEMORANDUM OF LAW IN SUPPORT OF
## THE PRUDENTIAL DEFENDANTS' MOTION TO DISMISS
## <u>THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................... 1

ARGUMENT ......................................................................................... 7

**I.**   THE COMPLAINT FAILS THE *TWOMBLY/IQBAL* STANDARD. ............ 7

**II.**   THE COMPLAINT ALLEGES NO SECTION 11 VIOLATIONS. .............. 8

**A.**   Plaintiffs' Annuity-Related Allegations Do Not State A Claim...................... 9

    **1.**   No Inference Can Be Made That Reserves And DAC Amortization Had To Be Increased By $380 Million As Of The Offering Date. ...................................................... 11

    **2.**   Defendants Did Not "Violate" Item 303. ............................................. 14

    **3.**   The Alleged Annuity-Related Misstatements Were Immaterial. ........ 16

**B.**   Plaintiffs' Impairment Allegations Do Not State A Claim........................... 17

    **1.**   Prudential Disclosed Its Impairment Methodology............................. 18

    **2.**   Defendants Had No Duty To Disclose Additional Impairments......... 23

        **a.**   The Registration Statement Was Not Misleading................... 23

        **b.**   Item 303 Required No Additional Disclosure.......................... 24

        **c.**   Additional Impairments Were Not Material. ........................... 25

**C.**   Plaintiffs' ARS Allegations Do Not State A Claim....................................... 26

    **1.**   Prudential Was Not "Subject To" Any ARS-Related Proceedings. ....................................................................... 28

    **2.**   Prudential Had No Contingent Liability To Disclose. ........................ 29

    **3.**   Defendants Had No Duty To Disclose Any Information Regarding Wachovia Securities' ARS-Related Matters...................... 30

        **a.**   Nothing In The Litigation Disclosure Was Misleading. .......... 30

i

**b.**   Facts Concerning The ARS Settlement Are Not Alleged To Have Been Known Or Knowable As Of The Offering....... 31

**c.**   Item 303 Imposed No Disclosure Duty.................................. 33

**d.**   The Complaint Alleges No GAAP Violation.......................... 34

**4.**   The Wachovia Securities Matters Were Not Material........................ 36

**D.**   Plaintiffs Have Failed To Plead Any Compensable Loss............................. 37

**III.**   THE COMPLAINT FAILS TO STATE A CLAIM AGAINST THE INDIVIDUAL DEFENDANTS. ................................................ 38

CONCLUSION ...................................................................... 40

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                    **PAGE(S)**

*In re Acceptance Ins. Co. Sec. Litig.*,
   423 F.3d 899 (8th Cir. 2005) ....................................................................8

*In re Adams Golf, Inc. Sec. Litig.*,
   381 F.3d 267 (3d Cir. 2004) ............................................................9, 25, 29

*In re Adams Golf, Inc. Sec. Litig.*,
   176 F. Supp. 2d 216 (D. Del. 2001), *aff'd in part*, 381 F.3d 267
   (3d Cir. 2004)...............................................................................................14

*In re Arbinet-thexchange, Inc. Sec. Litig.*,
   2006 WL 3831396 (D.N.J. Dec. 28, 2006) (Linares, J.) .....................8, 9, 33, 39

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009)...........................................................................7, 8

*Ballay v. Legg Mason Wood Walker, Inc.*,
   925 F.2d 682 (3d Cir. 1991) .............................................................................3

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)........................................................................7, 8, 12, 27

*Benak v. Alliance Capital Mgmt., L.P.*,
   435 F.3d 396 (3d Cir. 2006) ...........................................................................32

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997) ...................................................................12, 16

*Cafaro v. HMC Int'l, LLC*,
   2009 WL 1622825 (D.N.J. June 10, 2009) (Linares, J.) .........................7, 11, 33

*California Pub. Employees' Ret. Sys. v. Chubb*,
   394 F.3d 126 (3d Cir. 2004) .............................................................................7

*Cooperman v. Individual, Inc.*,
   171 F.3d 43 (1st Cir. 1999).............................................................................9

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ..............................................................39

*In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*,
    7 F.3d 357 (3d Cir. 1993) ........................................................................17, 23

*Garber v. Legg Mason, Inc.*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008) ..............................................................15

*Godchaux v. Conveying Techniques, Inc.*,
    846 F.2d 306 (5th Cir. 1988) .....................................................................35, 36

*Gray v. Bayer Corp.*,
    2009 WL 1617930 (D.N.J. June 9, 2009) (Linares, J.) .......................................8

*J&R Mktg. SEP v. Gen. Motors Corp.*,
    549 F.3d 384 (6th Cir. 2008) .....................................................................15, 36

*J&R Mktg. SEP v. Gen. Motors Corp.*,
    2007 WL 655291 (E.D. Mich. Feb. 27, 2007), *aff'd*,
    549 F.3d 384 (2007).............................................................................16, 26, 37

*Kaplan v. First Options of Chicago, Inc.*,
    19 F.3d 1503 (3d Cir. 1994), *aff'd*, 514 U.S. 938 (1995)..................................36

*Klein v. Gen. Nutrition Cos.*,
    186 F.3d 338 (3d Cir. 1999) ...........................................................................25

*Kusner v. First Pennsylvania Corp.*,
    531 F.2d 1234 (3d Cir. 1976) ...............................................................16, 26, 37

*Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*,
    2009 WL 2590087 (E.D. Pa. Aug. 20, 2009) ....................................................37

*In re Merck & Co. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005) .............................................................................9

*Miles-Hickman v. David Powers Homes, Inc.*,
    613 F. Supp. 2d 872 (S.D. Tex. 2009)...............................................................12

*In re NAHC, Inc. Sec. Litig.*,
    306 F.3d 1314 (3d Cir. 2002) ....................................................................12, 37

iv

*New Jersey v. Sprint Corp.*,
   314 F. Supp. 2d 1119 (D. Kan. 2004)................................................................28

*In re PDI Sec. Litig.*,
   2005 WL 2009892 (D.N.J. Aug. 17, 2005) (Linares, J)...............................12, 27

*In re PEC Solutions Sec. Litig.*,
   2004 WL 1854202 (E.D. Va. May 25, 2004), *aff'd*, 418 F.3d 379
   (4th Cir. 2005).......................................................................................18, 35

*Pyramid Holdings, Inc. v. Inverness Med. Innovations, Inc.*,
   2009 WL 2251471 (D. Mass. Jul. 29, 2009) .....................................................29

*Scibelli v. Roth*,
   2000 WL 122193 (S.D.N.Y. Jan. 1, 2000) .......................................................17

*Shaw v. Digital Equip. Corp.*,
   82 F.3d 1194 (1st Cir. 1996)............................................................................15

*In re Shoretel, Inc. Sec. Litig.*,
   2009 WL 248326 (N.D. Cal. Feb. 2, 2009) ......................................................38

*In re Suprema Specialties, Inc. Sec. Litig.*,
   438 F.3d 256 (3d Cir. 2006) .......................................................................16, 23

*Thor Power Tool Co. v. Comm'r of Internal Revenue*,
   439 U.S. 522, 544 (1979)................................................................................36

*In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*,
   202 F. Supp. 2d 8 (S.D.N.Y. 2001) .................................................................20

*In re Vonage Initial Public Offering Sec. Litig.*,
   2009 WL 936872 (D.N.J. Apr. 6, 2009) ........................................................8, 40

*Zucker v. Quasha*,
   891 F. Supp. 1010 (D.N.J. 1995), *aff'd*, 82 F.3d 408 (3d Cir. 1996) .....16, 23, 25

## FEDERAL STATUTES, REGULATIONS AND RULES

15 U.S.C. § 77k............................................................................. *passim*

15 U.S.C. § 77*l*(a)(2)...................................................................................3

15 U.S.C. § 77o ................................................................................... 3, 29

17 C.F.R. 229.103 ............................................................................. 28, 30

17 C.F.R. 229.303 ............................................................................ *passim*

FED. R. CIV. P. 8 ...................................................................................... 7

FED. R. CIV. P. 9(b) ...................................................................... 8, 15, 39

FED. R. CIV. P. 12(b)(6) ......................................................................... 7

**OTHER AUTHORITIES**

18A AM. JUR. 2D *Corporations* § 724 (2009) ...................................... 36

## PRELIMINARY STATEMENT

Plaintiffs are purchasers of debt securities of Prudential Financial, Inc. ("Prudential"). They filed this lawsuit in the wake of the most serious financial markets crisis this country has seen since the Great Depression, the worst effects of which were felt beginning late in the third quarter of 2008, months after they bought their securities. During that crisis, the value of Prudential's investments in certain fixed maturity securities (primarily subprime mortgage-backed securities and other asset-backed securities ("ABS")) fell. Likewise, the performance of the investments selected by Prudential's annuity account holders declined, increasing Prudential's obligations to guarantee death benefits and annual return rates for an-nuity account holders. Plaintiffs' case depends principally on the factually unsup-ported assumption that the market events that led to the declines *must have* oc-curred earlier, when the securities were offered. Plaintiffs also argue that Pruden-tial should have disclosed information about litigation and regulatory proceedings relating to a joint venture entity in which Prudential held only an approximately 25% minority interest. Besides failing as a matter of law, this claim – like Plain-tiffs' other claims – depends on a speculative and implausible assumption that Pru-dential knew at the time of the Offering about later events.

