**LITE DEPALMA GREENBERG & RIVAS, LLC**
Joseph J. DePalma
Katrina Carroll
Two Gateway Center, 12th Floor
Newark, NJ 07102-5003
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@ldgrlaw.com
*Liaison Counsel for Lead Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| KAREN M. BAUER, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. 09-1120-JLL |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| PRUDENTIAL FINANCIAL, INC., et al. | ) ) | |
| Defendants. | ) ) ) | |
| NOAH HADDOCK, Individually and on Behalf of all Others Similarly Situated, | ) ) | Civil Action No. 09-1771-JLL |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| PRUDENTIAL FINANCIAL, INC., et al. | ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE
PRUDENTIAL DEFENDANTS' AND THE UNDERWRITER DEFENDANTS'
MOTIONS TO DISMISS THE CONSOLIDATED
<u>AMENDED CLASS ACTION COMPLAINT</u>**

225367 v1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................ iii

I.    INTRODUCTION ............................................................... 1

II.   THE OFFERING ................................................................ 3

III.  STANDARD OF REVIEW ON A MOTION TO DISMISS ................. 5

IV.   ARGUMENT ..................................................................... 6

      A. The Elements Of A Section 11 Claim ............................... 7

         1. Liability Under Section 11 Is "Virtually Absolute" ................... 7

         2. Liability For Omission of Material Facts Pursuant
            To Item 303 .............................................................. 10

      B. Defendants Misrepresented The Existence Of Material
         Litigation Concerning The Auction Rate Securities Market .......... 11

         1. Plaintiffs' Allegations Concerning Defendants' Material
            Misrepresentations and Omissions Concerning the Joint
            Venture Litigation State A Claim ............................... 11

         2. Defendants' Arguments Are Without Merit ............................. 16

      C. Defendants Misrepresented The Amount of Money Required
         To Pay For Prudential's Annuity Obligations And Deferred
         Policy Acquisition Costs ............................................... 24

         1. Plaintiff Alleges Material Misrepresentations and Omissions
            Concerning the Cost of Funding Prudential's Annuity and
            Deferred Acquisition Costs ..................................... 24

         2. Defendants' Arguments Are Without Merit ............................. 26

      D. Plaintiff's Impairment Allegations State a Claim ......................... 30

         1. Plaintiff's Allegations Concerning Other-Than Temporary
            Impairments of Prudential's Assets State A Claim .................. 30

2. Defendants' Arguments Are Without Merit.............................32

E. Plaintiff Has Properly Pled Compensable Loss .............................36

F. The Complaint States A Claim Against The Individual
   Defendants And The Underwriter Defendants...............................38

G. The Complaint States A Control Person Claim Against The
   Individual Defendants ...................................................39

V. CONCLUSION......................................................................40

## TABLE OF AUTHORITIES

<u>Cases</u>

*Angres v. Smallworldwide PLC,*
   94 F. Supp. 2d 1167  (D. Colo. 2000).................................................................... 33

*Ashcroft v. Iqbal,*
   __ U.S. __, 129 S. Ct. 1937  (2009)........................................................................ 6

*Basic v. Levinson,*
   485 U.S. 224 (1988)............................................................................................ 21

*Berson v. Applied Signal Tech., Inc.,*
   527 F.3d 982 (9th Cir. 2008)............................................................................... 23

*Cafaro v. HMC Intern., LLC,*
   No 07-2793, 2009 WL 1622825 (D.N.J. June 10, 2009) ........................................ 5

*Caviness v. Derand Resources Corp.,*
   983 F.2d 1295 (4th Cir. 1993) ............................................................................. 14

*Foman v. Davis,*
   371 U.S. 178 (1962)............................................................................................ 40

*Ganino v. Citizens Utilities Co.,*
   228 F.3d 154 (2d Cir. 2000)............................................................... 17, 19, 21, 31

*Gustafson v. Alloyd Co.,*
   513 U.S. 561 (1995)...........................................................................................2, 7

*Herman & MacLean v. Huddleston,*
   459 U.S. 375 (1983)......................................................................................passim

*Huddleston v. Herman & MacLean,*
   640 F.2d 534 (5th Cir. 1981) ..........................................................................35, 36

*Hutchinson v. CBRE Realty Finance, Inc.,*
   638 F. Supp. 2d 265 (D. Conn. 2009)................................................................... 9

iii

*In re Adams Golf, Inc. Sec. Litig.,*
   176 F. Supp. 2d 216 (D. Del. 2001)...................................................................28, 29

*In re Adams Golf, Inc. Sec. Litig.,*
   381 F.3d 267 (3d Cir. 2004) .................................................................8, 21, 28, 29

*In re Adams Golf, Inc. Sec. Litig.,*
   618 F. Supp. 2d 343  (D. Del. 2009)................................................................... 10

*In re Arbinet-thexchange, Inc. Sec. Litig.,*
   No. 05-4404, 2006 WL 3831396 (D.N.J. Dec. 28, 2006) ...................................8, 10

*In re Burlington Coat Factory Sec. Litig.,*
   114 F.3d 1410 (3d Cir. 1997) ........................................................................... 26

*In re Cigna Corp. Sec. Litig.,*
   459 F. Supp. 2d 338 (E.D. Pa. 2006)................................................................. 28

*In re Constar Int'l, Inc. Sec. Litig.,*
   585 F.3d 774 (3d Cir. 2009).......................................................................passim

*In re Countrywide Fin. Corp. Sec. Litig.,*
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) .............................................................. 39

*In re Par Pharmaceutical Sec. Litig.,*
   733 F. Supp. 668 (S.D.N.Y. 1990) ..................................................................... 33

*In re PMA Capital Corp. Sec. Litig.,*
   No. 03-6121, 2005 WL 1806503 (E.D. Pa. July 27, 2005) .................................... 39

*In re Suprema Specialties, Inc. Sec. Litig.,*
   438 F.3d 256 (3d Cir. 2006)......................................................................8, 16, 38

*In re ValueVision Intern., Inc. Sec. Litig.,*
   896 F. Supp. 434 (E.D. Pa. 1995)...................................................................... 33

*In re Vonage Initial Public Offering Sec. Litig,*
   No. 07-177, 2009 WL 936872 (D.N.J. April 6, 2009) ........................................9, 13

*Kusner v. First Pennsylvania Corp.,*
   531 F.2d 1234 (3d Cir. 1976) ........................................................................... 22

*Lormand v. US Unwired, Inc.,*
  565 F.3d 228 (5th Cir. 2009) .................................................................. 35

*Luminent Mortg. Captial, Inc. v. Merrill Lynch & Co.,*
  No. 07-5423, 2009 WL 2590087 (E.D. Pa. Aug. 20, 2009) ................................... 37

*Makor Issues & Rights, Ltd. v. Tellabs Inc.,*
  437 F.3d 588 (7th Cir. 2006) .................................................................. 35

*No. 84 Employer-Teamster Joint Council Pension Trust Fund*
  *v. Am. West Holding Corp.,*
  320 F.3d 920 (9th Cir. 2003) .................................................................. 23

*Ottmann v. Hanger Orthopedic Group, Inc.,*
  353 F.3d 338 (4th Cir. 2003) .................................................................. 28

*Oxford Asset Management, Ltd. v. Jaharis,*
  297 F.3d 1182 (11th Cir. 2002) ................................................................. 6

*Rubenstein v. Collins,*
  20 F.3d 160 (5th Cir. 1994) ................................................................... 36

*Shapiro v. UJB Fin. Corp.,*
  964 F.2d 272 (3d Cir. 1992) ................................................................... 20

*Siracusano v. Matrixx Initiatives, Inc.,*
  585 F.3d 1167 (9th Cir. 2009) ................................................................. 13

*TSC Industries v. Northway, Inc.,*
  426 U.S. 438 (1976) .......................................................................... 20

*Zell v. InterCapital Income Sec., Inc.,*
  675 F.2d 1041 (9th Cir. 1982) ................................................................. 14

Statutes
15 U.S.C. § 77k(a) ..........................................................................7, 38
15 U.S.C. §§ 77k and 77o ..................................................................... 2
15 U.S.C. §77k(b) .........................................................................8, 9, 38
15 U.S.C. §77k(e) ........................................................................... 36
15 U.S.C. §77o ............................................................................. 39

Rules

Fed. R. Civ. P. 12(b)(6)....................................................................................5, 9
Fed. R. Civ. P. 15(a) ...................................................................................... 40
Fed. R. Civ. P. 9............................................................................................. 6

