Brian E. Pastuszenski (*pro hac vice*)
Deborah S. Birnbach (*pro hac vice*)
Sarah Heaton Concannon (*pro hac vice*)
Laura Stock Craven (*pro hac vice*)
GOODWIN PROCTER LLP
53 State Street
Boston, MA 02109
Tel: (617) 570-1000

Liza M. Walsh
Peter J. Pizzi
CONNELL FOLEY LLP
85 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 535-0500

*Counsel for Prudential Financial, Inc., Arthur F. Ryan,*
*Richard J. Carbone, Peter B. Sayre, Dennis G. Sullivan,*
*Frederic K. Becker, Gordon M. Bethune, Gaston Caperton,*
*Gilbert F. Casellas, James G. Cullen, William H. Gray III,*
*Jon F. Hanson, Constance J. Horner, Karl J. Krapek,*
*and James A. Unruh*

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| KAREN M. BAUER, Individually and on Behalf of All Others Similarly Situated, | ) ) ) Civil Action No. 09-01120 (JLL) |
| Plaintiff, | ) CONSOLIDATED ACTION |
| v. | ) ) Honorable Jose L. Linares |
| PRUDENTIAL FINANCIAL, INC., et al., | ) ) Oral Argument Requested |
| Defendants. | ) ) |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE PRUDENTIAL DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ....................................................................... ii

INTRODUCTION ................................................................................ 1

ARGUMENT ..................................................................................... 7

I.      PLAINTIFFS MISSTATE THE RELEVANT LEGAL STANDARDS. ....... 7

II.     PLAINTIFFS HAVE NOT ALLEGED A SECTION 11 VIOLATION ...... 12

      A.     Plaintiffs' Annuity-Related Allegations Do Not State A Claim.......... 12

            1.     Post-Offering Statements By Messrs. Carbone And Grier Provide No Plausible Basis For Plaintiffs' Allegations. .......... 12

            2.     Prudential Complied With FAS 97. ........................................ 18

      B.     Plaintiffs' Impairment Allegations Do Not State A Claim.................. 19

            1.     There Is No Plausible Basis To Argue That Additional Impairment Should Have Been Recorded In Q1 2008. ........... 19

            2.     Intraquarter Disclosure Was Not Required. ............................. 22

      C.     The Auction Rate Securities Allegations Do Not State A Claim ........ 24

      D.     Plaintiffs Have Not Pled A Compensable Loss. .................................. 28

      E.     The Allegedly Omitted Information Was Immaterial. ........................ 28

III.    THE INDIVIDUAL DEFENDANT CLAIMS MUST BE DISMISSED. ................................................................................ 30

CONCLUSION .................................................................................. 30

i

# TABLE OF AUTHORITIES

## CASES

*In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267 (3d Cir. 2004) .............................29

*Angres v. Smallworldwide PLC*, 94 F. Supp. 2d 1167 (D. Colo. 2000).................22

*In re Arbinet-thexchange, Inc. Sec. Litig.*, No. 05-4404 (JLL), 2006 WL
   3831396 (D.N.J. Dec. 28, 2006)...............................................................8, 9, 24

*Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009) ....................................................7

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)....................................7, 15, 16, 22

*Blackmoss Inv., Inc. v. ACA Capital Holdings, Inc*., No. 07-civ-10528,

   2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) .................................................10, 28

*In re Burlington Coat Factory,* 114 F.3d 1410 (3d Cir. 1997).............10, 11, 23, 29

*Caviness v. Derand Resources Corp.*, 983 F.2d 1295 (4th Cir. 1993)...................25

*Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460 (D.N.J. 1998).......................16

*Gray v. Bayer Corp.*, No. 08-4716 (JLL), 2009 WL 1617930 (D.N.J. June 9,
   2009) ....................................................................................................7

*J&R Mktg. SEP v. Gen. Motors Corp.*, No. 06-10201, 2007 WL
   655291(E.D. Mich. Feb. 27, 2007), *aff'd on other grounds*, 549 F.3d 384
   (6th Cir. 2007)...........................................................................................30

*Kusner v. First Pennsylvania Corp.*, 531 F.2d 1234 (3d Cir. 1976) .......................30

*Landmen Partners, Inc. v. Blackstone Group, L.P.*, No. 08-CW-3601 (HB),
   2009 WL 3029002 (S.D.N.Y. Sept. 22, 2009) .................................................8, 9

*Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182 (11th Cir. 2002)...............9, 10

*Panther Partners, Inc. v. Ikanos Commc'n, Inc.*, 538 F. Supp. 2d 662 (S.D.N.Y. 2008), *aff'd* No. 08-3398-cv, 2009 WL 2959883 (2d Cir. Sept. 17, 2009) ................................................................................................9

*Pennsylvania ex rel Zimmerman v. Pepsico, Inc.*, 836 F.2d 173 (3d Cir. 1988) ................................................................................................16

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, No. 08-10446-RGS, 2009 WL 3149775 (D. Mass. Sept. 30, 2009) ........8

*Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996) ...................................11

*Siracusano v. Matrix Initiatives, Inc.*, 585 F.3d 1167 (9th Cir. 2009) ...................25

*Spreckels v. Helvering*, 315 U.S. 626 (1942)........................................................24

*In re Turkcell Iletism Hizmetler A.S. Sec. Litig.*, 202 F. Supp. 2d 8 (S.D.N.Y. 2001) ..........................................................................................9

*In re Ultimate Corp. Sec. Litig.*, No. 86-civ-5944, 1989 WL 86961 (S.D.N.Y. July 31, 1989) ................................................................................9

*In re ValueVision Int'l Sec. Litig.*, 896 F. Supp. 434 (E.D. Pa. 1995)....................22

*In re Vonage Initial Pub. Offering Sec. Litig.*, No. 07-177 (FLW) 2009 WL 936872 (D.N.J. Apr. 6, 2009) ......................................................7, 25

*Zell v. InterCapital Income Sec., Inc.*, 675 F.2d 1041 (9th Cir. 1982)...................25

*Zucker v. Quasha*, 891 F. Supp. 1010 (D.N.J. 1995), *aff'd*, 82 F.3d 408 (3d Cir. 1996) ....................................................................................10, 11, 23

## STATUTES

15 U.S.C. § 77k(e) ..............................................................................................28

## RULES AND REGULATIONS

Federal Rule 9(b) ..................................................................................................7

**OTHER AUTHORITIES**

Financial Accounting Standards Board Statement No. 97 ......................................18

## INTRODUCTION

Plaintiffs' Opposition confirms that this case should be dismissed. Plaintiffs argue that Prudential should be held responsible under the securities laws for not predicting that financial statement charges for two regularly-reported line items would be negatively affected by the precipitous economic decline that occurred in the quarters following the Offering of the Notes. But the securities laws are not investment insurance – they do not insulate investors against market declines or give investors the right to recover when their investments temporarily drop in value due to market downturns. Plaintiffs plead no facts that plausibly show that the Offering Materials contained anything but accurate historical results for the first quarter of 2008, or that any of the allegedly omitted information even existed prior to the Offering – much less that Defendants were aware of it. Plaintiffs fail to allege that the claimed omissions reflected anything other than the impact of post-Offering declines in the capital markets (where Prudential expressly disclosed the risk and potential impact of future market deterioration) or that the non-cash charges were otherwise material to debt investors in an entity with over $478 billion in assets as of the first quarter 2008[1]. The Opposition highlights that Plain-