This case is dead on arrival. The securities laws are not investment insur-ance that guarantees against market declines, and Plaintiffs do not plead a single

fact suggesting that Defendants misrepresented or omitted anything as it existed as of the Offering.  Instead, Plaintiffs' allegations are nothing but implausible speculation, contradicted by the very documents on which they profess to rely.

Prudential conducted a public offering of 9% junior subordinated notes (the "Notes") pursuant to a prospectus supplement filed with the Securities and Exchange Commission ("SEC") effective June 24, 2008 (the "Offering").[1]  The Notes are a form of debt security, obligating Prudential to repay the principal upon the scheduled maturity date in 2038 and make quarterly interest payments until maturity.  Lead Plaintiff brings this action on behalf of a putative class of investors in the Notes ("Plaintiffs"), alleging that the offering materials for the Notes, particularly Prudential's 2008 first quarter Form 10-Q incorporated therein, contained materially false and misleading statements and omissions.  The Consolidated [Amended] Class Action Complaint ("Complaint" or "Cmplt.") asserts claims pursuant to Sec-

---

[1] The Notes were offered pursuant to a shelf registration statement, which permits issuers to offer securities on a delayed basis pursuant to separately filed prospectus supplements.  Cmplt. ¶ 40.  The prospectus supplement and the issuer's most recent periodic SEC filings are incorporated by reference into the shelf registration statement.  The Offering of the Notes on June 24, 2008 included an initial Registration Statement filed on March 16, 2006 (Ex. 1) and a June 24, 2008 Prospectus Supplement (Ex. 4), and under applicable SEC rules incorporated Prudential's annual report on SEC Form 10-K for the fiscal year ended December 31, 2007 (filed February 27, 2008) (Ex. 2) and its quarterly report on SEC Form 10-Q for the quarter ended March 31, 2008 (filed May 1, 2008) (Ex. 3).  Cmplt. ¶ 41.  All citations to "Ex. [ ]" throughout refer to the exhibits attached to the Declaration of Katherine G. McKenney in Support of the Prudential Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint.

tions 11 and 15 of the Securities Act of 1933 (the "1933 Act")[2] against Prudential, the current and former Prudential officers and directors who signed the shelf Registration Statement (the "Individual Defendants") (collectively, the "Prudential Defendants"), and underwriters of the Offering (the "Underwriter Defendants").

Plaintiffs allege that the supposed omissions and misstatements caused Prudential to overstate net income as of the Offering date. Even assuming for argument's sake any facts had been pleaded that would permit a plausible inference that any misstatements or omissions had been made, Plaintiffs nowhere allege why they would be material to debt investors. As the Third Circuit has explained, what is material to investors in debt securities is the issuer's ability to pay interest and repay principal, neither of which is alleged to be in jeopardy here. In fact, the Notes are currently trading **above** their June 24, 2008 $25.00 offering price. Lead Plaintiff also admits that he purchased an additional $21,500 in the Notes on December 31, 2008, **months after** Prudential announced all of the information Plaintiffs claim

---

[2] The Complaint states that "[t]he claims herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2) and 77o)." Cmplt. ¶ 4. Section 77l(2) corresponds to Section 12(a)(2) of the 1933 Act. Because Section 12(a)(2) is not described as a basis for Plaintiffs' claims anywhere else in the Complaint, Defendants presume that the reference to "77l(a)(2)" is a typographical error. In any event, any claims under Section 12(a)(2) should be dismissed for the same reasons Plaintiffs' Section 11 claims must be dismissed, and for the additional reason that Plaintiffs have not alleged that they purchased Notes directly from Defendants in the Offering, as opposed to the aftermarket. *See Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682, 689 (3d Cir. 1991) (holding that Section 12(a)(2) "should not be expanded to aftermarket trading").

Defendants omitted or misstated.  These facts alone undermine Plaintiffs' claims.

In any event, Plaintiffs seek to capitalize opportunistically on the unprece-dented capital market disruptions over which Defendants had no control.  Those market dislocations began before the Offering, but worsened dramatically begin-ning late in the third quarter of 2008, with Lehman Brothers' collapse on Septem-ber 15, 2008.  Indeed, Prudential disclosed to investors when it offered the Notes that if market conditions did not improve, it would recognize almost ***half a billion dollars*** of other-than-temporary impairment charges for ABS by the end of the second quarter of 2008.  Likewise, when it disclosed its first quarter estimate of the reserves in respect of its annuity account obligations, it also stated that the amount of annuity account-related costs it would need to amortize could increase.  Plain-tiffs bought the Notes anyway.  At bottom, this case arises out of an overwhelming post-Offering worsening of market conditions generally, as reflected here:



In short, Plaintiffs' allegations amount to nothing more than a recitation of post-Offering events, and the conclusory assertion that the effects of those events *must* have happened earlier. Those allegations are contradicted both by other allegations in the Complaint itself and by the documents on which Plaintiffs rely. Specifically:

- Plaintiffs allege that because Prudential recorded a $380 million charge related to its annuity account reserves and deferred policy acquisition costs ("DAC") amortization in the third quarter of 2008, the reserve and amortization amounts reported in the first quarter must have been wrong. But, Plaintiffs have not alleged a single fact that would support the inference that the circumstances giving rise to the additional reserves and amortization Prudential recorded in the third quarter – *after* the markets had declined sharply and *after* Prudential had completed its annual review of the assumptions underlying its annuity obligations – existed as of the Offering. Further, Plaintiffs do not allege that Prudential deviated from its disclosed methodology for estimating those amounts or that this methodology failed to comply with U.S. generally accepted accounting principles ("GAAP"). Indeed, Plaintiffs have abandoned their claims against Prudential's auditors, who were named in the original complaints.

- Plaintiffs allege that Prudential's first quarter 2008 Form 10-Q misstated the amount of other-than-temporary impairment charges for ABS investments because Prudential recorded an additional $205 million in impairment charges for the second quarter, after the Offering. Plaintiffs' assertion that Prudential "concealed" from investors in the Offering this later-recorded amount makes no sense given that Prudential disclosed in its first quarter 2008 Form 10-Q that nearly *one half billion dollars* of unrealized losses, primarily associated with subprime mortgage-backed security investments, would turn into impairment charges in the second quarter if market conditions did not improve. Plaintiffs do not contend that Prudential's publicly disclosed methodology for assessing asset impairment violated GAAP, or that Prudential deviated from that methodology. The Complaint also fails to allege any factual support for Plaintiffs' speculation that the $205 million of ABS that later were written down had declined in value as of the end of the first quarter sufficiently to trigger impairment charges.

5

- Plaintiffs allege that Prudential did not disclose the existence of litigation and regulatory investigations relating to the marketing of auction rate securities ("ARS") – litigation and investigations to which Prudential was ***not a party***. Rather, those proceedings involved Wachovia Securities Financial Holdings, LLC ("Wachovia Securities"), a joint venture with Wachovia Corporation in which Prudential was only an approximately 25% minority investor. Because Prudential was not a party or even mentioned in these matters, it had no duty to disclose them in its litigation disclosure, and had no obligation to disclose in its financial statements any contingent liability associated with such matters because it had none. Moreover, it was public knowledge prior to the Offering that litigation had been filed and regulatory proceedings started against Wachovia Securities relating to this entity's ARS-related activities, which Plaintiffs do not dispute. Furthermore, it was not until August 2008, almost ***two months after the Offering***, that the SEC and Wachovia announced they had entered into a settlement, and no facts are alleged in the Complaint that would support any inference that a settlement had been agreed to (and was known or knowable to Prudential) two months earlier. Plaintiffs also ignore the post-Offering disclosures by regulators that their investigations were still ongoing in mid-July 2008, negating any plausible inference that Wachovia Securities had reached a settlement with them as of the Offering date. In any event, the non-cash charge that Prudential recorded after the Offering in respect of its minority interest in this joint venture entity was immaterial as a matter of law to Note investors, both because of its size and because it is not alleged to have affected Prudential's ability to repay the Notes.

Plaintiffs' claims against Prudential's outside directors and the other Individual Defendants are insufficient for the additional reason that the Complaint alleges ***no facts*** about any of them, aside from their respective roles as current or former officers and directors of Prudential and the fact that they signed the Registration Statement. The absence of any allegations suggesting they failed to undertake appropriate diligence in connection with the Offering, or had control over, or involvement in, the challenged statements, warrants dismissal of the claims against

them.  For all of these reasons, the Complaint should be dismissed in its entirety, with prejudice.

## **ARGUMENT**

## I.   **THE COMPLAINT FAILS THE *TWOMBLY/IQBAL* STANDARD.**

Rule 8 of the Federal Rules of Civil Procedure requires that a complaint "plead a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  As this Court recently explained, the question on a Rule 12(b)(6) motion to dismiss is whether a complaint "contain[s] sufficient *factual* matter, accepted as true, to state a claim for relief that is plausible on its face."  *Cafaro v. HMC Int'l, LLC*, 2009 WL 1622825, at *2 (D.N.J. June 10, 2009) (Linares, J.) (emphasis added) (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)).  Courts "need not credit a complaint's 'bald assertions' or 'legal conclusions.'" *California Pub. Employees' Ret. Sys. ("CALPERS") v. Chubb*, 394 F.3d 126, 143 (3d Cir. 2004) (citation omitted).  If, after accepting the well-pleaded, factual allegations of the complaint as true, the complaint fails to state a claim, it must be dismissed.  *Twombly*, 550 U.S. at 570.