Regulations

17 C.F.R. §229.303(a)(3)(ii) ......................................................................... 10
17 C.F.R. 229.103........................................................................................ 19

Lead Plaintiff Paul J. Perry, Trustee of the Paul J. Perry Revocable Trust ("Plaintiff"), on behalf of himself and all others similarly situated, respectfully submits this Memorandum of Law in Opposition to the Motions to Dismiss the Consolidated Amended Class Action Complaint (the "Complaint") filed by (i) the Prudential Defendants [Doc. #57-1] ("Prud. Mem.")[1] and (ii) the Underwriter Defendants [Doc. #58-1] ("Und. Mem.") (collectively, the "Motions").[2]

## I.    INTRODUCTION

On June 24, 2008 – just four business days before the end of the second quarter ended June 30, 2008 – Defendants obtained over *$920 million* dollars from Class Members in an initial public offering (the "Offering") of 9% Junior Subordinated Notes (the "Notes") offered at $25 per Note through a registration statement and prospectus (the "Registration Statement"). The Registration Statement contained several material misrepresentations and omissions. First, the Registration Statement misrepresented and concealed the existence of material litigation against a Prudential

---

[1] The Prudential Defendants are Arthur F. Ryan, Richard J. Carbone, Peter B. Sayre, Dennis G. Sullivan, Frederic K. Becker, Gordon M. Bethune, Gaston Caperton, Gilbert F. Casellas, James G. Cullen, William H Gray III, Jon F. Hanson, Constance J. Horner, Karl J. Krapek, and James A. Unruh (the "Individual Defendants") (¶¶ 10-23), together with Prudential Financial, Inc. ("Prudential").

[2] The Underwriter Defendants are Citigroup Global Markets Inc.; Merrill Lynch, Pierce, Fenner & Smith Inc.; Morgan Stanley & Co. Inc.; UBS Securities LLC; Wachovia Capital Markets LLC; Banc of America Securities LLC; RBC Capital Markets Corp,; and J.P Morgan Securities Inc. (¶¶25-32).

joint venture arising out of Prudential's involvement in the collapse of the Auction Rate Securities ("ARS") market.  Only after the Offering did Defendants disclose the litigation which Prudential has paid $235 million to date to resolve in part.  Second, the Registration Statement understated the amount of Prudential's liability in connection with its annuity obligations and deferred acquisition costs by up to $380 million by misrepresenting the amount of money necessary to fund those obligations.  Finally, the Registration Statement materially understated by approximately $205 million the amount of Prudential's assets that had declined in value by more than 50% in the period preceding the Offering.  In total, the Registration Statement overstated Prudential's reported pre-tax income by approximately $820 million; as a result, instead of the $69 million in net income reported, Defendants should have reported a net *loss* of approximately $454 million.

Plaintiff is entitled to relief under the liberal liability provisions for initial public offerings under §§ 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k and 77o.  Plaintiff need not prove "either fraud or reliance on those whose moral responsibility to the public is particularly heavy – the originators of securities." *Gustafson v. Alloyd Co.,* 513 U.S. 561, 582 (1995) (internal citations omitted).  Consequently, a Defendant need not have acted with knowledge or scienter, nor must Plaintiff prove causation.  *Herman & MacLean v. Huddleston,* 459

225367 v1                                    2

U.S. 375, 381-82 (1983). Moreover, the amount of liability is clear. On the day this litigation was filed on March 4, 2009, the Notes had decreased in value from $25 per Note to only $13.04 per Note, a decrease of almost 48%.

Defendants seek to dismiss Plaintiff's claims based upon fact-bound arguments that are contrary to the express allegations in the Complaint and, at most, raise disputed issues of fact. In addition to challenging the materiality of the misrepresentations in the Registration Statement (which courts routinely hold is uniquely inappropriate for resolution on a motion to dismiss), Defendants repeatedly challenge whether the alleged misrepresentations in the Registration Statement were false when made by ignoring the factual allegations in the Complaint. Consequently, Defendants' factual arguments should be rejected and their motions to dismiss denied.

## II.  THE OFFERING

On June 24, 2008, Defendants conducted an initial public offering (the "IPO" or the "Offering"). ¶¶3, 41.[3] In the Offering, Prudential sold 36.8 million 9% Junior Subordinated notes (the "Notes" or "Securities") at $25 per Note. ¶1, 3. Prudential raised over $920 million. ¶3. Curiously, Prudential scheduled the Offering for only

---

[3] All references to "¶_" herein are to Plaintiff's Complaint.

***four business days*** before the end of Prudential's second fiscal quarter on June 30, 2008.  ¶41.[4]

On June 24, 2008, Prudential filed a prospectus supplement for the Offering (the "Prospectus Supplement").  ¶41.   The Prospectus Supplement expressly incorporated by reference, *inter alia,* Prudential's quarterly report for the quarter ended March 31, 2008 filed on Form 10-Q with the SEC (the "Form 10-Q") and Prudential's annual report for the year ended December 31, 2007 filed on form 10-K with the SEC (the "Form 10-K").  *Id.*  The Form S-3, Prospectus Supplement, Form 10-K and Form 10-Q (together with other documents incorporated by reference into the Prospectus Supplement) jointly formed the registration statement for the Offering (the "Registration Statement").  The Registration Statement was signed by every Individual Defendant (¶¶10-23), and every Underwriter Defendant underwrote the Offering (¶¶25-32).

By March 12, 2009 – the date of the initiation of this litigation – the price per Note had declined by approximately ***48%*** from the Offering price of $25.00 to only $13.04 per Note.[5]

---

[4]   Prudential and Defendants conducted the Offering pursuant to a "shelf registration" (or continuous offering) process.  ¶40.   On or about March 16, 2006, Prudential filed a form S-3 Registration Statement and Prospectus with the SEC (the "Form S-3").  *Id.*  Under the "shelf registration" process, Prudential was then allowed to sell securities through prospectus supplements in future offerings.  *Id.*.

## III.   STANDARD OF REVIEW ON A MOTION TO DISMISS

A Court evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(6) "must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favour of the non-moving party." *Cafaro v. HMC Intern., LLC,* No 07-2793, 2009 WL 1622825, at *2 (D.N.J. June 10, 2009) (Linares, J.).  A complaint should not be dismissed so long as it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.*

Plaintiff's claims arise exclusively under §§ 11 and 15 of the Securities Act. The standard for alleging a claim under the Securities Act is not difficult.  "A *prima facie* case under § 11 is straightforward, requiring only a showing of a material misrepresentation or omission from a defendant's registration statement." *In re Constar Int'l, Inc. Sec. Litig.,* 585 F.3d 774, 782-83 (3d Cir. 2009).  Accordingly, the standard for Plaintiff to "nudge[]" his claim "across the line from conceivable to

---

[5]  The first complaint in this Litigation was filed on March 12, 2009 [Doc. #1], on behalf of all persons who purchased the Notes pursuant to and/or traceable to the false and misleading Registration Statement.  On May 22, 2009, this Court appointed Plaintiff as Lead Plaintiff in this Litigation to represent the Class [Doc. #29], and Plaintiff filed the operative consolidated amended Complaint on July 21, 2009 [Doc. #43].

plausible" to defeat a motion to dismiss (*see Ashcroft v. Iqbal,* __ U.S. __, 129 S. Ct. 1937, 1951 (2009) (internal citations omitted)) is easily met.[6]

## IV.   ARGUMENT

The Securities Act imposes liability upon defendants that sell securities in public offerings through material misstatements or omissions, even if those misrepresentations were innocent, and without proof of reliance or causation (*see* Part IV.A. below).  Defendants' Motions should be denied because Plaintiff has specifically alleged materially false representations and/or omissions in the Registration Statement in connection with three different subjects (*see* Parts IV.B, C and D below).