---

[1] Reply Ex. 1 (PRU 1Q08 10-Q), at 1. Citations to "Reply Ex." refer to exhibits attached to the Declaration of Laura Stock Craven in Further Support of the Prudential Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint (Jan. 26, 2010). Citations to "Ex." refer to the exhibits attached to the Declaration of Katherine G. McKenney in Support of the Prudential Defendants'

tiffs:

• Seek opportunistically to capitalize on the turmoil in the U.S. and global capital markets during the second and third quarters of 2008. As Prudential specifically disclosed, that post-Offering turmoil led to increases in subsequent quarters of certain reserves and impairment charges that Plaintiffs argue, with no factual basis, should have been recorded in the first quarter, prior to the Offering;

• Make arguments that are contradicted by the undisputed documents that Prudential filed with the SEC and upon which the Complaint itself relies;

• In the absence of any facts showing that even a single statement in the Offering Materials was false when made, depend on selectively and incompletely quoting post-Offering remarks made by two Prudential officers; and

• Ask the Court to draw inferences that are not pled with the particularity required of allegations that "sound in fraud" (as these do) and are not even plausible in light of the documents and information referenced in the Complaint and of which the Court may take judicial notice.

More specifically, Plaintiffs' claims fail for the following principal reasons:

**Annuity-Related Charges**: Each quarter, Prudential discloses in its financial statements that quarter's reserve adjustments relating to its obligations to annuity account holders as well as its amortization of deferred policy acquisition costs ("DAC") associated with annuity accounts.[2] Plaintiffs argue that the Offering Materials were somehow false or misleading because the annuity-related reserves that

---

Motion to Dismiss the Consolidated Amended Class Action Complaint (Sept. 21, 2009).

[2] Prudential records reserves for its future policy benefit liabilities to annuity account holders, including guaranteed living and death benefits where the contractual value of those benefits exceeds annuity account holders' investment returns. DAC are costs relating primarily to the acquisition of annuity contracts, including commissions, costs of policy issuance and underwriting, and field office expenses. Pru. Mem. at 9-10 n.4.

2

Prudential recorded in its third quarter financial statements and issued months after the Offering on October 29, 2008 were not recorded in the first quarter.  Having no facts suggesting that Prudential knew any information that would have rendered the first quarter numbers false, the Complaint instead quotes selectively from remarks made by Prudential's Chief Financial Officer (Mr. Carbone) during the third quarter earnings conference call held in October 2008.  The Opposition also, for the first time, cites remarks made during that same post-Offering call by Prudential's Vice Chairman (Mr. Grier).  Even if the Court were to consider Mr. Grier's remarks (which are alleged nowhere in the Complaint), their remarks together do not plausibly support the inference that the circumstances that led to the third quarter charges existed as of the end of the first quarter.  To the contrary, when considered in their entirety, these remarks support only one inference – that, as Prudential disclosed in its third quarter 10-Q and earnings call, the third quarter charges were recorded due to worsening economic conditions that occurred *in the third quarter.*

**Impairment of Investments in Subprime Mortgage-Backed Securities**: As of the Offering date, Prudential's robust disclosures regarding impairment of certain fixed maturity securities (primarily subprime mortgage-backed securities and other asset-backed securities ("ABS")) due to deteriorating market conditions put investors on notice that market conditions already had caused declines in ABS values, and that further deterioration was possible if market conditions did not im-

prove.  In addition to disclosing impairment charges for the first quarter of $539 million and warning about possible future impairments, the Offering Materials included tables that detailed the categories of ABS that had declined in value, including $247 million of such securities that had declined by 20% or more during the first quarter and that would result in future impairment charges at the end of the second quarter if the markets did not improve.  In its second quarter financial statements, issued weeks *after* the Offering, Prudential recorded an impairment charge of $452 million in its Financial Services Businesses segment.  That amount included ABS that had declined in value by 20% or more (previously reported as $247 million in the first quarter in the Offering Materials) and additional amounts resulting from precipitous declines in value of 50% or more in ABS during the second quarter.  Plaintiffs simply subtract this previously reported $247 million from the total amount of the impairment charge taken in the second quarter and speculate that Prudential should have recorded an additional $205 million charge in its *first* quarter financial statements.  But no facts have been alleged suggesting that this additional ABS with 50% or greater declines occurred in the first quarter.  Rather, Plaintiffs' argument is based entirely on an out-of-context snippet from Mr. Carbone's remarks during the post-Offering second quarter earnings call in July 2008.  When read in their entirety, however, those remarks do not plausibly support any inference that the additional declines occurred in the first quarter.

To the contrary, Mr. Carbone stated that "at March 31" (the end of the first quarter), Prudential's ABS investments had declined by 20% or more for greater than three but less than six months, in the total amount of $247 million. Mr. Carbone explained that it was Prudential's practice to take an impairment charge after assets had declined in value by 20% or more for a period of at least six months, and that the second quarter charge thus would have totaled $247 million for those assets "*if nothing else changed*." But Mr. Carbone then explained that something did change: certain ABS investments declined precipitously (by 50% or more) after the end of the first quarter. Mr. Carbone further noted that Prudential's practice is not to wait a full six months to take an impairment charge when assets decline in value by 50% or more. The express words that Mr. Carbone used, which both the Complaint and the Opposition ignore, are inconsistent with and undermine any inference that the assets causing the additional impairment charges during the second quarter were "already impaired by more than 50% in the quarter ended March 31, 2008." Opp. at 31-32. Any such inference would be implausible.

**Reduction in Value of Minority Equity Interest in Wachovia Securities**: Plaintiffs concede in the Opposition that the SEC regulation that specifically addresses disclosure of lawsuits and regulatory investigations by an issuer – Item 103 of Regulation S-K – did not require disclosure by Prudential of the auction-rate securities ("ARS")-related litigation and regulatory investigations concerning Wa-

chovia Securities mentioned in the Complaint.  As Plaintiffs acknowledge, Prudential was not itself the subject of any such investigation and was not a defendant in any such litigation.  Rather, Plaintiffs' argument that Prudential should have disclosed these matters turns on the factually unsupported assertion that the third quarter charge that Prudential recorded in respect of its minority interest in Wachovia Securities somehow reflected the payment of a Prudential liability.  *See* Opp. at 2, 13, 18.  This assertion, however, is contradicted by the actual charge that Prudential recorded.  The Opposition does not address, much less dispute, that the non-cash charge Prudential took was simply a reduction in the equity value of its minority investment in Wachovia Securities due to that entity's settlement with state and federal regulators, not the payment of a liability by Prudential.  Because the undisputed financial statements on which the Complaint relies confirm that Prudential itself paid nothing in respect of the Wachovia Securities settlement, Plaintiffs' argument that Prudential had a contingent liability that should have been recorded under Financial Accounting Standards Board Statement No. 5 ("FAS 5") is meritless on its face.  Plaintiffs likewise do not address, much less dispute, that they have not alleged any facts that would support the inference that the prerequisites for a FAS 5 charge (*i.e.*, that the Wachovia Securities settlement was both probable and reasonably estimable as of the Offering date) had been met.