Here, Plaintiffs have alleged no facts that would "nudge" Plaintiffs' claims "across the line from conceivable to plausible."  *Iqbal*, 129 S. Ct. at 1951 (quoting *Twombly*, 550 U.S. at 570).  Plaintiffs' claims consist entirely of factually unsupported speculation, contradicted both by other allegations in the Complaint itself

and by documents it references, that facts Prudential disclosed after the Offering
**must have existed** and were known or knowable to Prudential at the time of the Of-
fering.  Because the Complaint alleges no facts that would support any such infer-
ence, it should be dismissed with prejudice.  *See, e.g.*, *In re Acceptance Ins. Co.
Sec. Litig.*, 423 F.3d 899, 903-04 (8th Cir. 2005) (affirming dismissal of Section 11
claims where post-offering statements did not support inference of prior knowl-
edge).[3]

## II.   THE COMPLAINT ALLEGES NO SECTION 11 VIOLATIONS.

An issuer of securities has no duty to disclose *all* material information sim-
ply because it might be interesting to a potential investor.  *In re Arbinet-
thexchange, Inc. Sec. Litig.*, 2006 WL 3831396, at *4 (D.N.J. Dec. 28, 2006)

---

[3]  Plaintiffs allege that Defendants "concealed" material information, including
"known trends" (Cmplt. ¶¶  3, 42, 52-53, 60-61, 66-67).  Plaintiffs are thus alleg-
ing intentionally deceptive conduct.  The Complaint thus "sounds in fraud" and
must satisfy the requirement of Federal Rule 9(b) that fraud be pleaded with factual
particularity.  *See In re Vonage Initial Public Offering (IPO) Sec. Litig.*, 2009 WL
936872, at *5-7 (D.N.J. Apr. 6, 2009) (dismissing 1933 Act claims because they
sounded in fraud).  The Complaint must be dismissed under Rule 9(b) because it
does not allege with the requisite particularity "(1) a specific false representation of
material fact; (2) knowledge by the person who made [it] of its falsity; (3) igno-
rance of its falsity by the person to whom it was made; (4) the intention that it
should be acted upon; and (5) that the plaintiff acted upon it to his [or her] dam-
age."  *Id.* at *7.  *See also Gray v. Bayer Corp.*, 2009 WL 1617930, at *2 (D.N.J.
June 9, 2009) (Linares, J.) (claims that defendant "misrepresented and failed to
disclose" information sounded in fraud).  In any event, whether or not the Com-
plaint is scrutinized under Rule 9(b)'s particularity standard, the Complaint must
still be dismissed because it fails plausibly to allege the existence of any material
misstatements or omissions in accordance with the pleading standard articulated by
the Supreme Court in *Twombly* and *Iqbal*.

(Linares, J.) (dismissing Section 11 claims with prejudice); *accord Cooperman v. Individual, Inc.*, 171 F.3d 43, 46-47 (1st Cir. 1999) (affirming dismissal of Section 11 claims). Rather, to state a claim under Section 11, a plaintiff must plead facts showing that a registration statement (i) "contained an untrue statement of material fact"; (ii) "omitted to state a material fact required to be stated therein"; or (iii) omitted to state a material fact "necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a); *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004) (affirming dismissal of Section 11 claims); *see also In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 274-75 (3d Cir. 2005) (same). A plaintiff also must adequately allege that the facts underlying any alleged misstatement or omission were **known or knowable** at the time of the offering, such that the defendants' statements were materially misleading **when made**. *In re Arbinet-thexchange, Inc.*, 2006 WL 3831396, at *4. Plaintiffs have not met these requirements.

### A.    Plaintiffs' Annuity-Related Allegations Do Not State A Claim.

Plaintiffs allege that Prudential understated its reserves in respect of its obligations to annuity account holders and its amortization of DAC associated with annuity accounts.[4] Cmplt. ¶¶ 54-59. Prudential disclosed in its first quarter 2008

---

[4] Prudential records reserves for its future policy benefit liabilities to annuity account holders, including guaranteed living and death benefits where the contractual value of those benefits exceeds annuity account holders' investment returns. Ex. 2 (Prudential "PRU" 2007 10-K), at 11, 39. DAC are costs relating primarily to the acquisition of annuity contracts, including commissions, costs of policy issuance

Form 10-Q that it bases its annuity reserves in part on "future rate of return assumptions" relating to annuity account holders' investments, and that the reserves it records are only "estimates" that may be adjusted.  Ex. 3 (PRU 1Q08 10-Q), at 50, 81.[5]  Similarly, Prudential disclosed that amortization of DAC is based in part on "estimated [future] gross profits."  *Id.* at 50.  Prudential also told investors that these reserves and DAC amortization were not based on "actual performance" of annuity account holders' investments, as Plaintiffs concede.  *See* Cmplt. ¶ 57.  Indeed, Prudential disclosed that if it had calculated future rates of return solely on the basis of actual investment performance, the reserves and amortization of DAC it recorded for the first quarter of 2008 would have been higher:

> Management estimates the amortization of [DAC] and other costs, and the costs relating to the reserves for the . . . benefit features of our variable annuity products in the first quarter of 2008 ***would have*** increased approximately $30 million ***had we adjusted our estimate*** of future gross profits to reflect the actual fund performance and corresponding changes to the future rate of return assumptions.

Ex. 3 (PRU 1Q08 10-Q), at 50 (emphasis added).  This disclosure alerted investors that future amounts for reserves and amortization likely would increase if invest-

---

and underwriting, and field office expenses.  *Id.* at 69.

[5] *See also* Ex. 2 (PRU 2007 10-K), at 11 (Prudential records reserves it "***believe[s]*** will meet its future obligations" for its annuity contracts based on actuarial assumptions that it "***believe[s]*** to be appropriate").  Prudential's description of its methodology for calculating annuity reserves and DAC was incorporated into the Registration Statement.  *See id.* at 69-71; Ex. 3 (PRU 1Q08 10-Q), at 50.

ment performance did not improve.  *Id.*

Despite these explicit disclosures, Plaintiffs now allege that had Prudential calculated its annuity obligations based solely on annuity account holders' actual investment performance, rather than using the "future rate of return assumptions" method, Prudential would have "needed to add as much as ***$380 million*** in additional Reserves" to the number disclosed at the end of the first quarter.  Cmplt. ¶¶ 55-58.  This allegation is premised solely on Prudential's post-Offering, third quarter increase to reserves and amortization in that amount six months later. Cmplt. ¶ 58.  Plaintiffs' allegation is specious, both because this is not how Prudential calculated its annuity obligations (as investors in the Notes were told) and because the Complaint alleges no facts that would support any inference that consideration of actual investment performance in the first quarter would have required increasing reserves and DAC amortization by $380 million at that time. *Cafaro*, 2009 WL 1622825, at *2 (complaint must allege sufficient facts to state plausible claim for relief).

### 1.   No Inference Can Be Made That Reserves And DAC Amortization Had To Be Increased By $380 Million As Of The Offering Date.

In its Form 10-Q for the third quarter of 2008, filed with the SEC over ***four months after*** the Offering, Prudential announced that it had recorded an annuity-related charge of $380 million in that quarter.  Prudential disclosed that the third quarter charge resulted from reviewing the assumptions it used in setting reserves

and evaluating DAC during the review process it undertakes annually in the third quarter and after taking into account dramatic deterioration in economic and market conditions as of the end of the third quarter.  Ex. 7 (PRU 3Q08 Earnings Call Transcript), at 2; Ex. 8 (PRU 3Q08 10-Q), at 65.  Based on this **_third quarter_** disclosure, Plaintiffs attack Prudential's **_first quarter_** estimate of reserves and amortization of DAC disclosed two quarters earlier.  Plaintiffs' argument that the $380 million reflected actual performance in the first quarter, based on then-current market conditions and investment performance, is unsupported speculation that does not rise to the level of plausibility required by _Twombly_.  550 U.S. at 570.

The inference Plaintiffs seek to draw from amounts Prudential recorded in the third quarter of 2008 after two quarters of worsening market performance is contradicted by the documents referenced in the Complaint and by market events of which this Court can take judicial notice.[6]  As this Court has stated: "When allegations contained in a complaint are contradicted by the document it cites, the document controls."  _In re PDI Sec. Litig._, 2005 WL 2009892, at *21 (D.N.J. Aug. 17, 2005) (Linares, J).  Prudential's SEC filings state expressly that the third quar-

---

[6] In deciding a motion to dismiss, a court may consider the full text of documents referred to or relied on in the complaint, _e.g._, _In re Burlington Coat Factory Sec. Litig._, 114 F.3d 1410, 1426 (3d Cir. 1997), as well as SEC filings. _E.g._, _In re NAHC, Inc. Sec. Litig._, 306 F.3d 1314, 1331 (3d Cir. 2002).  Courts also may take judicial notice of market events.  _E.g._, _Miles-Hickman v. David Powers Homes, Inc._, 613 F. Supp. 2d 872, 889 (S.D. Tex. 2009) ("[T]he Court cannot ignore the financial realities of mid-2008 and thereafter. The Court takes judicial notice of the global, national, and local financial and credit crises . . . .")

ter charges came not from events occurring before the Offering, as Plaintiffs specu-late, but instead "from . . . annual reviews, largely reflecting the impact of ***current market conditions***." Ex. 8 (PRU 3Q08 10-Q), at 53.