---

[6]  Plaintiff's claims all arise under the Securities Act and do *not* involve (and, indeed, the Complaint expressly *disclaims*) any allegation of fraud.  ¶¶69, 80.  Accordingly, the heightened pleading standards under Fed. R. Civ. P. 9 and the Private Securities Litigation Reform Act ("PSLRA") do *not* apply in this case.  *See In re Suprema Specialties, Inc. Sec. Litig,* 438 F.3d 256, 269 (3d Cir. 2006) ("Section 11 . . . does not require plaintiffs to allege that defendants possessed any scienter") (internal citations omitted).  Contrary to Defendants' argument (Prud. Mem. 8, n.3), Plaintiff's allegation that Defendants failed to disclose material information in the Registration Statement in violation of Item 303 does *not* mean that the Complaint "sounds in fraud."  A Securities Act claim for liability arising out of the failure to disclose known trends or uncertainties under Item 303 arises through negligent conduct.  *See Oxford Asset Management, Ltd. v. Jaharis,* 297 F.3d 1182, 1191 (11th Cir. 2002) (liability under the Securities Act for violation of Item 303 only requires showing of negligence).  Accordingly, nothing in Item 303 requires that a complaint allege fraudulent intent in order to state a claim under the Securities Act.

## A.     The Elements Of A Section 11 Claim

### 1.     Liability Under Section 11 Is "Virtually Absolute"

Under Section 11 of the Securities Act, if an issuer of new securities is taking

investors' money, the issuer, not the investors, is liable for **any** material

misrepresentation made in connection with that new offering.  Indeed, section 11

imposes liability on **all** who are involved in the securities offering, including **absolute**

liability on the issuer (here, Prudential) and *prima facie* liability on **all** directors,

signatories to the registration statement and underwriters, where the registration

statement (1) contained an untrue statement of a material fact; (2) omitted to state a

required material fact; or (3) omitted to state a material fact necessary to make the

statements therein not misleading.  *See* 15 U.S.C. § 77k(a) (imposing liability where

"any part of the registration statement, when such part became effective contained an

untrue statement of a material fact or omitted to state a material fact required to be

stated therein or necessary to make the statements therein not misleading").

Section 11 imposes liability "without proof of either fraud or reliance on 'those

whose moral responsibility to the public is particularly heavy' – the 'originators of

securities.'" *Gustafson,* 513 U.S. at 582 (quoting legislative history of the Securities

Act).  Section 11 of the Securities Act:

> was designed to assure compliance with the disclosure provisions of
> the Act by imposing a stringent standard of liability on the parties who

play a direct role in a registered offering.  If a plaintiff purchased a security issued pursuant to a registration statement, he need ***only show a material misstatement or omission to establish his prima facie case***. Liability against the issuer of a security is ***virtually absolute, even for innocent misrepresentations***.  Other defendants bear the burden of demonstrating due diligence.  *See* 15 U.S.C. §77k(b).  Although limited in scope, ***Section 11 places a relatively minimal burden on a plaintiff***.

*Herman & MacLean,* 459 U.S. at 381-82 (1983) (footnotes omitted) (emphasis added); *In re Suprema Specialties, Inc.,* 438 F.3d at 269 (quoting *Huddleston* and noting that that "Section 11 is a virtually absolute liability provision") (citation omitted); *see Constar,* 585 F.3d at 782 (holding that "[a] prima face case under § 11 is straightforward"); *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 273 (3d Cir. 2004) (holding that § 11 "impose[s] civil liability for the making of materially false or misleading statements in registration statements"); *see In re Arbinet-thexchange, Inc. Sec. Litig.,* No. 05-4404, 2006 WL 3831396, at *3-4 (D.N.J. Dec. 28, 2006) (Linares, J.) (noting that § 11 imposes liability "upon persons who signed the registration statement, current and in certain instances future directors of the company, and the offering underwriters").

Under § 11 of the Securities Act, liability is "strict;" that is, liability for a material misrepresentation or omission is imposed upon the issuer ***regardless of*** whether that defendant actually knew or should have known the misrepresented or omitted facts.  *See Herman & MacLean,* 459 U.S. at 381-82; 15 U.S.C. § 77k(b);

225367 v1

8

*Hutchinson v. CBRE Realty Finance, Inc.,* 638 F. Supp. 2d 265, 274 (D. Conn. 2009) ("[S]ecurities issuers [are] subject to strict liability with regard to material misstatements and omissions, ***regardless of whether the material omitted facts were known or knowable or not***. . . .  [I]nnocent misstatements, even when the issuer was duly diligent in preparing the securities offering at question, are subject to a strict liability standard") (emphasis added) (citing *Herman & MacLean*); *In re Vonage Initial Public Offering Sec. Litig,* No. 07-177, 2009 WL 936872, at *11, n.11 (D.N.J. April 6, 2009) (where Plaintiff alleged that Registration Statement was misleading for failure to disclose initiation of litigation against issuer before initial public offering, but which was not served on issuer until after offering, defendant's argument that "they had no knowledge of the filing of the []litigation prior to the IPO issuing" is "irrelevant for a Rule 12(b)(6) analysis" of a Securities Act claim).  Defendants ***other than Prudential*** may escape ultimate liability on summary judgment or at trial by affirmatively "demonstrating due diligence."  *Herman & MacLean,* 459 U.S. at 381-82; *see* 15 U.S.C. § 77k(b).  However, the availability of this affirmative defense to non-issuer defendants does ***not*** change the standard for properly alleging a *prima facie* case under § 11.  *See Herman & MacLean,* 459 U.S. at 381-82.

Accordingly, the only pertinent question at this stage of the litigation is whether the statements and omissions were ***objectively*** false or misleading at the time

of the Offering (*i.e.,* were false when made).  Defendants' factual arguments that they did not know, or could not have known, of the adverse facts (*see., e.g.,* Prud. Mem. at 8, 9, 31-33) are therefore not only contrary to the factual allegations in the Complaint, but irrelevant on a motion to dismiss.[7]

### 2.  Liability For Omission of Material Facts Pursuant To Item 303

Section 11 not only imposes liability for false or misleading statements, but expressly imposes liability for the ***omission*** of facts that are "required to be stated" in a registration statement.  *See Constar,* 585 F.3d at 783.  Among the types of information "required to be stated" are:

> any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations . . .

Regulation S-K, Item 303; 17 C.F.R. §229.303(a)(3)(ii) ("Item 303"); *In re Adams Golf, Inc. Sec. Litig.,* 618 F. Supp. 2d 343, 348-49 (D. Del. 2009) (denying motion for summary judgment where "a jury could reasonably conclude that [the allegedly

---

[7]  In *In re Arbinet-theexchange, Inc. Sec. Litig.,* No. 05-4404, 2006 WL 3831396 (D.N.J. Dec. 28, 2006), this Court stated in *dicta* that a "plaintiff must plead facts to demonstrate that the allegedly omitted facts existed and were either known or knowable at the time of the offering."  *See* Prud. Mem. at 9.  Plaintiff's counsel respectfully submits that the fact that omitted facts ***existed*** at the time of the Offering is sufficient to state a *prima facie* case under § 11.  In any event, as discussed below, the allegedly omitted facts were "known or knowable" by Defendants at the time of the Offering.

undisclosed] risk was, in fact, a known trend or uncertainty [that] rendered the statements the [] defendants made in their IPO registration materials false and misleading"). Therefore, regardless of whether any of the statements in the Prospectus are false or misleading, Defendants were expressly obligated to disclose any material known trends or uncertainties.

     **B.**    **Defendants Misrepresented The Existence Of Material Litigation Concerning The Auction Rate Securities Market**

           **1.**    **Plaintiffs' Allegations Concerning Defendants' Material Misrepresentations and Omissions Concerning the Joint Venture Litigation State A Claim**

The Registration Statement contained material misrepresentations of present fact concerning Prudential's involvement in and liability from litigation arising out of the February 2008 collapse of the market for auction rate securities ("Auction Rate Securities" or "ARS"). Auction Rate Securities are municipal bonds, corporate bonds and preferred stock with interest rate or dividend yields that are re-set through periodic actions. ¶43. Since 2003, Prudential had been a 38% owner in a two-partner joint venture (with Wachovia Securities Financial Holdings LLC) that underwrote, sold and participated in ARS auctions (the "Joint Venture"). ¶43. According to Prudential's Form 10-Q for the quarter ended March 31, 2008, the Joint Venture produced $51 million in pre-tax income for Prudential for that quarter (constituting a

substantial portion of the $69 million in net income that Prudential reported for that quarter).

The ARS market collapsed on February 14, 2008 (*i.e.,* over ***four months*** before the Offering).  ¶44.  Immediately following this collapse, various lawsuits and investigations were initiated against the Joint Venture.  For example, a class action complaint (the "Joint Venture Class Action") was filed on or about March 19, 2008 (over ***three months*** before the Offering).  Also, prior to the Offering, the SEC and other regulatory agencies commenced an investigation into the Joint Venture's alleged misconduct (the "Joint Venture Regulatory Investigations," and, together with the Joint Venture Class Action, the "Joint Venture Litigation").  ¶45.