For all these reasons, this meritless action should be dismissed.

6

## ARGUMENT

## I.   PLAINTIFFS MISSTATE THE RELEVANT LEGAL STANDARDS.

**Particularity and Plausibility**:  Although Plaintiffs say they disclaim any allegations of fraud and are not subject to Federal Rule 9(b) (Opp. at 6 n.6) the Complaint in fact sounds in fraud because it portrays Prudential's disclosures as intentionally deceptive.  *See* Pru. Mem. at 8, n.3 (citing Cmplt. ¶¶ 3, 42, 52-53, 60-61, 66-67).  The Opposition also attacks Prudential's good faith by asserting, for example, that there is something "[c]urious[]" about the Offering's timing vis-à-vis the close of the second fiscal quarter.  Opp. at 3-4; *see also id*. at 32 n.18 (assets did not "magically become impaired . . . in the four business days between June 25, 2008 and June 30, 2008").  Plaintiffs cannot have it both ways.  Having chosen to attack the Offering as a scheme to conceal information, Plaintiffs must satisfy the particularity requirements of Federal Rule 9(b).  *See Gray v. Bayer Corp.*, No. 08-4716 (JLL), 2009 WL 1617930, at *2 (D.N.J. June 9, 2009) (Linares, J.); *In re Vonage Initial Pub. Offering (IPO) Sec. Litig*., No. 07-177 (FLW), 2009 WL 936872, at *5-7 (D.N.J. Apr. 6, 2009).  Plaintiffs have not pleaded the elements of fraud with particularity.  This reason alone requires dismissal.  *See* Pru. Mem. at 8, n.3.

The Complaint also fails even to satisfy the *Twombly/Iqbal* requirement that any allegation (whether sounding in fraud or not) be more than merely possible but rise to the level of plausibility.  Here, Plaintiffs' allegations are implausible be-

cause they are contradicted by the undisputed documents on which the Complaint itself relies and of which the Court can take judicial notice. *See* Pru. Mem. at 7-8.[3]

**Knowledge Requirement of Section 11 and Item 303:** Plaintiffs argue that post-Offering impairment and annuity-related charges should have been recorded in the first quarter of 2008 or, in any event, that Item 303 required disclosure of these later non-cash charges as a "known trend" as of the Offering date. Cmplt. ¶¶57-60, 63-66. Plaintiffs also argue that Defendants should be held liable "*regardless of* whether [they] actually knew or should have known the misrepresented or omitted facts," because under Section 11 "liability is 'strict.'" Opp. at 8 (emphasis in original). In making this assertion, Plaintiffs misstate the law and all but ignore this Court's holding in *In re Arbinet-thexchange, Inc. Sec. Litig.*, No. 05-4404 (JLL), 2006 WL 3831396, *4 (D.N.J. Dec. 28, 2006), that an issuer cannot violate Section 11 unless the allegedly omitted material information was known or knowable at the time the registration statement was issued. *See* Opp. at 10 & n.7 (characterizing *Arbinet* as *dicta*).

Although Section 11 is said to be a "strict liability" statute in that (unlike Section 10(b) of the 1934 Act) it does not require proof of intent to defraud, Sec-

---

[3] *Accord Landmen Partners, Inc. v. Blackstone Group, L.P.*, No. 08-CW-3601 (HB), 2009 WL 3029002, at *3, *10 (S.D.N.Y. Sept. 22, 2009) (dismissing Section 11 claims falling short of line between "possibility" and "plausibility"); *Plumbers' Union Local No. 12 Pens. Fund v. Nomura Asset Accept. Corp.*, No. 08-10446-RGS, 2009 WL 3149775, at *2, *9 (D. Mass. Sept. 30, 2009) (same).

tion 11 does not impose liability on an issuer for omission of "information of which it had no knowledge at the time of the offering." *In re Ultimate Corp. Sec. Litig.*, No. 86-civ-5944, 1989 WL 86961, at *1 (S.D.N.Y. July 31, 1989)). *Accord Arbinet*, 2006 WL 3831396, at *4; *Panther Partners, Inc. v. Ikanos Commc'n, Inc.*, 538 F. Supp. 2d 662, 669-70 (S.D.N.Y. 2008) (dismissing Section 11 claim; "critical inquiry" is "whether – and to what extent – [defendant] was aware of the issues and their potential impacts at the time of the offering statements"), *aff'd*, No. 08-3398-cv, 2009 WL 2959883 (2d. Cir. Sept. 17, 2009).

Likewise, Item 303 of SEC Regulation S-K imposes a disclosure obligation only if a material adverse trend or uncertainty is known (and not just merely knowable) at the time of a securities offering. *See* Pru. Mem. at 15. As the Eleventh Circuit stated in *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182 (11th Cir. 2002), "the first element of the Item 303 disclosure test . . . requires management to assess whether the '*known* trend, demand, commitment, event or uncertainty [is] likely to come to fruition.'" 297 F.3d at 1191 (emphasis added). *Accord Landmen Partners, Inc.*, 2009 WL 3029002, at *9 n.14 ("Both the language of Item 303 itself and the SEC releases and case law interpreting it are clear that Item 303 requires disclosure of '*known* trends.'"); *In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001) (dismissing Section 11 claims where "[t]he complaint fail[ed] to allege that there [were] 'trends' or that they were

'known'").  The Opposition does not cite a single authority to the contrary.[4]

**No Intraquarter Duty To Predict Quarterly Results:**  Prior to the end of a fiscal quarter, an issuer has no duty to predict financial results for that quarter.  *In re Burlington Coat Factory,* 114 F.3d 1410, 1432 (3d Cir. 1997) (issuer's reporting of financial results for a quarter just ended "does not contain an implicit representation that the trend is going to continue, and hence does not, in and of itself, obligate the company to update the public as to the state of the quarter in progress"); *Zucker v. Quasha*, 891 F. Supp. 1010, 1015-16 (D.N.J. 1995), *aff'd*, 82 F.3d 408 (3d Cir. 1996) (dismissing Section 11 and other claims based on alleged omission of negative quarterly results where offering made two days before quarter end).