More specifically, on October 30, 2008, Prudential stated that "one third of the charge [for the third quarter] came from ***modifying our assumptions*** to recog-nize policy holder tendency, to keep their contracts in force when death benefit guarantees are in the money." Ex. 7 (PRU 3Q08 Earnings Call Transcript), at 2.[7] This reference is to Prudential's annual review of the actuarial assumptions under-lying its annuity reserves and DAC calculations, which takes place in the third quarter of each year. Prudential's 2007 annual report on Form 10-K put investors in the Notes on notice of this annual review process. Ex. 2 (PRU 2007 10-K), at 82-83 (describing 2007 results based on annual review).

Prudential also explained that "[t]he remainder of the [$380 million] charge came almost entirely from the substantial market-related decline in account values[8]

---

[7] *See also* Ex. 8 (PRU 3Q08 10-Q), at 52: "Individual Annuities segment results for the third quarter and the first nine months of 2008 declined in comparison to the corresponding prior year periods, reflecting the impact of our annual reviews of the reserve for the guaranteed minimum death and income benefit features of our vari-able annuity products and the estimate of total gross profits used as a basis for am-ortizing deferred policy acquisition and other costs."

[8] Plaintiffs incorrectly surmise that the "account values" to which Prudential re-ferred were declines in "the Company's investments." *See* Cmplt. ¶¶ 56-58, 60. Instead, as its undisputed SEC filings disclosed, those "account values" referred to the investment accounts of Prudential's annuity contract holders. *See* Ex. 2 (PRU 2007 10-K), at 10 (describing investment options for annuity account holders).

13

over the past year, leading to lower expected fees and higher expected benefit costs." Ex. 7 (PRU 3Q08 Earnings Call Transcript), at 2. This "market-related decline," which Plaintiffs nowhere mention, is a reference to the decline in the financial markets that was evident earlier in the year, but which worsened precipitously in late September 2008, ***three months after the Offering***. *See* Ex. 27 (S&P 500 index chart). Plaintiffs have not alleged one fact that would make it plausible to conclude that these market-related declines occurred six months earlier in the first quarter of 2008 as opposed to when the Court can take judicial notice they actually occurred. *See In re Adams Golf, Inc. Sec. Litig.*, 176 F. Supp. 2d 216, 221 (D. Del. 2001), *aff'd in part by* 381 F.3d 267 (3d Cir. 2004) (rejecting inference that disclosure of weakened sales "over the last 12 months" sufficiently alleged the condition existed prior to the offering nine months earlier). Indeed, in its 2007 annual report, Prudential warned investors that reserves and DAC would increase if market conditions did not improve.[9]

### 2.   Defendants Did Not "Violate" Item 303.

Based on their factually unsupported speculation that consideration of first quarter actual investment performance would have required reserves and DAC

---

[9] *See, e.g.*, Ex. 2 (PRU 2007 10-K), at 39 ("A market decline could result in guaranteed minimum benefits contained in many of our variable annuity products being higher than current account values or our pricing assumptions would support, requiring us to materially increase reserves for such products.") *See also id.* at 39-41 for additional annuity-related risk disclosures.

amortization $380 million higher than what Prudential estimated based on its future rate of return assumptions, Plaintiffs argue that Defendants "violated" Item 303 of SEC Reg. S-K by not disclosing this supposed "known trend or uncertainty." Item 303 requires disclosure of "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. 229.303(a)(3)(ii).[10]

In a shelf registration offering like that for the Notes, Item 303 does not require an issuer to disclose information in the prospectus supplement separate from whatever disclosure might otherwise have been required in its periodic SEC filings on Forms 10-Q and 10-K that are incorporated into the offering. *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1205 (1st Cir. 1996). And, no disclosure is required unless the alleged "trend" was both knowable and *actually known* by the issuer as of the offering date. *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 614 (S.D.N.Y. 2008) ("[Plaintiff] argues that pleading a trend's existence is enough to support a claim. . . . [Plaintiff] misreads Item 303, which requires that the trend actually be *known*.") *Accord J&R Mktg. SEP v. Gen. Motors Corp.*, 549 F.3d 384, 391-92 (6th Cir. 2008) (affirming dismissal of Section 11 claims). Plaintiffs have alleged no facts that would support an inference that a $380 million difference be-

---

[10] Plaintiffs' allegation that Defendants "concealed" a "known trend[]" triggers the heightened pleading requirements of Rule 9(b). *See* footnote 3, *supra*.

tween reserves and DAC amortization estimated by Prudential's future rate of return methodology and the amounts that would have been calculated solely using actual investment performance existed or was known as of the date of Prudential's March 31, 2008 Form 10-Q.  Nor have Plaintiffs alleged a basis to infer that any such difference (had it existed) was known as of the Offering.[11]

### 3.    The Alleged Annuity-Related Misstatements Were Immaterial.

Section 11 liability arises only from ***material*** misstatements.  *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 269 (3d Cir. 2006).  Here, Plaintiffs claim that Prudential misstated quarterly net income (Cmplt. ¶ 3), but the Third Circuit has observed that alleged misstatements of an issuer's net income are not material to ***debt*** investors.  *See Kusner v. First Pennsylvania Corp.*, 531 F.2d 1234, 1237 (3d Cir. 1976) (noting that misstatement of earnings would be of "no interest" to bondholders); *accord J&R Mktg. SEP v. General Motors Corp.*, 2007 WL 655291, at *10-12 (E.D. Mich. Feb. 27, 2007), *aff'd on other grounds*, 549 F.3d 384 (2007) (citing *Kusner*) (dismissing Section 11 claims because net income immaterial to debt investors).  Debt investors, like the Noteholders here, are in-

---

[11] An issuer has no duty to provide intra-quarter estimates of financial results (*i.e.*, outside of its Forms 10-Q) unless the issuer experiences "extreme changes" in the fundamental nature of the issuer's business since its prior quarterly filing.  *See, e.g.*, *In re Burlington Coat Factory*, 114 F.3d at 1433-34 & n.20.  No such facts are alleged.  As the court in *Zucker v. Quasha* explained, information about a quarter in progress is "necessarily incomplete" regardless of the proximity to quarter end. 891 F. Supp. 1010, 1015-16 (D.N.J. 1995), *aff'd*, 82 F.3d 408 (3d Cir. 1996).

stead focused on an issuer's ability to make interest and principal payments, which is not alleged to be in jeopardy here.  Quarterly profit fluctuations due to ***non-cash*** reserve and amortization amounts simply do not call into question an issuer's ability to pay and thus are immaterial.[12]

## B. Plaintiffs' Impairment Allegations Do Not State A Claim.

Plaintiffs' argument that Prudential understated other-than-temporary impairments to its ABS by $205 million in its March 31, 2008 Form 10-Q is based on the same factually unsupported speculation on which its other claims are based – that facts Prudential disclosed later ***must*** have existed earlier.  There is no factual basis in the Complaint, however, for making any such inference.  The words the district court used in dismissing the plaintiffs' Section 11 claims in *Scibelli v. Roth* are entirely apt here:  "To ***infer*** that [the issuer] ***possessed*** such information on July 24 because [it] ***announced*** such information on September 29 is not a reasonable inference, and the plaintiffs' complaint fails on this score."  2000 WL 122193, at *3 (S.D.N.Y. Jan. 1, 2000) (emphasis added).

---

[12] Lead Plaintiff's additional purchases of Notes on December 31, 2008, ***after*** Prudential's third quarter announcement of increased annuity-related charges, further belies any argument that those later-recorded charges were material to Plaintiffs. *See, e.g.*, *In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 369, 377 (3d Cir. 1993) (dismissing 1933 Act claims in part because plaintiffs failed to allege "a substantial likelihood that a reasonable investor would consider [the allegedly omitted information] important in deciding how to act").  The Notes also are now trading above their June 24, 2008 offering price.  *See* Ex. 28 (showing current trading prices of the Notes).

17

## 1.   __Prudential Disclosed Its Impairment Methodology.__

In its first quarter 2008 Form 10-Q Prudential disclosed that it had recognized $539 million in other-than-temporary impairments to its ABS.[13]  Plaintiffs argue that "properly recognized" other-than-temporary impairments would have been $205 million higher at the end of the first quarter.  Cmplt. ¶¶ 63-64.  Plaintiffs, however, do not allege that Prudential's methodology for assessing impairment violated GAAP,[14] and indeed they have dropped their claims against Prudential's auditors.[15]  Nor do Plaintiffs contend that Prudential deviated from its own impairment methodology, which it expressly disclosed in the documents incorporated by reference into the Registration Statement.