Even though the Registration Statement contained sections entitled "Litigation and Regulatory Matters" and "Legal Proceedings" that purported to describe all of the material lawsuits and regulatory matters concerning Prudential (¶48), it did not even mention the Joint Venture Litigation.  The affirmative representations of present fact concerning existing lawsuits were false because they concealed the existence of the Joint Venture Litigation.  ¶48.

On July 31, 2008 – approximately one month ***after*** raising $920 million in the Offering – Prudential disclosed the existence of the Joint Venture Litigation in its quarterly report for the quarter ended June 30, 2008.  ¶46.  On October 29, 2008,

Prudential disclosed it was taking a pre-tax charge of ***$235 million*** to resolve the Joint Venture Regulatory Investigations (¶46); to date, the Joint Venture Class Action is unresolved, and it is likely that Prudential will have to pay substantially more money to resolve the remaining Joint Venture Litigation.

Plaintiff has alleged a *prima facie* claim concerning the material misrepresentations and nondisclosures of present fact concerning Prudential's involvement in, and liability arising out of, the Joint Venture Litigation.  First, the Registration Statement misrepresented Prudential's material lawsuits and regulatory matters because the sections entitled "Litigation and Regulatory Matters" and "Legal Proceedings," which purported to list all material lawsuits and regulatory matters concerning Prudential, ignored the Joint Venture Litigation.  These statements constituted representations of present fact to a reasonable investor that, as of the Offering, there were no other material lawsuits or regulatory matters.  These representations were materially false or misleading due to their failure to disclose the ***existence*** of, and Prudential's potential liability as a result of, the Joint Venture Litigation.  *See, e.g., In re Vonage,* 2009 WL 936872, at *12-13 (failure to disclose litigation in registration statement would be actionable under  § 11 if litigation had already commenced or was substantially certain to occur); *Siracusano v. Matrixx Initiatives, Inc.¸* 585 F.3d 1167, 1172, 1179-1080 (9th Cir. 2009) (statements in Form

10-Q warning that product liability claims and litigation could have a material
adverse impact on the company were materially false and misleading where 10-Q
failed to disclose that litigation had already been initiated); *Caviness v. Derand
Resources Corp.*, 983 F.2d 1295, 1304 (4th Cir. 1993) (complaint alleged violation
where securities offering documents and financial statements failed to disclose
pending litigation); *see also Zell v. InterCapital Income Sec., Inc.,* 675 F.2d 1041,
1045-46 (9th Cir. 1982) (reversing grant of summary judgment to defendant on claim
that defendant had failed to disclose lawsuits because "[i]t cannot be inferred from
the present record that the litigation omitted from the statements would have no
substantial significance to a reasonable stockholder").

Second, even if Defendants had not purported to disclose all material litigation
in the Registration Statement, their failure to disclose the existence of the Joint
Venture Litigation rendered Prudential's financial statements materially misleading in
violation of generally accepted accounting principles ("GAAP").  Prudential was
required under GAAP to disclose "loss contingencies" resulting from "pending or
threatened litigation" in its financial statements.  ¶¶50-51.  Companies are required to
make this disclosure ***even if*** the reporting entity believes that an "unfavourable
outcome" is "not probable" or "the amount of loss cannot be reasonably estimated" at
the time of filing.  ¶51 (quoting paras. 4(b) and 37 of Financial Accounting Standards

Board Statement No. 5 ("FASB 5")).  The first Joint Venture Litigation was initiated prior to the Offering, and as early as March 19, 2008.  ¶45.  Consequently, the financial statements in the Registration Statement were false and misleading because they failed to disclose the *existence* of the pending Joint Venture Litigation.

Third, the Registration Statement materially overstated financial results by failing to disclose the *amount* of Prudential's contingent liabilities in connection with the Joint Venture Litigation.  GAAP expressly requires that financial statements accrue a charge for a contingent loss where the "[i]nformation available prior to the issuance of the financial statements indicates that it is probable that an asset has been impaired or a liability has been incurred."  ¶50 (quoting FASB 5).  Here, in violation of GAAP, the financial statements made *no* accrual for the Company's contingent liability from the Joint Venture Litigation.

Fourth, Defendants' failure to disclose the existence of, and Prudential's potential liability from, the Joint Venture Litigation violated of Item 303.  ¶52.  The Joint Venture Litigation begun by March 19, 2008 at the latest – which resulted in a $235 million reduction in Prudential's income – constituted "known trends or uncertainties" within the meaning of Item 303.  The concealment of these "known trends or uncertainties" was material to Prudential's financial results, as the $235

million loss to Prudential was almost four times the size of the $69 million reported

as income for the quarter ended March 31, 2008.

### 2.    Defendants' Arguments Are Without Merit

Significantly, Defendants do not (and cannot) dispute that (i) the Joint Venture

Litigation began months before the Offering; and (ii) the Registration Statement

completely failed to disclose or account for the existence of the Joint Venture

Litigation.  *See Herman & MacLean,* 459 U.S. at 381-82 (plaintiff "need only show a

material statement or omission to establish his *prima facie* case"); *In re Suprema*

*Specialties, Inc.,* 438 F.3d at 269 (same, quoting *Herman & MacLean*).

Defendants' attempts to avoid liability for their concealment of the Joint

Venture Litigation fail.  First, Defendants' argument that the Joint Venture Litigation

did not "concern" Prudential (Prud. Mem. At 26-27, 30-31) borders on the frivolous,

and is contrary to the factual allegations in the Complaint. Prudential was a co-owner

of the Joint Venture with only one other partner.  Both Prudential's 2007 Form 10-K

and its Form 8-K filed on August 12, 2008 expressly state that Prudential "has a 38%

ownership interest in the [J]oint [V]enture."  *See, e.g.,* Prudential Ex. 15.[8]

---

[8]  Although Prudential argues that it only had a 25% ownership interest based on
certain after-the-fact accounting "lookback" options Prudential subsequently decided
to implement (Prud. Mem. at 27), Prudential's *post hoc* accounting does not change
the fact that Prudential owned 38% of the Joint Venture at the time of the Offering.
In any event, even an ownership level of 25% established that the Joint Venture
Litigation "concerned" prudential under GAAP.

Consequently, and as Defendants admit, Prudential used "equity accounting" to account for its investment in the Joint Venture in that Prudential owned over 20% of the Joint Venture.  *See* Prud. Mem. at 27, 35.  "Ownership of 20% or more of the voting stock of an investee should lead to a presumption that . . . an investor has the ability to exercise significant influence over the investee" and that "the investing company is required to report its percentage share of the investee's income or loss on its own financial statement."  *Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 164 n.7 (2d Cir. 2000) (citing Accounting Principles Board Opinion No. 18 ("APB Opinion No. 18"), attached to the Prudential Motion as Exhibit 24); *see also* FASB Statement No. 57 (use of equity accounting is an admission of "significant influence").  Consequently, these admissions are themselves enough under GAAP to establish that the Joint Venture's affairs "concern" Prudential.

Prudential essentially ***admitted*** that the Joint Venture Litigation concerned Prudential in its Form 10-Q for the quarter ended June 30, 2008 – the period of the Offering – where it (belatedly) disclosed the existence of the Joint Venture Litigation for the first time.  Prudential explained that the Company's earnings included "[e]arnings of the [J]oint [V]enture," and thus that Prudential's earnings were themselves "subject to certain risks of the [J]oint [V]enture operations, including . . . legal actions, including a putative class action, and investigations by securities

17

regulators and agencies relating to [the Joint Venture's] role in the underwriting, sale, and auction of auction rate securities." *See* ¶46.  Not surprisingly, Defendants fail to mention this admission in their briefs.

That the Joint Venture Litigation "concerned" Prudential is further confirmed by the hundreds of millions of dollars that Prudential has already paid to resolve a portion of the Joint Venture Litigation.  Defendants admit that to date Prudential has taken *$235 million* in pre-tax charges arising from its ownership interest in the Joint Venture to resolve its liability.  ¶46.  These charges, if reflected in the Registration Statement, would have *eliminated* Prudential's reported net income for the quarter ended March 31, 2008.