In *Zucker*, plaintiffs argued that the defendant had a duty to disclose in its offering materials a negative trend in sales returns for the quarter ending two days after the offering.  *See* 891 F. Supp. at 1015.  Plaintiffs contended that defendant should have disclosed this information because its registration statement became

---

[4] Plaintiffs' argument that Item 303 does not require intentional omission of a known fact, only a negligent omission, misses the point and conflates intent with knowledge.  *See* Opp. at 6 & n.6 (citing *Oxford*, 297 F.3d at 1191).  *Oxford* explained that an issuer may know of a trend, but reasonably decide that trend does not meet the Item 303 materiality threshold.  *See Oxford*, 297 F.3d at 1191-92.  *Oxford* nowhere holds that an issuer can be liable for not disclosing a trend of which it was *unaware*.  *See id*.; *accord Blackmoss Inv., Inc. v. ACA Capital Holdings, Inc.*, No. 07-civ-10528, 2010 WL 148617, at *9-10 (S.D.N.Y. Jan. 14, 2010) (rejecting identical argument that 1933 Act claims are negligence-based and do not require knowledge of the allegedly omitted information, and observing that Item 303 requires disclosure only when information becomes a "known trend").

10

effective only two days before the quarter's close and because information regarding increased quarterly returns must have been available to defendant. *See id.* The court rejected this argument, stating:

> Regardless of whether a public offering occurs seventeen or only two days before the close of a fiscal quarter, data concerning a quarter that is in progress is necessarily incomplete. As a result, [the defendant] was incapable of making anything more than projections regarding return rates for the first quarter of 1994 on March 30 when its Prospectus and Registration Statement became effective.

*Id.* at 1016. The court held that nothing about the defendants' statement regarding returns for the prior quarter had been misleading, and that accurate statements of historical results impose no duty to make predictions about future results. *See id.* at 1015-16. *Zucker* is squarely on point here, and Prudential had no duty to disclose for the same reason the defendant in *Zucker* had no duty.

Intraquarter disclosure is not required unless an issuer has publicly announced its expectations for the future and then learns information indicating that future results will be an "extreme departure" from what could be anticipated based on publicly available information. *See Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1211 (1st Cir. 1996); *see also Burlington Coat*, 114 F.3d 1432, 1434 & n.20. Plaintiffs, however, have not alleged that Prudential made any such predictions of future results, much less alleged facts plausibly suggesting that the Prudential Defendants knew anything as of the Offering date that would have constituted an extreme departure from reasonably anticipated expectations as to future impairment

or annuity-related charges.  To the contrary, Prudential included robust risk factors in the Offering Materials about the potential impact on these items should the market continue to deteriorate.  Reply Ex. 5.  Prudential had no duty to disclose the allegedly omitted information about future charges (even assuming for argument's sake Plaintiffs had alleged facts plausibly indicating Prudential knew such information as of the Offering date).

## II.   PLAINTIFFS HAVE NOT ALLEGED A SECTION 11 VIOLATION.

### A.   Plaintiffs' Annuity-Related Allegations Do Not State A Claim.

Plaintiffs' annuity-related allegations are contradicted by Prudential's disclosures in the very documents that are referenced in the Complaint.

#### 1.   Post-Offering Statements By Messrs. Carbone And Grier Provide No Plausible Basis For Plaintiffs' Allegations.

The Complaint selectively quotes from certain post-Offering statements that Prudential's CFO, Mr. Carbone, made during Prudential's October 2008 third quarter earnings call regarding annuity-related charges that Prudential recorded for the third quarter ending September 30, 2008.  Plaintiffs argue that his statements support an inference that these charges should have been recorded in the first quarter ending March 31, or that they should have been disclosed as a "known trend" as of the Offering date.  For the first time in the Opposition, Plaintiffs also quote – again selectively – from post-Offering remarks made by Prudential's Vice Chair, Mr. Grier, likewise contending that these statements somehow suggest that the

12

third quarter charges should have been taken in the first quarter financial state-ments.  Neither individual's statements support the inferences Plaintiffs seek to draw.  In fact, any such inferences would be implausible, particularly when these statements are considered in their entirety, without Plaintiffs' selective editing.

In its quarterly reports before and after the Offering, Prudential disclosed the effect on adjusted quarterly operating income of increased amortization of DAC and increased annuity-related reserves due to deteriorating investment perform-ance.  *See, e.g.,* Reply Ex. 1 (PRU 1Q08 10-Q), at 50; Reply Ex. 2 (PRU 2Q08 10-Q), at 59-60.  Consistent with those earlier disclosures, Prudential in its third quar-ter 2008 financial statements recorded charges reflecting increased reserves for fu-ture annuity contract obligations and charges associated with the expense of enter-ing into annuity contracts.  Prudential disclosed that it was taking an annuity-related charge of $380 million comprised of: (i) $115 million relating to increased amortization of DAC-related costs and (ii) a $265 million increase in reserves for the guaranteed minimum death and income benefit features of its variable annuity products.  Reply Ex. 4 (PRU 3Q08 10-Q), at 65.  Although the Complaint chal-lenges the timing of the entire $380 million charge, Cmplt. ¶¶ 58-61, the Opposi-tion concedes that Plaintiffs do not contend $380 million should have been added to first quarter reserves, and nowhere mentions the $115 million amortization charge, much less attempts to refute Prudential's argument as to the appropriate

13

timing of that charge.  Opp. at 28 n. 15.  Prudential therefore assumes Plaintiffs

have waived any arguments as to the timing of the $115 million charge.[5]

 As for the remaining $265 million increase in reserves, Plaintiffs seize on

Mr. Carbone's statement that this charge "came almost entirely from the substan-

tial market-related decline in account values *over the past year*."  Plaintiffs argue

that the vague reference to a "decline in account values over the past year" must

mean "since October 2007."  Opp. at 28 & n.15.  This argument, however, is con-

tradicted by the full text of what Mr. Carbone said, which Plaintiffs omit from both

the Complaint and the Opposition.  Specifically, Mr. Carbone prefaced the October

2008 remarks Plaintiffs cite by observing that Prudential's business operations

were "substantially impacted by various discrete items . . . closely tied to the unfa-

vorable market conditions of the *past few months*," not "the past year."  Reply Ex.

3 (PRU 3Q08 Earnings Call Transcript), at 2 (emphasis added).  These words put

the statements that Plaintiffs selectively quote into context and make the inferences

Plaintiffs seek to draw implausible.