More specifically, Prudential disclosed in its first quarter 2008 Form 10-Q that in assessing potential impairment of ABS and other fixed maturity security in-

---

[13] Ex. 3 (PRU 1Q08 10-Q), at 87 ($388 million in other-than-temporary impairments to fixed maturity securities, primarily ABS, in the Financial Services Businesses), 89 ($151 million in other-than-temporary impairments to fixed maturity securities, primarily ABS, in the Closed Block Business).

[14] Prudential's CFO explained in its second quarter earnings call: "Now __*while there's no bright line under GAAP*__, we feel that our approach for recording other than temporary impairments is appropriate."  Ex. 5 (PRU 2Q08 Earnings Call Transcript), at 3 (emphasis added).  *See also* Ex. 26 (FASB Staff Position Nos. 115-1 and 124-1) (GAAP guidance for other-than-temporary impairments).

[15] Plaintiffs' dropping Prudential's auditors as defendants weakens, if not undermines entirely, their accounting-based claims.  *See In re PEC Solutions Sec. Litig.*, 2004 WL 1854202, at *12 (E.D. Va. May 25, 2004) ("Plaintiffs do not challenge [auditors'] opinion and a failure to challenge the independent auditors' opinions weakens an allegation that a defendant violated GAAP."), *aff'd*, 418 F.3d 379 (4th Cir. 2005).

vestments Prudential considered the extent and duration of any decline in value, and that its general practice was to take a charge for other-than-temporary impairment where securities have declined in value by more than 20% and where that decline has persisted for more than six months. Ex. 3 (PRU 1Q08 10-Q), at 115. Prudential also disclosed that for "precipitous (generally 50% or greater)" declines in value over "less than six months," it would also take an other-than-temporary impairment charge without waiting the full six month period. *Id.*[16]

Prudential also described the 50% figure as a "general" guideline, not a strict percentage triggering impairment, and explained that various factors are taken into consideration when deciding whether ABS must be written down as other-than-temporarily impaired. *See id.* Indeed, the guideline does not say that Prudential will impair ABS that have declined by 50% or more immediately, within three months, or within any specific time period. *See id.* The guideline says only that

---

[16] Prudential's impairment guidelines for fixed maturity securities stated: "In evaluating whether a decline in value is other-than-temporary, we consistently consider several factors including, but not limited to, the following: the extent and the duration of the decline, ***including, but not limited to*** the following ***general guidelines*** (i) declines in value greater than 20%, maintained for six months or greater; (ii) declines in value greater than 15%, maintained for more than one year on below investment grade bonds; and (iii) ***declines in value less than six months where there has been a precipitous (generally 50% or greater) decline in value***; the reasons for the decline in value (credit event, currency or interest rate related, including spread widening); our ability and intent to hold our investment for a period of time to allow for a recovery of value, including debt securities managed by independent third parties where we do not have management discretion; and the financial condition of and near-term prospects of the issuer." Ex. 3 (PRU 1Q08 10-Q), at 115 (emphasis added).

Prudential typically will not wait a full six months to record an impairment charge with respect to a precipitous decline of 50% or more. *See id.* The judgment this methodology requires Prudential to exercise makes perfect sense – a precipitous decline could be followed by an equally quick rise in value, and too quick re-cording of impairment charges could lead to investor confusion. *See In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001) (describ-ing instantaneous disclosure as potentially "misleading"). In short, nothing in Pru-dential's impairment guidelines obligated it to impair ABS that may have declined in value by 50% or more for up to three months as of March 31, 2008, and Plain-tiffs do not allege any such obligation.

Prudential's quarterly impairment analysis of fixed maturity securities in-cludes review of three groups of assets. *See* Ex. 3 (PRU 1Q08 10-Q), at 87, 89 (ta-bles of other-than-temporary impairment), 113-14 (tables of unrealized losses). As described above, the first category includes those assets that have declined in value by between 20% and 49% for six months, at which point Prudential generally clas-sifies them as other-than-temporarily impaired and records an impairment charge. *Id.* at 115. In the first quarter of 2008, Prudential impaired $539 million in fixed maturity securities, primarily ABS, falling into that category. The second and third categories of assets are described as having unrealized losses as a result of declin-ing in value by 20% or more for (a) zero to three months or (b) three to six months.

*Id.* at 113-14.  According to the methodology that Prudential had disclosed prior to the Offering, ABS falling into those two categories do not result in an other-than-temporary impairment charge unless they remain depressed in value by at least 20% for six months, or if they decline "precipitously" (generally, but not always, by at least 50%) over a shorter time period.  *See id.* at 113-15.  In its first quarter 2008 Form 10-Q, Prudential disclosed unrealized losses of $1.392 billion for fixed maturity securities, primarily ABS, that had declined in value by 20% or more for zero to three months,[17] and unrealized losses of $405 million of securities that had declined in value by 20% or more for three to six months (including $247 million from the Financial Services Businesses segment, as Plaintiffs acknowledge, *see* Cmplt. ¶ 65).[18]

Against this backdrop, Plaintiffs take out of context Mr. Carbone's July 31, 2008 statement that the $205 million of impairments announced in its Form 10-Q for the **second quarter** "came primarily from declines in value of 50% or more that were in the zero to three month category at March 31[, 2008]."  Cmplt. ¶ 35. Plaintiffs speculate that Prudential was referring to assets that had declined in value by more than 50% for a period of up to three months as of March 31.  But,

---

[17] Ex. 3 (PRU 1Q08 10-Q), at 113-14 ($860 million from the Financial Services Businesses + $532 million from the Closed Block Business).

[18] Ex. 3 (PRU 1Q08 10-Q), at 113-14 ($247 million from the Financial Services Businesses + $158 million from the Closed Block Business).

the inference Plaintiffs ask this Court to draw is not plausible.  To the contrary, the

only plausible inference is that Prudential was referring to assets in the "zero to

three month" ***unrealized loss*** category that is described in the first quarter 10-Q

(*i.e.*, assets that had declined in value by 20% or more for "zero to three months"

as of March 31) that later declined below 50% in the second quarter.  Ex. 3 (PRU

1Q08 10-Q), at 113-14.  Mr. Carbone's reference to "unrealized losses" in the

"three to six-month band" immediately before use of the phrase "zero to three

month category" permits no other reasonable interpretation:

> The 452 million of fixed maturity impairments for the quarter compares to 247 million of unrealized losses of 20% or greater at March 31 ***that we disclosed in our first quarter 10-Q in the three to six-month band***.  ***Now if nothing else changed***, you would have expected this to be the impairment for fixed income securities in the second quarter. Our general guideline is that for 20% or greater declines due to spread widening, we impair at six months. The increase in impairments to 452 million came primarily from declines in value of 50% or more that were in the ***zero to three month category*** at March 31. For declines of 50% or more, we don't wait six months to impair. Now while there's no bright line under GAAP, we feel that our approach for recording other than temporary impairments is appropriate. But it's also fair to point out that as an investor; our focus is on expected cash flows, which for the vast majority of these holdings, have not significantly changed.[19]

Ex. 5 (PRU 2Q08 Earnings Call Transcript), at 3 (emphasis added).

Equally important is Prudential's reference to "if nothing else had changed"

– those words make crystal clear that what drove the additional $205 million in

---

[19] Mr. Carbone's quoted statements during the second quarter earnings conference call refer only to the Financial Services Businesses segment of Prudential.  Ex. 5 (PRU 2Q08 Earnings Call Transcript), at 2.

impairment charges was precipitous decline *after* the end of the first quarter result-ing from changing market conditions of which this Court can take judicial notice. (*See* Ex. 27).  In short, Plaintiffs have failed to allege facts creating a reasonable inference that the additional $205 million "precipitous[ly]" declined in the first quarter, as opposed to the second quarter.  Plaintiffs have "simply failed to allege any facts capable of supporting a reasonable inference that [defendant's] statement . . . was misleading at the time it was made."  *Zucker*, 891 F. Supp. at 1016.

### 2.    Defendants Had No Duty To Disclose Additional Impairments.

#### a.    The Registration Statement Was Not Misleading.

In the absence of an SEC rule or regulation requiring disclosure, an issuer offering securities to the public is required to disclose information only where nec-essary to correct a materially inaccurate statement or to render a statement not ma-terially misleading.  *See In re Suprema Specialties, Inc.*, 438 F.3d at 269.  Here, not only did Prudential not make any affirmative misstatements about ABS im-pairments (as discussed above), but Prudential warned investors about the possibil-ity of additional ABS impairments in the future.  The central inquiry is whether the disclosure "in the complete context in which the author conveys it" would mislead a reasonable investor.  *In re Donald J. Trump*, 7 F.3d at 377.  Here, prior to the Of-fering, Prudential specifically warned investors that market conditions had resulted in significant asset impairments already, and that continuing market deterioration

could result in future impairments as well.  For example, the first quarter 2008

Form 10-Q contained the following warnings:

- "The level of impairment losses can be expected to increase when economic conditions worsen and decrease when economic conditions improve."  Ex. 3 (PRU 1Q08 10-Q), at 78.

- Prudential already had recorded $539 million in other-than-temporary impairment charges for fixed maturity securities, primarily ABS, for the first quarter of 2008.  *See id*. at 87, 89.