Defendants' argument that their failure to disclose the Joint Venture Litigation did not render those statements false and misleading because the Joint Venture had not finished negotiating the $235 million settlement as of the June 24, 2008 Offering (Prud. Mem. at 31-33) mischaracterizes the claims in the Complaint in that Plaintiff does not contend that the failure to disclose settlement negotiations was improper. Rather, the Complaint alleges that the concealment of (i) the existence of the Joint Venture Litigation; and (ii) the amount of the potential liabilities from the Joint Venture Litigation rendered the Registration Statement materially misleading. Because the existence of and potential liability from litigation must be disclosed long

before the commencement of settlement negotiations near the end of a case,

Defendants' argument is wrong.[9]

     Defendants' argument that Prudential was not required under GAAP to

disclose the Joint Venture Litigation because the Prudential did not have direct

liability for the Joint Venture's litigation exposure likewise fails.  As discussed

above, Prudential's undisputed use of "equity accounting" (*see* Prud. Mem. at 35)

establishes that Prudential *was* liable under GAAP for the Joint Venture Litigation.

*Ganino,* 228 F.3d at 164 n.7.  Incredibly, Defendants ignore the allegation that

*Prudential* has to date taken *$235 million* in pre-tax charges to resolve the Joint

Venture Litigation (¶46).  Given these undisputed facts, there can be no question that

*Prudential* was liable for the Joint Venture's conduct.[10]

---

[9]  Defendants' bizarre argument that they were not required to disclose the Joint Venture Litigation because disclosure was not required by an SEC rule *not* alleged by Plaintiff (Item *103* of SEC Reg. S-K, 17 C.F.R. 229.103) (Prud. Mem. at 28-29), is without merit.  Item 103 only requires disclosure of litigation where a registrant is a named party in a lawsuit.  Because Plaintiff does not allege that Prudential was named as a defendant in the Joint Venture Litigation, Plaintiff did *not* allege that Prudential was required to disclose the Joint Venture Litigation under Item 103. However, nothing in Item 103 immunizes a joint venture partner like Prudential from liability for failure to disclose material facts required under *other* statutory, regulatory or GAAP provisions.  Nor does Prudential cite to any authority that reads Item 103 to grant such immunity, as no authority exists for such a nonsensical proposition.

[10]  Defendants' argument that Prudential was not required to disclose or account for the Joint Venture Litigation under GAAP because Prudential was only a "minority investor" in the Joint Venture (Prud. Mem. at 35-36) is equally without merit.  GAAP requires that any material loss contingency impacting the Joint Venture's net income

Defendants' argument that Defendants' misrepresentations and omissions were immaterial as a matter of law (Prud. Mem. at 36-37) is also contrary to the factual allegations in the Complaint and without merit.  Materiality is a question of fact that is uniquely inappropriate for resolution on a motion to dismiss because the determination "requires delicate assessments of the inferences a 'reasonable [prospective purchaser]' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *TSC Industries v. Northway, Inc.,* 426 U.S. 438, 450 (1976) (footnotes omitted); *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 280-81 & n.11 (3d Cir. 1992) (an omitted fact is material so long as there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available") (quoting *TSC Indus.*, 426 U.S. at 449).  "Only if the alleged misrepresentations or omissions are so

---

(such as the pendency of the Joint Venture Litigation) be reported or disclosed as part of Prudential's statement of net income, regardless of whether Prudential is only a "minority investor."  APB Opinion No. 18 (GAAP requires an investor using the equity method of accounting to "adjust[] the carrying amount of the investment to recognize the investor's share of the earnings or losses of the investee" and that that adjustment must be "***included in the determination of net income by the investor***") (emphasis added).  Defendants' related argument that "like any stakeholder in a corporation, Prudential was not responsible for potential legal liability Wachovia Securities faced, except as otherwise agreed" (Prud, Mem. at 35-36) is puzzling.  Given that Prudential has paid ***$235 million*** to date, it is clear that Prudential is not just another "stakeholder in a corporation," but rather "agreed" to substantial financial responsibility for the Joint Venture.

***obviously unimportant*** to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." *In re Adams Golf, Inc. Sec. Litig.,* 381 F.3d 267, 274-75 (3d Cir. 2004) (dismissal proper only if alleged misrepresentations "were plainly unimportant to a reasonable investor") (emphasis in original; citations omitted). Materiality is ***not*** amenable to numerical formulas or cutoffs. *Basic v. Levinson,* 485 U.S. 224, 233, 236 n.14 (1988) (rejecting any "bright-line rule" for evaluating materiality because "[t]he materiality concept is judgmental in nature and it is not possible to translate this into a numerical formula"); *Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 162-63 (2d Cir. 2000) (citing *Basic* and rejecting "formulaic approach" or numerical benchmarks to establish materiality). Given the ***hundreds of millions of dollars*** in liability – enough to ***completely wipe out*** Prudential's reported net income in the Registration Statement – at the very least there is a question of fact as to whether the concealment of the Joint Venture Litigation was a material fact to investors who purchased Notes (and it certainly cannot be said to be "obviously unimportant" as a matter of law).

Similarly unavailing is Defendants' argument that the existence of the Joint Venture Litigation was "immaterial" because it purportedly did not affect "Prudential's ability to repay the Notes or make interest payments" (Prud. Mem. at

36-37).  The fact that Prudential's liability for the Joint Venture Litigation (to date) is hundreds of millions of dollars, enough to ***completely eliminate*** Prudential's reported net income in the Registration Statement, cannot be said to be "obviously unimportant" to Note investors (or to not affect Prudential's ability to repay the Notes or make interest payments as a matter of law).  The prices and interest rates for bonds fluctuate based on the perceived risk of repayment and credit ratings.  For example, United States treasury bonds have the lowest interest rates because there is no repayment risk.  Junk bonds have the highest interest rates and trade like stocks.  The prices and interest rates of corporate bonds fall across a wide spectrum between the two, and these prices fluctuate dramatically based on the financial condition of the issuer.  The bonds of a highly profitable company are worth more than the bonds of a company that loses money.  Consequently, whether Prudential made or lost money would be material.  Moreover, this argument raises questions of fact beyond the allegations of the Complaint and the mattes at issue here before the Court.[11]

---

[11]  Defendants' reliance on *Kusner v. First Pennsylvania Corp.,* 531 F.2d 1234, 1237 (3d Cir. 1976) is without merit.  The *Kusner* court merely examined in *dicta* the types of misrepresentations that might be of interest to holders of various types of securities (including convertible and non-convertible bonds), before holding that "a misrepresentation in the prospectus that would be material do a stock purchaser would be material to a convertible bond purchaser."  *Id.* at 1237.  The *Kusner* court did ***not*** address the present situation – where the misrepresentations alleged in a Registration Statement would completely wipe out the issuer's quarterly earnings – and certainly did not hold that such misrepresentations would be "immaterial" to bond holders.

Finally, Defendants' argument that it had no duty to disclose under Item 303 because it did not know about the Joint Venture Litigation (Prud. Mem. at 33-34) is without merit.  It strains credibility to believe that Prudential was simply unaware of lawsuits (including government investigations) concerning a Joint Venture in which it held a 38% ownership interest and which produced $51 million in pre-tax income for Prudential in the quarter ended March 31, 2008 (which, even after accounting for taxes, would comprise a substantial portion of the $69 million in net income that Prudential reported for that quarter).[12]

---

[12]  Although Plaintiff is not required to allege facts giving rise to a "strong inference" that Defendants knew about the Joint Venture Litigation prior to the Offering to state a claim under the Securities Act (as opposed to claims to the Securities Exchange Act of 1934), the facts concerning the Joint Venture Litigation would easily satisfy a scienter pleading standard given the significance of the Joint Venture to Prudential. *See, e.g., Berson v. Applied Signal Tech., Inc.,* 527 F.3d 982, 987-88 (9th Cir. 2008) (defendant officers' high level position in company infers scienter of their knowledge of financial issue with "devastating effect on the corporation's revenue"); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.,* 320 F.3d 920, 942-43 (9th Cir. 2003) (reversing district court's dismissal on ground that complaint failed to allege strong inference that defendants knew of airline's undisclosed maintenance and operational problems because assertions even by ***outside director*** defendants that they did not know of alleged significant problems affecting important aspects of a company's business and operations are "patently incredible" and "absurd").