 The very most one can infer from Mr. Carbone's words is that a general pe-

---

[5] This $115 million charge (approximately one-third of the $380 million total
charge) resulted from a third-quarter change in Prudential's actuarial assumptions
underlying its annuity reserves and DAC calculations.  *See* Reply Ex. 3 (PRU
3Q08 Earnings Call Transcript), at 2.  As the market declined during the third
quarter of 2008, Prudential increased its reserves to account for annuitants'
changed behavior (more annuitants elected to receive payments under the policies,
in lieu of investing in the declining market).  *See id.*

riod of decline in account values ***began*** at some point in late 2007.  His words say nothing about the velocity of those declines (the rate at which they occurred) or the distribution of declines in various quarterly periods.  They certainly do not support any inference that the specific declines that led to the increases in the third quarter occurred at any time other than the third quarter.  Any such inference would be implausible.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[6]

Moreover, when read in context, Mr. Carbone's statements are consistent with what Prudential said about the genesis of the $265 million increase in reserves in its quarterly 10-Q report for the third quarter.  *See* Reply Ex. 4 (PRU 3Q08 10-Q), at 52-53.  In that report, Prudential stated that third quarter results included $380 million of charges "largely reflecting the impact of *current* market condi-

---

[6] Prudential disclosed in both the first and second quarter 2008 financial statements the impact that market declines had had on quarterly annuity-related reserves and DAC amortization.  More specifically, the first quarter 2008 financials, which were incorporated into the Offering Materials, disclosed that annuity-related reserves and DAC amortization were based in part on "future rate of return assumptions." Pru. Mem. at 9-10.  Prudential also disclosed (as it had in prior quarters) that had actual quarterly annuity account investment performance been taken into account, reserves and DAC amortization would have been higher ($30 million higher in the first quarter).  *See* Reply Ex. 1 (PRU 1Q08 10-Q), at 50.  This amount increased to $50-60 million in the second quarter.  Reply Ex. 2 (PRU 2Q08 10-Q), at 60.  Prudential later disclosed that the third quarter charges of $380 million resulted from its annual review (conducted in the third quarter of each year) of the future rate of return assumptions Prudential uses in setting reserves and evaluating DAC and after taking into account the dramatic deterioration in economic and market conditions *as of the end of the third quarter.*  *See* Pru. Mem. at 11-12; Reply Ex. 3 (PRU 3Q08 Earnings Call Transcript), at 2; Reply Ex. 4 (PRU 3Q08 10-Q), at 65. There is thus no plausible basis for inferring that the third quarter charges should have been taken earlier.

tions." *Id.* (emphasis added).  Plaintiffs' selective citation of Mr. Carbone's remarks, once put in context, cannot support a plausible inference, under *Twombly*, that the later market conditions to which he referred even existed, much less were known by Prudential, in the first quarter of 2008.  *See* Pru. Mem. at 12-14; Reply Ex. 4 (PRU 3Q08 10-Q), at 65; *see also Twombly*, 550 U.S. at 570.

Plaintiffs likewise take remarks Mr. Grier made during the October 2008 earnings call out of context, selectively omitting portions of his statements that undermine the inferences they argue should be drawn.  As a threshold matter, the Complaint does not mention any statements by Mr. Grier, and these remarks should thus be ignored.  *See, e.g.*, *Pennsylvania ex rel Zimmerman v. Pepsico, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."); *Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 493 (D.N.J. 1998).  Even if the Court considered these statements, when read in full, they do not support the inferences Plaintiffs seek to draw – to the contrary, the inferences they support favor Prudential.

Consistent with Prudential's pre-Offering disclosures, Mr. Grier explained that during the third quarter of *each* fiscal year, Prudential reviews the actuarial assumptions underlying its annuity reserves and DAC amortization calculations.  *See* Reply Ex. 3 (PRU 3Q08 Earnings Call Transcript), at 6; Ex. 2 (PRU 2007 10-K), at 82-83 (describing results of 2007 annual review).  Plaintiffs argue that Mr. Grier

"admitted" that those actuarial assumptions had been "overly optimistic," and that Prudential's first quarter annuity-related charges therefore must have been too low. Opp. at 26 n.13. But Mr. Grier said absolutely nothing suggesting that Prudential's prior financial statements were inaccurate or non-compliant with GAAP. To the contrary, Mr. Grier's *full* remarks show that he said that increased market volatility *during the third quarter* had caused Prudential to reevaluate its historical methodology (known as the "corridor" approach) and use a different methodology, effective with the fourth quarter beginning October 1, 2008.[7]

Like Mr. Carbone's remarks, Mr. Grier's remarks support only one plausible inference – that deterioration of market conditions in the third quarter, not prior to the Offering – led to the changes in reserve and amortization levels and actuarial assumption methodology that the Complaint challenges.[8]

---

[7] Mr. Grier's full remarks were as follows:

> Up to this quarter, we have applied a corridor for market performance in evaluating DAC, related amortization items and guaranteed benefits, meaning that we have held out the impact of market performance until the annual review in the third quarter unless the changes breached a materiality threshold. *With the greater level of volatility we are seeing in the financial markets*, we have determined to move away from the corridor approach commencing with the fourth quarter of this year and will therefore give effect to market performance each quarter.

Reply Ex. 3 (PRU 3Q08 Earnings Call Transcript), at 6 (emphasis added).

[8] Prudential warned in the Offering about the risks and possible future impact of deteriorating market conditions. *See* Reply Ex. 5. Plaintiffs do not dispute that the market dramatically worsened in the third quarter of 2008, nor that the Court may take judicial notice of the timing of these market dislocations in the third quarter of

## 2.   Prudential Complied With FAS 97.

Plaintiffs argue for the first time[9] in the Opposition that "GAAP requires future rate of return assumptions to be evaluated regularly (*see* FASB Statement No. 97, par. 25)," and that "a reasonable investor . . . would have assumed that the Company had already adjusted downward its 'future [rate of] return assumptions' to account for the deteriorating investment returns it was actually experiencing." Opp. at 27.  This argument both misstates the requirements of FAS 97 (mentioned nowhere in the Complaint) and is flatly contradicted by Prudential's disclosures.

Plaintiffs misquote FAS 97, which does not address future rate of return assumptions.  Instead, it provides that "[e]stimates of *expected gross profit* used as a basis for amortization shall be evaluated regularly."  Reply Ex. 7 (FAS 97, ¶ 25) (emphasis added).  Prudential disclosed that it did precisely this.  For example, in its quarterly report for the first quarter of 2008 (incorporated by reference in the Offering Materials), Prudential stated that each quarter it evaluated, and then adjusted for current period experience, "the cumulative impact of differences between actual gross profits for the period and the previously estimated expected gross profits for the period."  Reply Ex. 1 (PRU 1Q08 10-Q), at 50.  Plaintiffs nowhere mention this disclosure, which contradicts and precludes their argument.

---

2008, months after the Offering.  Pru. Mem. at 4, 14; Ex. 27 (S&P 500 index chart).

[9] Plaintiffs' FAS 97 assertions do not appear in the Complaint, and should be ignored for the reasons stated at p. 16, *supra*.