- Prudential already had recorded ***nearly half a billion dollars in unrealized losses in ABS*** and other fixed maturity securities that had declined in value by 20% or more for three to six months, which could require other-than-temporary impairment charges in the second quarter of 2008 if the market did not improve.  *See id*. at 113-14.

In short, Prudential did not mislead investors about the possibility of future impairments, but rather, explicitly warned investors about them.

### b.      Item 303 Required No Additional Disclosure.

Plaintiffs argue that Defendants "violated" Item 303 of SEC Reg. S-K by not

disclosing the supposed "'known trend' that, as of the Offering, the amount of Pru-

dential's [ABS] that were impaired by 50% or more had increased by approxi-

mately $205 million" (Cmplt. ¶ 66), despite the fact that Prudential affirmatively

warned investors about the possibility of substantial future impairments.  In addi-

tion, for the reasons stated in Section II.A.2, *supra*, this allegation does not state a

violation of Item 303.  For instance, the Complaint alleges no facts that would sup-

port any inference that the $205 million in impairments either existed or were

***known*** to Prudential as of the Offering, or that the increased impairments, in the

context of existing disclosures, amounted to the sort of "extreme change" that would require an interim disclosure prior to filing the second quarter Form 10-Q. Plaintiffs' allegations reflect nothing more than continued decline in the value of Prudential's subprime mortgage-backed security investments due to market-wide events, which is not a "trend" triggering an Item 303 disclosure obligation.[20]  *In re Adams Golf, Inc.*, 381 F.3d at 278-79 (finding no duty to disclose industry-wide trends easily discernable to the public); *Klein v. Gen. Nutrition Cos.*, 186 F.3d 338, 343-44 (3d Cir. 1999) (dismissing Section 11 claims and stating, "Federal securities laws do not require a company to state the obvious.")

### c.   Additional Impairments Were Not Material.

Nowhere does the Complaint allege that disclosure of an additional $205 million in ABS impairment would have been material to investors in the Notes. Moreover, the documents incorporated into the Complaint demonstrate that Prudential's expected cash flows from the impaired assets had not changed significantly, despite this second quarter impairment charge.  As Mr. Carbone explained in reference to these investments in the second quarter earnings conference call:

---

[20] The alleged proximity of the Offering date to the end of Prudential's second quarter (Cmplt. ¶ 67) does not alter the insufficiency of the allegations.  *See Zucker*,  891 F. Supp. at 1016 (dismissing 1933 Act claims) ("Regardless of whether a public offering occurs seventeen or only two days before the close of a fiscal quarter, data concerning a quarter that is in progress is necessarily incomplete.  As a result, [defendant] was incapable of making anything more than projections regarding return rates for the first quarter of 1994 on March 30 when its Prospectus and Registration Statement became effective.")

"[I]t's also fair to point out that as an investor; our focus is on expected cash flows, which for the vast majority of these holdings, have not significantly changed."  Ex. 5 (PRU 2Q08 Earnings Call Transcript), at 3.[21]  What is important to a debt investor is the issuer's ability to repay the debt and interest (*see Kusner*, 531 F.2d at 1237; *J&R Mktg. SEP*, 2007 WL 655291, at \*10-12) – nothing Prudential disclosed is alleged to have called Prudential's ability to do so into question.

### C.    <u>Plaintiffs' ARS Allegations Do Not State A Claim.</u>

Plaintiffs allege that Defendants "misrepresented that Prudential was not subject to litigation or regulatory investigations concerning, and concealed ***Prudential's*** contingent $235 million liability arising out of, the collapse of the market for auction rate securities."  Cmplt. ¶ 3 (emphasis added).  Plaintiffs also allege that Defendants misrepresented that "there were no material lawsuits or regulatory matters involving ***Prudential*** arising out of the collapse of the ARS market . . . [and did not] account for ***Prudential's contingent liabilities*** in connection with the collapse of the ARS market . . . by failing to disclose the existence of pending litigation and regulatory matters ***against the Company*** related to the collapse of the ARS market."  *Id.* ¶ 42 (emphasis added).

Plaintiffs' ARS-related allegations, however, implausibly assume two facts

---

[21] *See also* Ex. 6 (PRU 2Q08 10-Q), at 108, 110 ("[W]e believe the recoverable value of the investment, based on expected future cash flows, is greater than the current fair value.")

***contradicted by*** other allegations in the Complaint as well as by documents that the Complaint references: that (1) Prudential was a party to the alleged litigation and regulatory investigations; and (2) Prudential was a party to and liable for payment of the regulatory settlement.  To the contrary, as Plaintiffs acknowledge elsewhere in the Complaint, Prudential was not a party to any ARS-related litigation or the subject of any ARS-related investigation, and did not enter into any ARS-related settlement with any regulator.  *See* Cmplt. ¶ 45.  Rather, that settlement was with Wachovia Securities Financial Holdings, LLC ("Wachovia Securities"), a joint venture with Wachovia Corporation in which Prudential was only an approximately 25% minority equity investor.  *See* Cmplt. ¶¶ 43, 45; Ex. 15 (PRU 8/12/08 8-K) (describing non-cash charges taken by Prudential, based on an "estimated diluted ownership level" of 25%).  When allegations contained in a complaint are contradicted by the document it cites, the document controls."  *In re PDI*, 2005 WL 2009892, at *21.

Further, Plaintiffs ignore the judicially-noticeable fact that it was not until August 2008, nearly ***two months after*** the Offering, that the SEC, state regulators and Wachovia announced their settlement.  Plaintiffs' allegations thus are implausible and cannot survive under *Twombly*.  550 U.S. at 570.

1.    **Prudential Was Not "Subject To" Any ARS-Related Proceedings.**

Item 103 of SEC Reg. S-K, which Plaintiffs do not cite, governs disclosure by issuers of legal proceedings. 17 C.F.R. 229.103. Plaintiffs disregard Item 103 because it requires issuers to "[d]escribe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant or any of its subsidiaries *is a party* or of which any of their property is the subject." *Id.* (emphasis added). Plaintiffs' attack on Prudential's disclosure in its 2007 Form 10-K and first quarter 2008 Form 10-Q is specious because the ARS-related litigation and regulatory matters to which Plaintiffs refer are not proceedings in which either Prudential or any of its subsidiaries was "a party," and Item 103 thus imposed no disclosure obligation. *See New Jersey v. Sprint Corp.*, 314 F. Supp. 2d 1119, 1136-37 (D. Kan. 2004) (no Item 103 disclosure required where defendant "was not a party in any IRS investigation").

Plaintiffs allege that Wachovia Securities, ***not*** Prudential, underwrote, sold and participated in ARS auctions, and that Wachovia Securities, ***not*** Prudential, was subject to litigation and investigations. Cmplt. ¶¶ 43, 45. Likewise, although Plaintiffs refer to a securities class action filed on March 19, 2008 against Wachovia Corporation and Wachovia Securities, they fail to note that Prudential is ***neither named as a party*** nor ***even mentioned*** in the class action complaint. *Compare* Cmplt. ¶ 45 *with* Ex. 10 (complaint in *Waldman v. Wachovia Corp.*, No. 08-02913

(S.D.N.Y. filed Mar. 19, 2008)).  Prudential similarly was **neither named as a party** to the regulatory settlement nor even mentioned in the SEC's complaint against Wachovia Securities that resulted in the settlement.  *Compare* Cmplt. ¶ 45 *with* Ex. 22 (complaint in *SEC v. Wachovia Securities, LLC*, No. 09-743 (N.D. Ill. filed Feb. 5, 2009)).[22] Absent facts showing that **Prudential** itself was a party to ARS-related litigation or investigations (Cmplt. ¶ 3), Plaintiffs' allegation that Prudential's litigation disclosure was inaccurate must be dismissed.  *In re Adams Golf, Inc.*, 381 F.3d at 278 (holding that securities laws obligated issuer to disclose information concerning "its own business," not that of other companies); *see Pyramid Holdings, Inc. v. Inverness Med. Innovations, Inc.*, 2009 WL 2251471, at *4, *6 (D. Mass. Jul. 29, 2009) (dismissing Section 11 claims contradicted by SEC filings).

### 2. Prudential Had No Contingent Liability To Disclose.

Likewise, Plaintiffs' allegation that Prudential had a contingent liability aris-ing out of these ARS-related litigation and investigatory matters is contradicted by the very documents the Complaint references.  Plaintiffs allege that on October 29, 2008, after Wachovia Corporation had publicly announced its settlement with the SEC and state regulators, Prudential supposedly "[took] a pre-tax charge of **$235 million** to **resolve** the claims asserted in connection with the Joint Venture Regula-

---

[22] *See also* Ex. 23 (SEC Lit. Rel. No. 20885, dated Feb. 5, 2009).

tory Investigations."  Cmplt. ¶ 46 (second emphasis added).  The Complaint, how-

ever, does not allege a single fact suggesting that ***Prudential*** resolved anything.