C.    **Defendants Misrepresented The Amount of Money Required To Pay For Prudential's Annuity Obligations And Deferred Policy Acquisition Costs**

1.    **Plaintiff Alleges Material Misrepresentations and Omissions Concerning the Cost Of Funding Prudential's Annuity And Deferred Acquisition Costs**

Plaintiff has alleged a *prima facie* § 11 claim concerning the material misrepresentations of present fact concerning the actual costs of funding Prudential's annuity and deferred acquisition costs.  The Registration Statement represented that Prudential earned approximately $54 million in pre-tax income for the quarter ended March 31, 2008.  ¶55.  This $54 million had been calculated *after* establishing a reserve to pay for Prudential's annuity obligations (*i.e.,* the amount of money required to pay for Prudential's obligations under the annuity contracts it sold to customers) and its deferred policy acquisition costs (*i.e.,* the amount of money required to pay for Prudential's commissions to sales agents, underwriting costs, and other costs incurred in connection with the sale of annuities) (the "Reserves").  ¶56. The Registration Statement further represented that the amount of the Reserves was calculated using statistically generated hypothetical "future rate of return assumptions" about the performance of the Company's investments contained in the Reserves, and that Prudential would have had to set aside an additional $30 million if the *actual* performance of Prudential's investments *to date* had been used to calculate

the needed reserves (instead of just the hypothetical "future rate of return assumptions"). ¶¶56-57.

The representations that the actual performance of Prudential's investments to date required Prudential to set aside only an additional $30 million were false because the actual performance of Prudential's investments as of the Offering required up to an additional $380 million, up to twelve times more. Had this $380 million amount been added to the Reserves at the time of the Offering, the charge would have completely eliminated the Company's reported net income of $69 million and in fact would have resulted in a significant, material loss. ¶59.

Not only was Defendants' statement that, based on actual performance, an additional $30 million would be needed to pay Prudential's annuity and deferred policy acquisition costs false because it should have been up to $380 million, it was also false because Prudential had not even done a legitimate analysis of its actual performance. Defendants *admit* that when they reported Prudential's reserves in connection with the June 24, 2008 Offering, Prudential had not updated the financial data and assumptions since the third quarter of 2007. Prud. Mem. at 13. Moreover, Defendant Carbone (Prudential's Chief Financial Officer) admitted during a conference call on October 30, 2008 that the Company's investments had been steadily deteriorating since well before the Offering. *See* ¶58 (Prudential's

25

investments had been deteriorating "over the past year," *i.e.,* since eight months **before** the Offering).  Consequently, the $30 million figure was **not** based upon the actual performance of the Company's investments at the time of the Offering because it did **not** take into account the admitted deterioration of the Company's investments in the eight months since October 2007.[13]

### 2.     Defendants' Arguments Are Without Merit

Defendants make the remarkable argument that Prudential's affirmative statement that use of actual investment performance required only a **$30** million increase to the Reserves somehow "alerted investors" that the Company would need to increase reserves by up to **$350 million more** "if investment performance did not improve."  Prud. Mem. at 10-11.  To the contrary, a reasonable investor would have

---

[13]  During the October 30, 2008 conference call, Mark Grier (Prudential's Vice Chairman) admitted that prior to the close of the third financial quarter ended September 30, 2008, Prudential had calculated its Reserves based upon overly optimistic future rate of return assumptions and stated that in the future Prudential would (i) cap assumed future investment returns at 10.5%; (ii) change future cost assumptions to reflect the fact "that future performance will average out with historical performance;" and (iii) "give effect to market performance each quarter" because previously "we have held out [*i.e.,* ignored] the impact of market performance until the annual review in the third quarter."  Although Grier's statement is not specifically alleged in the Complaint, it is contained in the same October 30 Conference Call discussed in the Complaint (*see* ¶58).  As Defendants acknowledge (Prud. Mem. at 12, n. 6), a court may consider the full text of documents referred to or relied on in the complaint.  *See, e.g., In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997).  Moreover, Plaintiff could file an amended complaint with the additional allegation in the event that the Court believes that doing so is necessary.

understood Prudential's representation to mean what it said: that investment returns were such that only *$30* million in additional Reserves would be necessary if actual investment performance were used, not that the actual performance of the Company's investments would require Prudential to pay more than ten times greater than that $30 million amount.   Moreover, because GAAP requires future rate of return assumptions to be evaluated regularly (*see* FASB Statement No. 97, par. 25), a reasonable investor also would have assumed that the Company had already adjusted downward its "future return assumptions" to account for the deteriorating investment returns it was actually experiencing.   A reasonable investor would *not* know from the Registration Statement that Prudential would need to increase reserves by up to *$350 million more* (*i.e.,* over ten times more) to pay for the Company's annuity and deferred acquisition costs.[14]

---

[14]   Defendants' argument that "Prudential's 2007 annual report on Form 10-K put investors . . . on notice of this annual review process" (Prud. Mem. at 13, citing Prudential Ex. 2 (PRU 2007 10-K at 82-83)) is without merit.  The Registration Statement specifically stated that an additional $30 million would be necessary to pay for Prudential's annuity and deferred policy acquisition costs as of the quarter ended March 31, 2008, if actual performance of Prudential's investments were used.  From this misrepresentation, a reasonable investor would necessarily infer that Prudential *had* conducted an analysis as of the March 31, 2008, quarter.  Moreover, although the Form 10-K discusses (in the notes to the financial statements) an "annual review" in connection with Prudential's annuity obligations, it does not inform investors that interim reviews did not also occur each quarter (or specify that the annual review had not occurred since the third quarter of 2007).

Second, Defendants are incorrect that there are no facts that "support any inference that consideration of actual performance in the first quarter would have required increasing reserves . . . by $380 million at that time" (Prud. Mem. at 11; *see* Prud. Mem. at 11-14).[15]  The Complaint specifically alleges that Defendant Carbone *admitted* during the October 30, 2008 conference call that the decline in the actual performance of the Company's investments necessitating the additional $380 million was the result of declines in the actual performance of the Company's investments since *October 2007*, eight months before the Offering.  ¶ 58.[16]  In addition, Prudential

---

[15]  As an initial matter, Plaintiff does *not* allege that the full $380 million charge eventually taken in the third quarter should necessarily have been taken at the time of the Offering.  Plaintiff alleges that, based on Prudential's own admission in October 2008 that performance had been deteriorating "over the past year," an amount "*as much as* $380 million" should have been charged in the Offering.  ¶¶ 58, 60 (emphasis added).  The precise charge that Prudential should have taken at the time of the Offering will necessarily be the subject of discovery and expert analysis.  *See, e.g., Ottmann v. Hanger Orthopedic Group, Inc.,* 353 F.3d 338, 350 n. 8 (4th Cir. 2003) (holding that "[i]t is inappropriate at the pleading state, before discovery" to require plaintiff to provide precise detail of alleged improper financial results); *In re Cigna Corp. Sec. Litig.,* 459 F. Supp. 2d 338, 356-57 (E.D. Pa. 2006) (due to "complexity" of determining precise financial impact of alleged misrepresentation and need for expert testimony, "the task of determining the precise measure of economic loss and damages here is best assigned to the factfinder at trial")

[16]  Contrary to Defendants' arguments (Prud. Mem. at 14), nothing in *In re Adams Golf, Inc. Sec. Litig.,* 176 F. Supp. 2d 216, 221 (D. Del. 2001), *aff'd in part by* 381 F.3d 267 (3d Cir. 2004), prevents the Court from considering Prudential's admission that the decline in the actual performance of the Company's investments had occurred "over the past year."  The Court of Appeals found that there was "nothing contrary or inconsistent" between the defendant's statement that an oversupply of inventory at the retail level "has weakened club sales industry-wide over the last 12 months [and]

admitted (as discussed above) that, as of the Offering, Prudential had not even

calculated the impact of actual market performance in almost a year (since October

2007).  Consequently, Prudential effectively admitted that the $30 million reserve

figure did not account for the deteriorating actual performance between October,

2007 and June, 2008.  For these reasons, Defendants' argument that the need to come

up with up to an additional $350 million did not exist at the time of the Offering (but

was solely due to a "market-related decline" that "worsened precipitously in late

September 2008)" (Prud. Mem. at 14) is directly contrary to the facts and, at best, is a

question of fact that is uniquely inappropriate for resolution on a motion to dismiss.[17]

---

resulted in substantial reductions in retailer purchases" (*see* 176 F. Supp. 2d at 221)
and the earlier representations in the registration statement that "[t]he Company
believes its prompt delivery of products enables its retail accounts to maintain smaller
quantities of inventory than may be required with other golf equipment
manufacturers" and "general forward-looking statements concerning the trends
'likely to increase the demand' for [defendant's] products." 381 F.3d at 279.  By
contrast, there is an inherent contradiction in this litigation between Defendants'
representation in the Registration Statement that only an additional $30 million would
be necessary if actual investment performance to date were used, and its admission
four months later that, due to performance problems "over the past year," an
additional *$380* million were necessary.