Moreover, contrary to Plaintiffs' argument that investors would have assumed that Prudential "had already adjusted downward its 'future [rate of] return assumptions'" as of the Offering date (Opp. at 27), Prudential's first quarter 2008 quarterly report explicitly told investors *exactly the opposite*:

> For purposes of evaluating deferred policy acquisition [DAC] and other costs and these reserves, the future rate of return assumptions are derived using a reversion to the mean approach, a common industry practice. As part of our approach, we develop a range of total estimated gross profits each period using statistically generated future rates of return that take into consideration the latest actual rates of return experienced to date. For the first quarter of 2008, since the previously determined total estimated gross profits were within the current period's range, *we did not adjust our future rate of return assumptions.*

Reply Ex. 1 (PRU 1Q08 10-Q), at 50 (emphasis added). No investor reasonably could have assumed otherwise.[10]

### B.    Plaintiffs' Impairment Allegations Do Not State A Claim.

#### 1.    There Is No Plausible Basis To Argue That Additional Impairment Should Have Been Recorded In Q1 2008.

Any reasonable investor looking at the progression of Prudential's impair-

---

[10] To the extent Plaintiffs continue to contend that Item 303 somehow created a duty to disclose additional annuity-related charges prior to the Offering (*see* Cmplt. ¶ 60), this argument would be meritless. The documents on which Plaintiffs claim to rely contradict any inference that the circumstances that gave rise to the third quarter annuity-related charges existed as of the first quarter financial statements or at any other time prior to the Offering, let alone were known by Prudential for purposes of Item 303. Plaintiffs' statement (Opp. at 28 n.15) that they are not arguing that the full $380 million in third quarter annuity-related charges should have been recorded in the first quarter is really a concession that they lack *any facts* that any amount was required to be recorded in the first quarter. Further, Prudential had no duty to provide intraquarter estimates of financial results. *See* Pru. Mem. at 16 n.11; pp. 10-12, *supra*; pp. 22-24, *infra*.

ment disclosures each quarter would have expected that Prudential's impairment charges would increase if the markets did not improve.  Prior to the Offering, Prudential explicitly warned investors that market conditions already had resulted in significant asset impairments, disclosed those impairments to date, disclosed for each quarter tables of assets that had already declined in value, and warned that continuing market deterioration could result in additional future impairments of those and other assets.  Among other things, it specifically disclosed:

- "The level of impairment losses can be expected to increase when economic conditions worsen and decrease when economic conditions improve."  Reply Ex. 1 (PRU 1Q08 10-Q), at 78.

- Prudential already had recorded $539 million in other-than-temporary impairment charges for fixed maturity securities, primarily ABS, for the first quarter of 2008.  *See id.* at 87, 89.

- Prudential already had recorded *nearly half a billion dollars in unrealized losses in ABS* and other fixed maturity securities that had declined in value by 20% or more for more than three but fewer than six months, which could require other-than-temporary impairment charges in the second quarter of 2008 if the market did not improve.  *See id.* at 113-14; Pru. Mem. at 24.

Plaintiffs argue, however, that Prudential should have recorded in its first quarter 2008 financial statements $205 million of the impairment in its subprime ABS investments that it disclosed in its second quarter financials after the Offering, at the end of July 2008.  This argument, however, is based entirely on speculation that in turn depends on an out-of-context sound bite from Mr. Carbone during a post-Offering July 31, 2008 quarterly earnings call.  Those remarks support no

such inference.  To the contrary, the only plausible inference Mr. Carbone's words

support is that changed market conditions *after* the first quarter led to greater im-

pairment and the need to record greater impairment charges in a later quarter.

Specifically, Mr. Carbone stated that Prudential's practice was to record im-

pairment after assets had declined by 20% or more for a period of at least six

months.  Ex. 5 (PRU 2Q08 Earnings Call Transcript), at 3; *see also* Reply Ex. 1

(PRU 1Q08 10-Q), at 113-116.  He also noted that at March 31, 2008, the end of

the first quarter, assets in the total amount of $247 million had declined in value by

20% or more for more than three but fewer than six months, and that this amount

(in this "three to six month band") would have been the maximum impairment

charge recorded for the second quarter "*if nothing else changed*."  Ex. 5 (PRU

2Q08 Earnings Call Transcript), at 3.  He then explained that circumstances *did*

change after the first quarter – certain ABS assets declined in value by 50% or

more.  *Id.*  Because it was Prudential's practice not to wait a full six months (two

quarters) to record an impairment when assets decline by this much during a quar-

ter, the Company in the second quarter recorded a total of $452 million in impair-

ment, which included declines of 20% or more for six months or more, plus de-

clines of 50% or more during the second quarter.  *Id.*  Mr. Carbone's precise words

were as follows:

> The 452 million of fixed maturity impairments for the [second] quarter com-
> pares to 247 million of unrealized losses of 20% or greater at March 31 that

we disclosed in our first quarter 10-Q in the three to six-month band. *Now if nothing else changed*, you would have expected this to be the impairment for fixed income securities in the second quarter. Our general guideline is that for 20% or greater declines due to spread widening, we impair at six months. The increase in impairments to 452 million came primarily from declines in value of 50% or more that were in the zero to three month category at March 31.

Ex. 5 (PRU 2Q08 Earnings Call Transcript), at 3 (emphasis added).[11]

### 2. Intraquarter Disclosure Was Not Required.

Alternatively, Plaintiffs contend that even if the 50% or greater declines in

ABS value did not occur until the second quarter of 2008 (as Mr. Carbone said

they did), Item 303 required Prudential to disclose future second quarter potential

impairment as a material adverse trend or uncertainty in the Offering Materials.

*See* Opp. at 34. Plaintiffs do not cite a single case that supports this argument, nor

---

[11] Plaintiffs continue to argue that Mr. Carbone's reference to additional "declines in value of 50% or more that were in the zero to three month category at March 31" must mean that the $205 million of additional impairment that occurred *after* the end of the first quarter must have occurred *during* the first quarter. Opp. at 31-32. But any such interpretation of these words would be illogical and implausible under *Twombly*, because it cannot be reconciled with – and requires ignoring – Mr. Carbone's explicit statement that "if nothing else changed," the $247 million in declines of 20% or more that had occurred "at March 31" would have been the total amount of impairment recorded at the end of the six month period (at June 30, 2008), not $452 million. Mr. Carbone's remarks can plausibly be interpreted in one way only – that the 50% or more declines in value that resulted in the additional impairment charges occurred *after* the first quarter. In contrast, the cases Plaintiffs cite involve words susceptible to different, but plausible, interpretations, and are therefore inapposite. *See Angres v. Smallworldwide PLC*, 94 F. Supp. 2d 1167, 1170-74 (D. Colo. 2000) (competing interpretations of statements about readiness for marketing and shipment of a product); *In re ValueVision Int'l Sec. Litig.*, 896 F. Supp. 434, 443 (E.D. Pa. 1995) (competing interpretations of terms "straight financing" and "straight debt").

could they.  It is well established that Item 303 requires disclosure only where the alleged material "trend" was actually *known* by the issuer as of the relevant date. *See* Section I, *supra*.  Plaintiffs allege no facts that would support any inference that a material amount of assets had declined in value by 50% or more in a single quarter as of the Offering date, much less that Prudential knew of such a decline.[12]

And, Prudential was under no other duty to disclose information about second quarter financial results until after the end of the quarter.  An issuer is not required to forecast quarterly financial results while a quarter is still in progress. *Burlington Coat,* 114 F.3d at 1432.  *Accord Zucker*, 891 F. Supp. at 1015-16 (information about a quarter in progress is "necessarily incomplete" regardless of the