The $235 million amount was not a payment ***by Prudential*** to the SEC or anyone

else, but rather an accounting adjustment reflecting a ***non-cash*** charge to Pruden-

tial's earnings arising from its minority equity ownership interest in the Wachovia

Securities joint venture due to ***that entity's*** increase to its legal reserves for the

SEC settlement.  Ex. 15 (PRU 8/12/08 8-K[23]); Ex. 19 (PRU 8/15/08 8-K); Ex. 20

(PRU 10/9/08 8-K), at Ex. 99; Ex. 21 (PRU 10/29/08 8-K), at 4-5; Ex. 8 (PRU

3Q08 10-Q), at 38.[24]

### 3. Defendants Had No Duty To Disclose Any Information Regarding Wachovia Securities' ARS-Related Matters.

#### a. Nothing In The Litigation Disclosure Was Misleading.

Given that SEC Reg. S-K Item 103 did not require Prudential to disclose the

ARS-related litigation and regulatory proceedings concerning Wachovia Securi-

ties, Plaintiffs' fall-back argument is that "those statements constituted affirmative

---

[23] "Based on the $500 million increase to legal reserves ***recorded by Wachovia*** and ***our*** estimate of our diluted ***ownership level*** in the joint venture, we anticipate that the Company's consolidated financial statements, and the results associated with the joint venture reflected in the Financial Advisory Segment, for the quarter ended September 30, 2008 will include a pre-tax charge within adjusted operating income and income from continuing operations before income taxes of approximately $125 million." (emphasis added).

[24] Moreover, Plaintiffs have not alleged (nor could they) that the $235 million charge equaled or exceeded 10% of Prudential's consolidated net assets ($478 billion) as of March 31, 2008, Item 103's threshold for disclosure of legal proceedings.  *See* 17 C.F.R. § 229.103(2); Ex. 3 (PRU 1Q08 10-Q), at 1.

representations of present fact that, as of the Offering, there were no material law-
suits or regulatory matters concerning Prudential other than the matters listed."
Cmplt. ¶ 48.  Prudential's litigation disclosure, however, makes no such statement
about all matters "concerning" Prudential, and even if it did, the matters against
Wachovia Securities would not be matters "concerning" Prudential.  *See* Ex. 3
(1Q08 10-Q), at 28-29.[25]  To the extent Plaintiffs are alleging that it was mislead-
ing for Prudential not to have mentioned the Wachovia matters, that, too, would be
meritless.  Nothing that Prudential said would have led an investor to form any
conclusion – let alone an incorrect conclusion – about the existence or non-
existence of regulatory or litigation proceedings against Wachovia Securities.

    **b.**    **Facts Concerning The ARS Settlement Are Not Alleged To
Have Been Known Or Knowable As Of The Offering.**

Plaintiffs' ARS-disclosure claims fail for the additional reason that they
have not alleged a single fact that would support an inference that settlement dis-
cussions between Wachovia Securities and regulators had even begun as of the
June 24, 2008 Offering, much less had reached fruition, or that Prudential was
privy to them.  To the contrary, Plaintiffs' speculation is contradicted by Pruden-
tial's and Wachovia Corporation's undisputed SEC filings concerning the Wacho-

---

[25] Prudential's litigation disclosure stated: "The Company is subject to legal and
regulatory actions in the ordinary course of its businesses.  Pending legal and regu-
latory actions include proceedings relating to aspects of the Company's businesses
and operations that are specific to it and proceedings that are typical of the busi-
nesses in which it operates . . . ."

via Securities settlement, which this Court may judicially notice:

- **July 17-July 22, 2008**:  Regulators disclose they are collecting information from Wachovia Securities.  Wachovia Corporation filed (on Form 8-K) its earnings release announcing results for the quarter ended June 30, 2008, and did not disclose any settlement with regulators relating to ARS market investigations.  Ex. 12 (Wachovia Corp. ("WB") 7/22/08 8-K), at 28; Ex. 11 (*Auction rate probe hits Wachovia*, L.A. TIMES, Jul. 18, 2008).[26]

- **August 11, 2008**:  Wachovia Corporation filed its second quarter Form 10-Q, disclosing as a "Subsequent Event" postdating its June 30, 2008 financial results a $500 million increase to legal reserves based on "active discussions of potential settlement" with regulators concerning two of its subsidiaries' ARS market participation.  Ex. 14 (WB 2Q08 10-Q), at 87.

- **August 12, 2008**:  Prudential announced that, based on Wachovia Corporation's August 11, 2008 disclosure of active settlement discussions and an increase of $500 million to Wachovia's legal reserves, Prudential would take a pre-tax charge corresponding to its minority ownership in Wachovia Securities.  Ex. 15 (PRU 8/12/08 8-K).

- **August 15, 2008**:  Wachovia Corporation, the SEC, and state regulators first announced a settlement "in principle."  Ex. 18 (WB 8/15/08 8-K), at Ex. 99; Ex. 16 (SEC Press Release No. 2008-176, dated Aug. 15, 2008); Ex. 17 (NASAA Press Release dated Aug. 15, 2008).  Prudential announced an increase to its pre-tax charge, based on Wachovia Corporation's same-day announcement of an "agreement in principle" with regulators and increases to Wachovia's legal reserves.  Ex. 19 (PRU 8/15/08 8-K).[27]

The only plausible inferences to be drawn from Wachovia Corporation's and

the SEC's disclosures, and from Prudential's SEC filings immediately following

---

[26] Courts may take judicial notice of news articles.  *Benak v. Alliance Capital Mgmt., L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006) (approving of district court's judicial notice of news articles to indicate information known to the public).

[27] The SEC announced settlements of similar ARS-related investigations of other ARS market participants during the same week of August 2008.  *See* Ex. 13 (SEC Press Release Nos. 2008-168 and 2008-171, dated Aug. 7 and Aug. 8, 2008 regarding settlements with Citigroup and UBS Securities LLC, respectively).

those disclosures, are that (i) the investigations were ongoing in mid-July, with regulators still gathering documents and information; (ii) no settlement had been reached between Wachovia Securities and regulators until after Wachovia Corporation's July 22, 2008 earnings release and likely not until at least August 11, 2008; and (iii) Prudential did not learn of the settlement "in principle," to which it was not even a party, **before** Wachovia did.  *See Cafaro*, 2009 WL 1622825, at *3 (allegations insufficient where lawful inferences are more plausible).

Section 11 does not impose liability on an issuer for allegedly omitting information that is not "known or knowable" to the issuer at the time of the offering. *In re Arbinet-thexchange, Inc.*, 2006 WL 3831396, at *4.  Here, the allegedly omitted information did not even concern Prudential, and the Complaint contains no facts that would permit an inference that any settlement between Wachovia Securities and any regulator was known or knowable prior to the Offering.

### c.    <u>Item 303 Imposed No Disclosure Duty.</u>

Plaintiffs allege that Item 303 "obligated" Defendants to disclose the financial impact on Prudential of the collapse of the ARS market and the legal proceedings against Wachovia Securities in which it was a minority investor.  Cmplt. ¶ 52. This allegation fails to state a claim for the same reason Plaintiffs' other Item 303 allegations discussed above fail to state a claim, including the absence of any factual allegation from which it could be inferred that Prudential knew of the alleg-

edly omitted information as of the Offering date.  *See* Sections II.A.2, *supra*.  In addition, no court has held that litigation to which the registrant is not a party can be a "known trend[] or uncertaint[y]" for Item 303 purposes.

### d.   The Complaint Alleges No GAAP Violation.

Plaintiffs also allege that the financial statements incorporated into the Registration Statement were "materially false or misleading due to the failure to recognize or disclose Prudential's contingent liability arising out of the collapse of the ARS market and/or the Joint Venture Litigations, in violation of GAAP."  Cmplt. ¶ 49.  Plaintiffs cite the provisions of Financial Accounting Standards Board Statement No. 5 ("FAS 5"),[28] which governs recording and disclosure of certain loss contingencies in financial statements.  *See* Cmplt. ¶¶ 50-51; Ex. 25 (FAS No. 5).  Plaintiffs' GAAP claim is meritless, however, because it requires assuming that Prudential, and not Wachovia Securities, faced potential liability arising out of the ARS-related regulatory and litigation proceedings brought against Wachovia Securities.  This assumption is contradicted by the other allegations in the Com-

---

[28]  FAS No. 5 requires contingent losses to be accrued only if ***both*** of the following conditions are met: "(a) Information available prior to issuance of the financial statement indicates that it is ***probable*** that an asset has been impaired or a liability incurred at the date of the financial statements.  It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.  (b) The amount of the loss can be ***reasonably estimated***."  Ex. 25 (FAS No. 5), at ¶ 8 (emphasis added).  Disclosure of contingent loss is required only if there is at least a "***reasonable possibility*** that a loss . . . may have been incurred."  *Id.* at ¶ 10 (emphasis added).

plaint discussed above and by the very documents the Complaint references.