[17]  Defendants' argument that it "warned investors that reserves . . . would increase if
market conditions did not improve" (Prud. Mem. at 14 & n. 9) is without merit.  As
discussed further below, Prudential's warning about what could occur *in the future*
does not relieve it of liability for misrepresentations concerning losses that had
*already occurred* as of the date of the Offering.  *See* Part IV.D.2 below; *Huddleston
v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981) ("To warn that the
untoward may occur when the event is contingent is prudent; to caution that it is only

Finally, as discussed above (*see* Part IV.B.2), Defendants argument that these misstatements were immaterial as a matter of law (Prud. Mem. at 16-17) is wrong. Defendants' misrepresentations and omissions understated Prudential's liability by up to $380 million, which would be enough to ***completely wipe out*** Prudential's net income.  As discussed above, this information would be tremendously important to investors who purchased Notes in the Offering (and certainly cannot be said to be "obviously unimportant").  At best, Defendants' materiality argument should be rejected as it requires the resolution of disputed fact questions, which is inappropriate on a motion to dismiss.

### D.     Plaintiff's Impairment Allegations State A Claim

#### 1.     Plaintiff's Allegations Concerning Other-Than Temporary Impairments of Prudential's Assets State A Claim

Plaintiff has alleged a *prima facie* Section 11 claim concerning the material misrepresentations in the Registration Statement arising out of the understatement of the amount of "other than temporary impairments" of Prudential's assets.  As discussed above, the Registration Statement represented that Prudential had net income of $69 million for the quarter ended March 31, 2008.  ¶3.  These financial results had been calculated after accounting for $539 million in "other-than-

_____

possible for the unfavorable events to happen when they have already occurred is deceit."), *aff'd in part, rev'd in part on other grounds*, 459 U.S. 375 (1983).

temporary impairment" losses on "fixed maturity securities" for the quarter ended

March 31, 2008.  ¶63.  Prudential recognized "other-than-temporary impairments" on

its asset-backed fixed maturity securities when the value of those securities had

decreased in amount (i) by 20% or more for six months or (ii) by 50%. *Id.*

On July 31, 2008, Prudential conducted a conference call with analysts

discussing the results of Prudential's quarter ended June 30, 2008 (the "July 31

Conference Call").  ¶64.  During the July 31 Conference Call, Defendant Carbone

(Prudential's CFO) reported that Prudential was recognizing an additional "$452

million of fixed maturity impairments" in the quarter ended June 30, 2008.  ¶65.

Carbone then admitted that $205 million of this $452 million was due to impairments

to asset-backed fixed maturity securities that "came primarily from declines of 50%

or more that were in the zero to three month category at March 31[, 2008]." *Id.*

Because they declined by more than 50% prior to March 31, 2008, they should have

been recorded as "other-than-temporary" impairment losses as of March 31, 2008.

Had this additional impairment of $205 million been accounted for in the Registration

Statement, the loss would have wiped out the net income of $69 million reported for

the quarter ended March 31, 2008.

Carbone's statement that the $205 million consisted of asset-backed fixed

maturity securities that were ***already*** impaired by more than 50% in the quarter ended

March 31, 2008 rendered the Registration Statement materially false and misleading

for failing to account for this (already extant) $205 million in "other-than-temporary"

losses.  ¶64. In the alternative, even assuming (as Defendants strenuously argue; see

Part IV.D.2 below) that the $205 million at issue only became impaired by 50%

during the quarter ended June 30, 2008 (rather than during the quarter ended March

30, 2008), Defendants are liable under Item 303 because the Registration Statement

failed to disclose this clearly known trend that would have a materially unfavorable

impact on income from continuing operations.  ¶66.  As noted above, the effective

date of the Offering was June 24, 2008 – only four business days before the end of

Prudential's June 30, 2008 quarter.  ¶41.  Accordingly, even assuming that the

additional $205 million of asset-backed fixed maturity securities had not become

impaired by 50% by March 31, 2008, there is no dispute that they were impaired by

50% or more by the June 24, 2008 effective date of the Offering.[18]

### 2.      Defendants' Arguments Are Without Merit

Defendants' arguments that they are not liable for their misrepresentations and

omissions concerning the amount of "other than temporary impairments" of the

Company's assets are unavailing.  Indeed, Defendants' primary argument – that the

$205 million in assets were not impaired by 50% as of March 31, 2008, but only

---

[18]   There is absolutely no factual basis to infer that the assets magically became
impaired by 50% in the four business days between June 25, 2008 and June 30, 2008.

became impaired by 50% ***during*** the quarter ended June 30, 2008 – is effectively an admission that Defendants were required to disclose this negative "trend" in the Registration Statement under Item 303.

Although Defendants devote several pages of their brief contesting Plaintiff's allegation that Carbone's statements during the July 31 Conference Call constituted an admission that the $205 million of assets were impaired by 50% as of March 31, 2008 (*see* Prud. Mem. at 18-23), a plain reading of Carbone's statement – that the $205 million represented impairments to asset-backed fixed maturity securities that "came primarily from declines of 50% or more that were in the zero to three month category at March 31[, 2008]" – clearly confirms the allegations.  Even if there is a dispute about how investors would have understood disputed language, which Plaintiff denies, that is a question of fact not amenable to resolution on a motion to dismiss.  *See, e.g., In re ValueVision Intern., Inc. Sec. Litig.,* 896 F. Supp. 434, 443 (E.D. Pa. 1995) (holding that, where dispute over how reasonable investors would interpret statements in defendants' press releases, the court "cannot resolve this factual dispute on a motion to dismiss").[19]

---

[19]  *See Angres v. Smallworldwide PLC,* 94 F. Supp. 2d 1167, 1174 (D. Colo. 2000) (denying motion to dismiss where the parties disputed the meaning of the term "release" used by a software developer because "[a] dispute over how reasonable investors understand a term contained within defendants' statements is a factual inquiry which cannot be determined on a motion to dismiss"); *In re Par Pharmaceutical Sec. Litig.*, 733 F. Supp. 668, 677 (S.D.N.Y. 1990) ("A statement is

However, even assuming, *arguendo,* that Defendants' arguments concerning Carbone's statements during the July 31 Conference Call were true, Defendants' own argument **confirms** that Defendants are liable under Item 303.  Defendants argue at length that "what drove the additional $205 million in impairment charges was precipitous decline" **during** the **June 30, 2008** quarter (rather than the March 31, 2008 quarter).  Prud. Mem. at 23.   Significantly, Defendants do not dispute that, although Defendants conducted the Offering on June 24, 2008 (just four business days **before** the end of the quarter), Defendants did not disclose this "precipitous decline" in the Prospectus Supplement filed on that date or anywhere else in the Registration Statement.  This is precisely the type of material, adverse trend for which Item 303 compels disclosure.

Defendants are also incorrect that the Registration Statement somehow purportedly warned investors that $205 million in impairments of Prudential's asset-backed fixed maturity securities had occurred.  *See* Prud. Mem. at 23-24.  As discussed above, even Defendants admit that the additional $205 million of assets had already become impaired by 50% by the June 30, 2008 quarter.  One of the purported

---

misleading if a reasonable investor, in the exercise of due care, would have received a false impression from the statement.  Because this determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts, it is generally a question of fact for the jury"; motion to dismiss denied) (citations and quotation marks omitted).

warnings cited by Defendants – that "Prudential had already recorded $539 million in other-than-temporary impairment charges" as of March 31, 2008 – is simply a statement of past fact that did not even remotely warn that ***additional*** impairments had ***already*** occurred during the June quarter.  Likewise, the remaining two warnings cited by Defendants only generically state the obvious – that impairment losses "can be expected to increase when economic conditions worsen" and that additional impairments could occur "if the market did not improve;" they do not disclose that, by the time of the Offering, $205 million in additional impairments (enough to eliminate Prudential's reported income in the Registration Statement) had ***already*** occurred.  Purported cautionary language that warns of adverse events that could conceivably occur in the future does not immunize defendants from liability for failing to disclose adverse events that have already in fact occurred.  *See Makor Issues & Rights, Ltd. v. Tellabs Inc.,* 437 F.3d 588, 598-500 (7th Cir. 2006) (when defendants knew that product demand was already drying up and production was far behind schedule, warnings that an industry downturn could affect forecasts or that there were risks associated with introducing new products were inadequate); *Huddleston*, 640 F.2d at 544 ("To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.").[20]

---

[20]  *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 249 (5th Cir. 2009) (purported

Finally, Defendants' argument that the additional $205 million in impairments as of the Offering – enough to eliminate Prudential's income as reported in the Registration Statement – somehow was not "material" as a matter of law (Prud. Mem. at 25-26) is without merit.  As discussed above, materiality is a question of fact and, in any event, it would not have been "obviously unimportant" for investors to know that Prudential was overstating its income and that, if the overstatement were properly removed, Prudential would have a net loss.  *See* Part IV.B.2 above.