---

[12] Plaintiffs argue that Prudential's ABS investments could not have "magically bec[o]me impaired by 50% in the four business days between June 25, 2008 and June 30, 2008."  Opp. at 32, n.18.  But, this argument assumes – with no plausible factual basis – that asset impairment is evaluated on a daily basis throughout a quarter, rather than in the weeks following a quarter end.  Indeed, Prudential disclosed that it assesses asset impairment on a *quarterly* basis, and its analysis of impairment for the second quarter did not occur until after the end of that quarter on June 30, 2008 – *i.e*, weeks after the Offering.  *See, e.g.,* Reply Ex. 1 (PRU 1Q08 10-Q), at 85, 89 (discussing first quarter); Reply Ex. 2 (PRU 2Q08 10-Q), at 108, 110 (discussing second quarter).  Moreover, Plaintiffs' argument assumes that large companies like Prudential can simply push a button and instantaneously calculate the extent of impairment.  Plaintiffs ignore the relevant accounting rules' requirement of a comprehensive analysis at the end of the relevant reporting period of multiple tiers of information, potentially including market prices, cash flow information, and other fundamental credit value information requiring the exercise of business judgment, before any impairment determination may be made.  *See* Ex. 26 (Financial Accounting Standards Board Staff Position Nos. 115-1 and 124-1), at ¶ 7 ("investor shall assess whether an investment is impaired in each reporting period"), ¶ 11 ("investor shall continue to evaluate whether the investment is impaired . . . in each subsequent reporting period").

proximity to quarter end); *see* pp. 10-12, *supra*.[13]

### C.     The Auction Rate Securities Allegations Do Not State A Claim.

Plaintiffs concede (Opp. at 19, n.9) that the SEC rule that specifically ad-
dresses when an issuer must disclose the existence of litigation or regulatory inves-
tigations, Item 103 of SEC Reg. S-K, did not require Prudential to disclose the
ARS-related regulatory investigations and litigation in which Wachovia Securities
was allegedly involved as of the Offering date.  Item 103 required no disclosure
because (as the Complaint acknowledges) Prudential itself was not the subject of
any such investigations or named as a party in any such litigation.  Only Wachovia
Securities, an entity in which Prudential held a minority equity investment, was the
subject of such proceedings.  *See* Pru. Mem. at 28-30.  Although Plaintiffs admit
that the SEC's specific rule concerning disclosure of litigation and regulatory in-
vestigations did not require disclosure here, they nonetheless argue that Prudential
was under some more general disclosure duty.  The SEC's specific rule governs.
As the Supreme Court said in *Spreckels v. Helvering*, 315 U.S. 626, 628 (1942), "a

---

[13] In addition, any reasonable investor who bought the Notes was on notice of the
deteriorating capital markets and their possible effect on asset values.  Prudential
disclosed prior to the Offering that it had already recorded *nearly half a billion dol-
lars in unrealized losses in ABS* and other assets due to declines in value of 20% or
more at March 31 which would result in impairment charges at the end of the sec-
ond quarter of 2008 unless market conditions improved.  Reply Ex. 1 (PRU 1Q08
10-Q), at 113-14.  An issuer has no duty to disclose information that investors al-
ready know or which is readily available.  *See Arbinet*, 2006 WL 3831396, at *5-6
(industry-wide trends easily discernable from publicly available information need
not be disclosed).

general regulation . . . is not controlling in the face of a specific regulation."[14]

Plaintiffs' more general disclosure argument is fatally flawed for an additional reason.  It requires making the assumption – contradicted by the same financial statements to which the Complaint refers – that the charge Prudential took in the third quarter as a result of Wachovia Securities' post-Offering regulatory settlement reflected the payment of a *Prudential liability*.  *See* Opp. at 4, 18-19 & n.10; Cmplt. ¶ 46.  Prudential's undisputed financial statements, however, make clear that this charge simply reflected a reduction in the value of Prudential's minority investment in Wachovia Securities due to Wachovia Securities' post-Offering decision to enter into a regulatory settlement, not the payment of a liability (or any other sort of payment) by Prudential.  *See* Pru. Mem. at 29-30.  The settlement required Wachovia Securities to repurchase certain money-good ARS se-

---

[14] The four cases Plaintiffs cite (Opp. at 13-14) do not hold that an issuer not itself involved in litigation has a duty to disclose such proceedings.  Three of those cases (*In re Vonage Initial Public Offering Sec. Litig.*, No. 07-177, 2009 WL 936872 (D.N.J. Apr. 6, 2009), *Siracusano v. Matrix Initiatives, Inc.*, 585 F.3d 1167 (9th Cir. 2009), and *Caviness v. Derand Resources Corp.*, 983 F.2d 1295 (4th Cir. 1993)) involved issuers who (unlike Prudential) were themselves parties to the litigation or were directly threatened with litigation.  The fourth case, *Zell v. Inter-Capital Income Sec., Inc.*, 675 F.2d 1041 (9th Cir. 1982), is also inapposite.  In *Zell*, the issuer issued a proxy statement soliciting shareholder approval of investment advisory agreements with third parties who were themselves involved in "a score of lawsuits."  *Id.* at 1043.  The court held that the existence of extensive litigation against these parties was material to the decision shareholders were being asked to make about approval of advisory agreements with these third parties.  *See id.* at 1045-46.  Here, the alleged existence of litigation or regulatory investigations involving Wachovia Securities – not the issuer of the Notes or otherwise involved in any way with the Offering – was not relevant to investors, let alone material.

25

curities it had sold to customers.  This *Wachovia Securities* liability led to a reduction in that entity's value, and, in turn, a reduction in the value of Prudential's minority interest in that entity.[15]  Indeed, when Prudential reported this charge, it did so not in the legal or regulatory proceedings section of its third quarter 10-Q, but rather in the section concerning its investments in third party entities.  Reply Ex. 4 (PRU 3Q08 10-Q), at 36-38.

Because the undisputed financial statements cited in the Complaint do not support any plausible inference that Prudential itself had any ARS-related liabilities, much less made a payment in respect of any such liabilities, Plaintiffs' argument that Prudential violated FAS 5 by not disclosing in its first quarter 2008 financial statements a supposed ARS-related "contingent liability" of Prudential is frivolous on its face.  *See* Opp. at 14-15 (citing FAS 5); *see also id.* at 18-19.  Prudential had no "loss contingency" to report under FAS 5 resulting from "pending or threatened litigation" because it was not a party to any such litigation.  Rather,

---

[15] The Opposition coins the phrase "Joint Venture Litigation."  Opp. at 12.  Contrary to what Plaintiffs attempt to imply through that phrase, the reduction in the value of Wachovia Securities (and of Prudential's minority interest in that entity) was a result not of any class action or other litigation against Wachovia Securities, but rather Wachovia Securities' increase in legal reserves for the SEC settlement.  Pru. Mem. at 29-30.  Moreover, the securities class action litigation against Wachovia Securities to which the Complaint refers (Cmplt. ¶ 45) has been dismissed, which renders even more implausible Plaintiffs' speculative assertion that "it is likely that Prudential will have to pay substantially more money to resolve the remaining Joint Venture Litigation."  Opp. at 13.  *See* Reply Ex. 8 (*Waldman v. Wachovia*, No, 1:08-cv-02913-SAS (S.D.N.Y. Dec. 8, 2009) (dismissing claims)).