Prudential was a minority investor in Wachovia Securities.  Consistent with its position as a minority investor in Wachovia Securities, Prudential accounted for that relationship under what is known as the "equity method" of accounting.  *See, e.g.*, Ex. 3 (PRU 1Q08 10-Q), at 133.  GAAP permits use of the equity method of accounting for minority investments such that the issuer's proportionate income from its share of the investment is recorded as a single line item in its financials. *See* Ex. 24 (APB Opinion No. 18: *The Equity Method of Accounting for Investments in Common Stock*), at ¶¶ 1, 6(b), 10, 11, 16-17).[29]  Plaintiffs nowhere dispute the appropriateness under GAAP of Prudential's use of this accounting method, as highlighted by their decision not to name Prudential's outside auditors as defendants in this action.[30]  Further, like any stakeholder in a corporation, Prudential was

---

[29] APB No. 18 explains that, using the equity method, "[a]n investor adjusts the carrying amount of an investment for its share of the earnings or losses of the investee subsequent to the date of investment and reports the recognized earnings or losses in income. . . .  Under the equity method, an investment in common stock is generally shown in the balance sheet of an investor as a single amount.  Likewise, an investor's share of earnings or losses from its investment is ordinarily shown in its income statement as a single amount."  Ex. 24, at ¶¶ 10, 11.

[30] Prudential's public accounting firm audited Prudential's financial statements that Plaintiffs now challenge and opined that they complied with GAAP in all respects. *See* Ex. 2 (PRU 2007 10-K) at 171-72; Ex. 9 (PRU 2008 10-K) at 237-38.  That fact – and Plaintiffs' decision to drop Prudential's auditors as defendants in this action – undermine the plausibility of Plaintiffs' GAAP allegations.  *See also In re PEC Solutions*, 2004 WL 1854202, at *12.  Absent allegations that the auditors' audit of an issuer's application of GAAP was unreasonable, a court must give deference to the auditors' professional judgment.  *Godchaux v. Conveying Tech-*

not responsible for potential legal liability Wachovia Securities faced, except as

otherwise agreed.  18A AM. JUR. 2D *Corporations* § 724 (2009) (basic tenet of

corporations law that a shareholder is not liable for the debts of the corporation);

*Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1520-21 (3d Cir. 1994),

*aff'd*, 514 U.S. 938 (1995) (same).  Treatment of Wachovia Securities' liabilities or

potential liabilities as those of Prudential, its minority investor, would be entirely

inconsistent with the equity method of accounting and bedrock corporations law.[31]

### 4.    The Wachovia Securities Matters Were Not Material.

Nothing in the Complaint would support an inference that Prudential's non-

cash accounting entry relating to the Wachovia legal reserve was material to inves-

tors in the Notes.  That charge is not alleged to have affected Prudential's ability to

---

*niques, Inc.*, 846 F.2d 306, 315 (5th Cir. 1988) ("Supreme Court precedent requires the district court to defer to the professional judgment of the accountant who prepared [the] financial statements.") (citing *Thor Power Tool Co. v. Comm'r of Internal Revenue*, 439 U.S. 522, 544 (1979)).

[31] Prudential could not have accounted for the impact of the settlement on its investment in Wachovia Securities until Wachovia Securities itself had incurred and recognized that liability, and there is no factual basis for inferring that Wachovia Securities had reached a settlement with the SEC prior to August 2008, when both Wachovia Corporation and (a few days later) the SEC itself publicly announced it. Ex. 14 (WB 2Q08 10-Q), at 87 ("Subsequent to June 30, 2008, this matter reached the threshold for accrual of a liability as of June 30, 2008."); Ex. 16 (SEC Press Release No. 2008-176, dated Aug. 15, 2008).  Prudential recorded its non-cash charge to earnings arising from its investment in Wachovia Securities immediately afterwards.  *See* APB Opinion No. 18 (Ex. 24, at ¶ 19(g)) ("If financial statements of an investee are not sufficiently timely for an investor to apply the equity method currently, the investor ordinarily should record its share of the earnings or losses of an investee from the most recent available financial statements.")

repay the Notes or make interest payments, and is thus immaterial.  *See Kusner*, 531 F.2d at 1237; *J&R Mktg. SEP*, 2007 WL 655291, at *10-12.

### D.   <u>Plaintiffs Have Failed To Plead Any Compensable Loss.</u>

Plaintiffs also have not pleaded any compensable loss, an essential element of a Section 11 claim.  This litigation apparently was brought because the Notes were trading below their offering price on the date the first complaint was filed.  Cmplt. ¶ 78.  The Notes are currently trading ***above*** the offering price (*see* Ex. 28),[32] and, therefore, ***above*** Plaintiffs' blended cost basis of $24.49 (as reflected on Lead Plaintiffs' certification).  Moreover, Plaintiffs have not alleged that they sold the Notes at a loss or even that a single payment due under the Notes has not been made.  Plaintiffs thus have no standing to bring this case.  *See Kusner*, 531 F.2d at 1237; *Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*, 2009 WL 2590087, at *1, *13 (E.D. Pa. Aug. 20, 2009) (dismissing case where plaintiffs alleged only mortgage-backed securities' price decline and no actual loss).

Further, Section 11 confines damage recovery to loss attributable to a mate-rial misrepresentation.  15 U.S.C. § 77k(e).  Plaintiffs have not alleged that the Notes' trading price declined due to any ***misrepresentations*** by Defendants.  *See Luminent*, 2009 WL 2590087, at *16 (failure to allege that misrepresentations, rather than market dislocation, caused loss fatal to plaintiffs' case).  Rather, the

---

[32] The Court can take judicial notice of securities prices.  *See In re NAHC, Inc.*, 306 F.3d at 1331 (taking judicial notice of stock prices).

only reasonable inference is that any decline in the market price of the Notes is due to the unprecedented financial markets crisis that has gripped this country, a fact this court may judicially notice.  Although an affirmative defense, the absence of loss causation is fatal to a Section 11 plaintiff's claims at the motion to dismiss stage when it is apparent on the face of the complaint or from facts the court can judicially notice.[33]  *See, e.g.*, *In re Shoretel, Inc. Sec. Litig.*, 2009 WL 248326, at *5-6 (N.D. Cal. Feb. 2, 2009) (citing cases and dismissing Section 11 claims for lack of loss causation on face of complaint).

## III.   THE COMPLAINT FAILS TO STATE A CLAIM AGAINST THE INDIVIDUAL DEFENDANTS.

The Complaint alleges no facts that would support any inference that the Registration Statement contained a single material misrepresentation or omission. The Complaint states no claim against any of the Individual Defendants for the separate and independent reason that it alleges no facts that would call into ques-

---

[33]  In the third quarter Form 10-Q (on which Plaintiffs base their annuity reserves-related claims), Prudential explained that the increased reserves were attributable to "annual reviews, largely reflecting the impact of ***current market conditions***." Ex. 8 (PRU 3Q08 10-Q), at 53.  Similarly, in the July 31, 2008 earnings conference call (on which Plaintiffs rely for their impairment-related claims), Prudential explained that impairments occurred primarily due to "widening of credit spreads in an illiquid market,"  Ex. 5 (PRU 2Q08 Earnings Call Transcript), at 3.  The Court may also take judicial notice that the price of the Notes did not fall in mid-August 2008 in response to the disclosures regarding Wachovia Securities' ARS settlement or Prudential's disclosure of its non-cash charges corresponding to its minority ownership interest in Wachovia Securities.  *See* Ex. 28 (Notes prices).

tion their diligence, particularly where the directors were entitled to rely on the ex-

pertise of Prudential's auditors with respect to its financial statements. *See* 15

U.S.C. § 77k(b)(3). Section 11 exempts from potential liability an issuer's indi-

vidual officers and directors where, as here, there are no factual allegations that

they failed to conduct sufficient diligence with respect to the offering. This plead-

ing deficiency warrants dismissal of the claims against them. *See In re Country-*

*wide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1181-82 (C.D. Cal. 2008) (dis-

missing Section 11 claims against underwriters absent allegations it was unreason-

able to rely on auditors). Moreover, the Complaint does not assert a single allega-

tion that any of the information supposedly not disclosed to investors was "known"

to any of the Individual Defendants for purposes of Item 303, or that any of them

knowingly or intentionally "concealed" any information for purposes of Rule 9(b).

Plaintiffs' "control person" liability claims under Section 15 of the 1933 Act

likewise fail because they require an underlying violation of Section 11, which has

not been shown here. *See In re Arbinet-thexchange, Inc.*, 2006 WL 3831396, at

*11 (dismissing Section 15 claim). In addition, it is insufficient for control person

liability for Plaintiffs to allege – as they do here – only that an individual defendant

was an officer or director at the time of the Offering and signed the Registration

Statement. *See* Cmplt. ¶¶ 10-23. Rather, courts require that plaintiffs allege that

each individual defendant had control over or involvement in the specific state-

ments of the issuer being challenged.  *See, e.g.*, *In re Vonage IPO*, 2009 WL

936872, at \*22 (plaintiffs must allege facts beyond mere status sufficient to show

control).  No such allegations are made here.

## <u>CONCLUSION</u>

For all the foregoing reasons, the Complaint should be dismissed in its en-

tirety, with prejudice.

Dated:  September 21, 2009                    Respectfully submitted,

   /s/ Liza M. Walsh
Liza M. Walsh
Peter J. Pizzi
CONNELL FOLEY LLP
85 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 535-0500
Fax: (973) 535-9217

Brian E. Pastuszenski
Deborah S. Birnbach
Sarah Heaton Concannon
Katherine G. McKenney
GOODWIN PROCTER LLP
53 State Street
Boston, MA 02109
Tel: (617) 570-1000
Fax: (617) 523-1231

*Counsel for Prudential Financial,
Inc. and the Individual Defendants*