### E.       Plaintiff Has Properly Pled Compensable Loss

Plaintiff has easily satisfied the minimal burden for pleading damages in a  § 11 claim.  "Under § 11(e), the measure of damages is set as the difference between the price paid for a security purchased pursuant to the registration statement, and the price at the time suit was filed or the security was sold. . . .  Any decline in value is presumed to be cause by the misrepresentation in the registration statement."  *In re Constar,* 585 F.3d at 782-83 (citations omitted); *see* 15 U.S.C. §77k(e).  Here, Plaintiff alleged that he purchased Notes pursuant to or traceable to the Registration Statement (¶8) and that suit was filed on March 4, 2009, by which point the Notes

---

risk warnings were misleading because the "defendants continually skewed the mix of information by omitting the known severe risks associated with these business actions even as they recognized signs that those risks had already materialized"), *citing Rubenstein v. Collins,* 20 F.3d 160, 171 (5th Cir. 1994) ("the inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known material, adverse facts") and *Huddleston,* 640 F.2d at 544.

were trading at only \$13.04 per Note, approximately 48% below the \$25 per Note offering price (¶78).

Defendants' argument that Plaintiff suffered no loss because "[t]he Notes are currently trading above the offering price" and Plaintiff did not sell his Notes at a loss (Prud. Mem. at 37) ignores the plain language of §11(e) (and the Third Circuit's express holding in *Constar*), which specifically provides that Plaintiff's damages are measured by the (undisputed) difference between the \$25 per Note Offering price and \$13.04 per Note price on March 4, 2009, when this litigation was first filed.[21] Defendants further argue (Prud. Mem. at 37-38) that Plaintiff has not properly alleged that the misrepresentations alleged in the complaint "caused" Plaintiff's damages. To the contrary, however, "[i]n a §11 case, plaintiffs do ***not*** have the burden of proving causation." *In re Constar,* 585 F.3d at 782-83 (emphasis added). Rather, "defendants may assert, ***as an affirmative defense,*** that a lower share value did not result from any nondisclosure or false statement." *Id.* (emphasis added).

---

[21] Defendants are incorrect that *Luminent Mortg. Captial, Inc. v. Merrill Lynch & Co.,* No. 07-5423, 2009 WL 2590087 (E.D. Pa. Aug. 20, 2009) requires that a plaintiff in a § 11 case actually have sold his securities at a price lower than the offering price in order to allege damages. In *Luminent,* the plaintiff only alleged that he suffered damages from an investment in mortgage-backed securities because the investment paid a lower "income stream" than had been represented in the offering documents. *Id.* at *13. Whatever the merits of plaintiff's unusual and non-statutory damages claim in *Luminent*, they do not impact the adequacy of Plaintiff's damages allegations here, which conform directly to § 11(e) and the Third Circuit's holding in *Constar*.

**F.      The Complaint States A Claim Against The Individual Defendants And The Underwriter Defendants**

Plaintiff has adequately alleged the primary liability of the Individual Defendants and the Underwriter Defendants under § 11.[22]  As discussed above (*see* Part IV.A.1), in order "to establish his *prima face* case" under §11, Plaintiff "need only show a material misstatement or omission" in the Registration Statement. *Herman & MacLean,* 459 U.S. at 381-82; *In re Suprema Specialties, Inc.,* 438 F.3d at 269; *see* 15 U.S.C. § 77k(a).  The Individual Defendants each signed the Registration Statement (¶¶10-23), and the Underwriter Defendants each underwrote the Offering (¶¶25-32).  Accordingly, Plaintiff has met his pleading burden.  Each of these Defendants now "bear the burden of demonstrating due diligence" *as an affirmative defense* in order to escape liability.  *Herman & MacLean,* 459 U.S. at 381-82*; see* 15 U.S.C. §77k(b).  Contrary to Defendants' argument (Prud. Mem. at 39; Und. Mem. at 2), Plaintiff has no obligation to allege facts rebutting this potential *affirmative defense* as part of Plaintiff's own Complaint.[23]

---

[22]   The Underwriter Defendants' motion to dismiss makes no additional argument beyond incorporating by reference the arguments in the Prudential Defendants' motion to dismiss (*see* Und. Mem. at 1).  Accordingly, the Underwriter Defendants' motion to dismiss should similarly be denied for all of the reasons set forth in this brief.

[23]   Defendants' argument that, contrary to the fundamental nature of an affirmative defense, *Plaintiff* has the burden of *pleading* that Defendants' affirmative defense does *not* apply (Prud. Mem. at 39) is plainly wrong.  In the sole authority cited by

G.   **The Complaint States A Control Person Claim Against The Individual Defendants**

Plaintiff also has alleged the control person liability of each Individual Defendant under §15 of the Securities Act, 15 U.S.C. §77o.  "In order to plead control person liability [under §15], a plaintiff must allege facts that show that the defendant had the power or potential power to influence and control the activities during the relevant period *or* that the defendant had actual control over the transaction in question."  *In re PMA Capital Corp. Sec. Litig.,* No. 03-6121, 2005 WL 1806503, at *20 (E.D. Pa. July 27, 2005) (emphasis added).  Defendants' argument that plaintiffs must "allege that each individual defendant had control over or involvement in the specific statements of the issuer being challenged" (Prud. Mem. at 39) improperly focuses only on the second component of the control person test. Here, the fact that each Individual Defendant signed the Registration Statement demonstrates that he or she had the "potential power to influence" whether it was filed or not (and thus whether the Offering occurred or not).  This is enough to satisfy the standard for pleading a §15 violation.  *See id.* (denying individual defendant's

---

Defendants for this tenuous proposition, the court held that the plaintiff had the burden to plead facts rebutting the application of an affirmative defense specifically ***"[b]ecause the[] due diligence defense appear[ed] on the face of the" complaint***.  *In re Countrywide Fin. Corp. Sec. Litig.,* 588 F. Supp. 2d 1132, 1181-82 (C.D. Cal. 2008).  By contrast, Defendant does not (and cannot) allege a single fact "on the face of" Plaintiff's Complaint that purportedly demonstrates that the Individual or Underwriter Defendants used "due diligence."

motion to dismiss §15 claim because "plaintiffs plead that McDonnell, as CFO, signed PMA's financial statements [and t]herefore, under the plain meaning of §15, McDonnell can be liable because his acts influenced the setting of loss reserves and the reporting of PMA's financial status").

## V.    CONCLUSION

For the foregoing reasons, Plaintiff has met all applicable pleading burdens and the Prudential and Underwriter Defendants' Motions to Dismiss should be denied.  If this Court determines that any part of the Complaint should be dismissed, Plaintiff respectfully requests leave to amend pursuant to Fed. R. Civ. P. 15(a) to address any pleading deficiencies identified by the Court.  Leave to amend should be "freely given."  Fed. R. Civ. P. 15(a); *see Foman v. Davis*, 371 U.S. 178, 182 (1962).

Dated: December 8, 2009              **LITE DEPALMA GREENBERG**
                                     **& RIVAS, LLC**

                          By:    /s/ Joseph J. DePalma
                                 Joseph J. DePalma
                                 Katrina Carroll
                                 Two Gateway Center, 12th Floor
                                 Newark, NJ 07102-5003
                                 Telephone: (973) 623-3000
                                 Facsimile: (973) 623-0858
                                 jdepalma@ldgrlaw.com

                                 *Liaison Counsel for Plaintiff*

225367 v1                        40

Jeffrey S. Nobel
Nancy A. Kulesa
**IZARD NOBEL LLP**
29 South Main Street, Suite 215
West Hartford, CT  06107
Telephone: (860) 493-6292
Facsimile: (860) 493-6290
jnobel@izardnobel.com

*Lead Counsel for Plaintiff*

225367 v1

41