any FAS 5 disclosure obligation, if and when triggered, belonged exclusively to Wachovia Securities. Prudential's public filings show that it never recorded a liability from any ARS-related litigation or other proceedings concerning Wachovia Securities, and there is no allegation in the Complaint that it ever did.[16]

Plaintiffs' FAS 5 arguments fail for the separate and independent reason that this accounting rule requires the recording of a loss contingency only if loss is both "probable" and "reasonably estimable." *See* Pru. Mem. at 34 n.28. Here, not only was any future loss not Prudential's (it was Wachovia Securities' loss), but the Complaint does not allege a single fact that would permit the inference that as of the end of the first quarter or the Offering date any ARS-related liability of any entity was both probable and reasonably estimable as to amount. *See* Pru. Mem. at 31-33.[17]

---

[16] Plaintiffs argue that "Prudential is not just another 'stakeholder in a corporation,' but rather 'agreed' to substantial financial responsibility for the Joint Venture." Opp. 19-20 n.10. Plaintiffs do not, however, point to any agreement that imposed on Prudential any obligation to pay any portion of Wachovia Securities' settlement with the regulators. Prudential's undisputed financial disclosures also do not reflect the payment or existence of any liability of Prudential, but merely the write-down in the value of Prudential's minority investment in Wachovia Securities.

[17] For the same reason, Item 303 (*see* Opp. at 15-16, 19, n.9) cannot save this contingent liability argument. Even putting aside the fact that the specificity of Item 103 trumps the generality of Item 303, Item 303 does not require disclosure absent a known material adverse trend or uncertainty. The Complaint, however, does not plausibly allege that, as of the end of the first quarter or the Offering date, Prudential knew that Wachovia Securities would enter into a settlement in the future with regulators, much less what the magnitude of any future settlement would be to that other entity. *See* Pru. Mem. at 33-34. Plaintiffs do not dispute that the existence of

### D.     **Plaintiffs Have Not Pled A Compensable Loss.**

Plaintiffs' claims must also be dismissed because it is evident from the face of the Complaint that Plaintiffs cannot prove a compensable loss.  *See, e.g.*, *Blackmoss*, 2010 WL 148617, at *11 (dismissing Section 11 claim).  "While a plaintiff pursuing a Securities Act claim is not required to affirmatively plead causation, a negative causation defense may be considered on a dismissal motion where the absence of loss causation is apparent on the face of the complaint."  *Id.* Plaintiffs do not dispute that: (i) the Notes are currently trading *above* their June 24, 2008 Offering price; (ii) the Complaint contains no allegation that they sold their Notes at a loss; and (iii) Plaintiffs have not alleged that the Notes' trading price declined due to any misrepresentations by the Prudential Defendants.  *See* Pru. Mem. at 37.  Moreover, even after the allegedly omitted information was disclosed, the price remained stable and named Plaintiff bought still more Notes.  *See* p. 29, *infra*.  "Under these circumstances, Plaintiff cannot establish a causal relationship between Defendants' alleged misrepresentations and subsequent declines in [Defendant's] stock price."  *Blackmoss*, 2010 WL 148617, at *11.

### E.     **The Allegedly Omitted Information Was Immaterial.**

Section 11 confines recovery to losses attributable to *material* misrepresentations.  15 U.S.C. § 77k(e).  Plaintiffs plead no facts showing that Prudential's

---

litigation or a regulatory investigation, without more, does not qualify as a material "trend" or "uncertainty" within the meaning of Item 303.  *See id.*

first quarter financial results (the only financial results incorporated into the Offering Materials) were materially false when issued or that the Offering Materials were materially misleading as of the Offering Date. Moreover, the Notes' price and Plaintiffs' own actions belie any claim of materiality.

Where the market for a security is efficient and the disclosure has no effect on the price, the information disclosed is immaterial as a matter of law. *See Burlington Coat,* 114 F.3d at 1425. Here, on the dates the Complaint claims "corrective" disclosures were made – July 31, 2008, October 29, 2008 and October 30, 2008 (Cmplt. ¶¶ 46, 58, 64), the price of the Notes remained virtually unchanged. Reply Ex. 6 (showing trading prices of the Notes). In other words, the information which Plaintiffs complain should have been disclosed in the Offering Materials (*see* Opp. at 20-21) plainly had no impact on the price of the Notes and was thus "obviously unimportant" to investors. *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274-75 (3d Cir. 2004)). This "obvious[] unimportan[ce]" is further evidenced by the Lead Plaintiff's purchase of $21,500 in Notes on December 31, 2008, *months after* Prudential announced all of the information Plaintiffs claim Defendants omitted or misstated. *See* Pru. Mem. at 3-4, 37-38. Finally, non-cash charges of the sort Plaintiffs here claim should have been disclosed are immaterial to debt investors as a matter of law because courts have recognized that note holders are concerned about receiving interest and being paid back. *See id.* at 16, 36-

29

37; *Kusner v. First Pennsylvania Corp.*, 531 F.2d 1234, 1237 (3d Cir. 1976); *J&R Mktg. SEP v. Gen. Motors Corp.*, No. 06-10201, 2007 WL 655291, at *10-12 (E.D. Mich. Feb. 27, 2007), *aff'd on other grounds*, 549 F.3d 384 (6th Cir. 2007).

## III.   THE INDIVIDUAL DEFENDANT CLAIMS MUST BE DISMISSED.

Plaintiffs' Opposition merely intones that the Individual Defendants are liable under Section 15 because they "signed the Registration Statement." Opp. at 39. These allegations alone, however, cannot support any inference of control over, or involvement in, the challenged statements, or failure to undertake appropriate diligence in connection with the Offering. *See* Pru. Mem. at 38-40. Plaintiffs' "control person" allegations thus must be dismissed.

## CONCLUSION

For all the above reasons, as well as those set forth in the Prudential Defendants' opening brief, the Complaint should be dismissed with prejudice.

Dated:  January 26, 2010                          Respectfully submitted,

Brian E. Pastuszenski                          /s/ Liza M. Walsh
Deborah S. Birnbach                          Liza M. Walsh
Sarah Heaton Concannon                   Peter J. Pizzi
Laura Stock Craven                            CONNELL FOLEY LLP
GOODWIN PROCTER LLP                  85 Livingston Avenue
53 State Street                                    Roseland, New Jersey 07068
Boston, MA 02109                             Tel: (973) 535-0500
Tel: (617) 570-1000                           Fax: (973) 535-9217
Fax: (617) 523-1231
*Counsel for Prudential Financial, Inc.*
*and the Individual Defendants*

LIBA/2061467.1

30