**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KAREN M. BAUER, Individually and on Behalf of All Others Similarly Situated, | **OPINION** |
| Plaintiff, | |
| v. | Civil Action No.: 09-1120 (JLL) |
| PRUDENTIAL FINANCIAL, INC. et al., | |
| Defendants. | |
| NOAH HADDOCK, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | |
| v. | Civil Action No.: 09-1771 (JLL) |
| PRUDENTIAL FINANCIAL, INC. et al., | |
| Defendants. | |

**LINARES**, District Judge.

This matter comes before the Court on a motion to dismiss Plaintiff's Amended Class Action Complaint filed by the "Prudential Defendants"[1] and a motion to dismiss filed by the "Underwriter Defendants."[2]  Plaintiff's Amended Class Action Complaint asserts a claim for violations of § 11 and § 15 of the Securities Act of 1933.  The Court has considered the submissions in support of and in opposition to the motions and decides the matter without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure.  For the reasons discussed

---

[1] Prudential Financial, Inc., Arthur F. Ryan, Richard J. Carbone, Peter B. Sayre, Dennis G. Sullivan, Frederic K. Becker, Gordon M. Bethune, Gaston Caperton, Gilbert F. Casellas, James G. Cullen, William H. Gray III, Jon F. Hanson, Constance J. Horner, Karl J. Krapeck, and James A. Unruh.

[2] Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Morgan Stanley & Co., Incorporated, UBS Securities LLC, Wachovia Capital Markets, LLC, Banc of America Securities LLC, RBC Capital Markets Corporation, and J.P. Morgan Securities Inc.

below, the Prudential Defendants' and the Underwriter Defendants' motions are granted in part and denied in part.

## I.      BACKGROUND

"On or about March 16, 2006, Prudential filed a Form S-3 Registration Statement and Prospectus with the SEC . . . using a 'shelf registration' or continuous offering process."   (Am. Compl. ¶ 40.)  Pursuant to this process, "[t]he Form S-3, the prospectus supplement and any documents incorporated by reference[] . . . constitute the registration statement for a [future] offering."  (Id.)  One such offering occurred on or about June 24, 2008.  (Id., at ¶ 3.)   On that date, "Prudential conducted an initial public offering of [9% Junior Subordinated Notes] (the "IPO" or "Offering") that raised over $920 million by selling 36.8 million Notes of the Securities at a price of $25 per Note."  (Id., at ¶¶ 1, 3.)  In connection with this offering, Prudential filed its prospectus; "[t]he Prospectus Supplement expressly incorporated by reference Prudential's quarterly report for the quarter ended March 31, 2008 filed on form 10-Q with the SEC . . . and Prudential's annual report for the year ended December 31, 2007 filed on form 10-K with the SEC."  (Id., at ¶ 41.)  "The Form S-3, Prospectus Supplement, Form 10-K and Form 10-Q (along with other documents incorporated by reference into the Prospectus Supplement) jointly formed the registration statement for the Offering (the "Registration Statement")."  (Id.)

Plaintiff brings this action on behalf of himself and others who purchased the Notes pursuant to the Registration Statement.  (Id., at ¶ 1.)  Plaintiff alleges that there were several misstatements and/or omissions in the Registration Statement for the Offering.  Specifically, Plaintiff alleges that there were misstatements and/or omissions related to three sections: (1) pending litigation and regulatory items, (2) annuity obligations and deferred policy acquisition costs, and (3) other than temporary impairments.

<u>Litigation and Regulatory Items</u>

Plaintiff alleges that "the financial statements in the Registration Statement . . . fail[ed] to disclose the existence of pending litigation and regulatory matters against the Company related to the collapse of the ARS [(Auction Rate Securities)] market" and "fail[ed] to account for Prudential's contingent liabilities in connection with the collapse of the ARS market."  (<u>Id.</u>, at ¶ 42.)  At times relevant to Plaintiff's claims, "Prudential and the Wachovia Corporation were partners in a joint venture known as Wachovia Securities Financial Holdings LLC that, among other activities, underwrote, sold, and participated in auctions with regard to Auction Rate Securities (the "Joint Venture")."  (<u>Id.</u>, at ¶ 43.)

Plaintiff asserts that "[o]n February 13, 2008, the formerly liquid market for ARS became almost entirely illiquid when various broker-dealers, including the Joint Venture, suddenly ended their participation as market-makers in the ARS market."  (<u>Id.</u>, at ¶ 44.)  The collapse of the ARS market "resulted in various complaints, lawsuits, and investigations against the Joint Venture." (<u>Id.</u>, at ¶ 45.)  "[Also], prior to the Offering, the SEC and other regulatory agencies commenced an investigation into the Joint Venture's misconduct in connection with the collapse of the ARS market, and formally requested internal documents and other information in furtherance of that investigation."  (<u>Id.</u>)  "Both the Form 10-K and Form 10-Q contained sections entitled 'Litigation and Regulatory Matters' and 'Legal Proceedings,'" but they did not contain any disclosure regarding the Joint Venture Litigations or any contingent liability of Prudential arising out of the collapse of the ARS market.  (<u>Id.</u>, at ¶¶ 47, 48.)  "On July 31, 2008–approximately one month after the Offering–Prudential disclosed [for the first time] the existence of the Joint Venture Litigations."  (<u>Id.</u>, at ¶ 46.)  "On October 29, 2008, Prudential disclosed that it was taking a pre-

tax charge of $235 million to resolve . . . claims asserted in connection with the Joint Venture Regulatory Litigations." (Id.)

<u>Annuity Obligations and Deferred Policy Acquisition Costs</u>

Plaintiff alleges that pre-tax income in the Registration Statement was understated because Prudential's costs of its annuity obligations and its deferred policy acquisition costs were higher than stated. (Id., at ¶¶ 58-59.) "[T]he Registration Statement reported that the Company earned approximately $54 million in pre-tax income (from continuing operations before equity in earnings of joint ventures) for the quarter ended March 31, 2008." (Id., at ¶ 55.) "The Registration Statement stated that the $54 million amount had been calculated after establishing a reserve to provide for Prudential's annuity obligations . . . and its deferred policy acquisition costs." (Id., at ¶ 56.) It stated that the reserve amount was calculated "using statistically generated 'future rate of return assumptions' about the Company's investments in the Reserves." (Id.) But, "[t]he Registration Statement [also] represented that the amount of Reserves would have to be $30 million higher if the actual performance of the Company's investments had been used to calculate the needed Reserves (instead of the 'future rate of return assumptions')." (Id., at ¶ 57.)

In the third quarter of 2008, Prudential recorded a $380 million annuity-related charge. (See id., at ¶ 58.) In explaining this charge in an October 30, 2008 conference call with analysts, Defendant Carbone stated:

> In our individual annuity business, we increased our reserve to guaranteed minimum death benefits and increased amortization of deferred policy acquisition costs producing a charge of about $0.65 per share. About one third of the charge came from modifying our assumptions to recognize policyholder tendency . . . . The remainder of the charge came almost entirely from the substantial market-related decline in account values over the past year . . . .

(Dec. of Laura Stock Craven in Further Support of the Prudential Defs.' Mot. to Dismiss the Consolidated Am. Class Action Compl., Ex. 3, Prudential's Earning Conference Call on Oct. 30, 2008 [hereinafter "Oct. 30, 2008 Call"], at 2; see also Am. Compl. ¶ 58.)  Plaintiff asserts that this statement by Defendant Carbone is an admission that some portion of the charge represented a decline that had already occurred prior to the end of the first quarter.

<u>Other Than Temporary Impairments</u>

Plaintiff also alleges that Prudential understated the amount of other-than-temporary impairments in the Registration Statement.  "The Registration Statement represented that Prudential recognized 'other-than-temporary impairments' on its asset-backed fixed maturity securities when the value of those securities had decreased in amount (i) by 20% or more for six months or (ii) by 50%."  (Am. Compl. ¶ 63.)  Prudential "recognized $539 million in 'other-than-temporary impairment' losses on fixed maturity for the quarter ended March 31, 2008." (Id.)  Prudential recognized another $452 million in impairment losses for the quarter ended June 30, 2008.  (Id., at ¶ 68.)  In a conference call with analysts on July 31, 2008, Defendant Carbone stated that "[t]he increase in impairments to 452 million came primarily from declines in value of 50% or more that were in the zero to three month category at March 31[, 2008]."  (Dec. of Katherine G. McKenney in Support of the Prudential Defs.' Mot. to Dismiss, Ex. 5, Prudential's Earnings Conference Call July 31, 2008 [hereinafter "July 31, 2008 Call"], at 3; see also Am. Compl. ¶ 65.)

For the quarter ended March 31, 2010, "Prudential reported . . . net income of $69 million."  (Id., at ¶ 68.)  Plaintiff alleges that, had the financial statements not contained the above alleged misstatements and not, as a result, overstated "Prudential's pre-tax income by

$820 million[, Prudential] . . . would have reported a net loss of as much as $454 million for the quarter ended March 31, 2008."  (Id.)

## II.    LEGAL STANDARD

The parties dispute the appropriate legal standard for the present motions.  Defendants argue that Plaintiff's Amended Complaint "sounds in fraud," and, thus, the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) apply.  Plaintiff argues that the claims under § 11 of the 1933 Act are strict liability claims which do not require a showing of scienter or fraud.   Thus, Plaintiff argues that only the Rule 8 pleading requirements apply in evaluating the sufficiency of the Amended Complaint.

"Independent of the standard applicable to Rule 12(b)(6) motions, Fed. R. Civ. P. 9(b) requires that in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Cal. Pub. Employees Ret. Sys. v. Chubb Corp., 394 F.3d 126, 144 (3d Cir. 2004) (internal quotations omitted).  "[U]nlike [securities] claims brought under the anti-fraud provisions of the 1934 Act, claims under the 1933 Act that do not sound in fraud are not held to the heightened pleading requirements of Fed. R. Civ. P. 9(b)."  In re Adams Golf, Inc. Secs. Litig., 381 F.3d 267, 273 n.5 (3d Cir. 2004).  But, where "section 11 1933 Act claims . . . are grounded in allegations of fraud[, they] are subject to Fed. R. Civ. P. 9(b)."  Cal Pub., 394 F.3d at 161.  Thus, for § 11 claims, a Court must examine the complaint to determine if they are based on allegations of fraud.  See id., at 160.

Here, the Amended Complaint makes, in part, the following allegations:

- The Securities Act claims asserted herein involve strict liability and negligence claims, and do not sound in or arise from allegations of fraud. (Am. Compl. ¶ 1.)

- Defendants sold the Securities in the Offering by means of a false and misleading registration statement and prospectus which, as alleged below,

(i) misrepresented that Prudential was not subject to litigation or regulatory investigations concerning, and concealed Prudential's contingent $235 million liability arising out of, the collapse of the market for auction rate securities; (ii) materially understated the actual amount of Prudential's $380 million liability in connection with its annuity obligations and deferred acquisition costs; and (iii) materially understated by approximately $205 million the amount of Prudential's "other than temporary impairments" as of March 31, 2008, by failing to account for the decrease in the value of the Company's asset-backed fixed maturity securities that had decreased in value more than 50%. (Id., at ¶ 3.)

- The Registration Statement contained material misrepresentations of present fact which concealed the liability and involvement of the Company arising out of the February 2008 collapse of the market for action rate securities.  (Id., at ¶ 42.)

- Defendants' misrepresentations and omissions discussed above and the adverse information concealed by Defendants' failure to comply with Item 303 were especially material because the Registration Statement became effective on June 24, 2008, only four business days before the end of Prudential's second fiscal quarter on June 30, 2008.  (Id., at ¶¶ 53, 67.)

- Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count [(Violations of Section 11 of the Securities Act against All Defendants)] is based solely on claims of strict liability and/or negligence under the Securities Act. (Id., at ¶ 69.)

- [T]he Registration Statement (i) contained untrue statements of material fact, (ii) omitted to state information required to be stated therein and (iii) omitted information necessary to make the statements contained in the Registration Statement not misleading.  (Id., at ¶ 71.)

The Court finds that the § 11 allegations, all of which are of the same type as the above allegations, do not sound in fraud.  The allegations in Plaintiff's Amended Complaint are more akin to the "expressly negligence-based" allegations made in In re Suprema Specialties, Inc. Securities Litigation, 438 F.3d 256, 274 (3d Cir. 2006), which were found to not sound in fraud, than the claims which "brim[med] with references to [the] defendants' intentional and reckless misrepresentation of material facts" in California Public, 394 F.3d at 161.

All § 11 claims will have allegations that statements were false and misleading–this is a requirement of a § 11 prima facie case.  The question is whether, overall, the allegations assert that such false statements were made fraudulently or intentionally.  In <u>California Public</u>, a case bringing § 10(b) and § 11 claims, the Third Circuit held that a "one-sentence disavowment of fraud" was "insufficient to divorce the claims from their fraudulent underpinnings" after reviewing the allegations as a whole.  <u>Id.</u>, at 160.  The § 11 claim in that case "expressly incorporate[d] by reference all of the preceding allegations, including the section[] entitled 'scienter and scheme allegations.'"  <u>Id.</u>, at 161.  Additionally, "[t]he linchpin of Plaintiffs' action [was] their allegations that Defendants knowingly and intentionally committed accounting violations, issued a series of false and misleading statements regarding improvements in [the defendant's] . . . business, and omitted critical information."  <u>Id.</u>, at 160.  For example, the complaint in that case alleged that the defendants "deliberately falsif[ied]" results and "manipulated reserve levels."  <u>Id.</u>, at 141.  This is not the case with Plaintiff's Amended Complaint.  Plaintiff alleges simply that false and misleading statements were made, and that the misstatements concealed Prudential's true financial position.  It does not allege that such misstatements were made knowingly or intentionally.  In fact, Plaintiff expressly makes clear that it is bringing strict liability and negligence based claims and "disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct."  (Am. Compl. ¶ 69.) Taking the Amended Complaint as a whole, the allegations are consistent with this express statement.  Therefore, this Court agrees with Plaintiff that only the pleading requirements of Rule 8 apply to the present motions.

For a complaint to survive dismissal under Rule 8, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v.</u>

Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully;" mere consistency with liability is insufficient.  Id.  In evaluating the sufficiency of a complaint, a court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party.  See Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).  But, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[;] [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Iqbal, 129 S. Ct. at 1949.   It is the underlying specific facts alleged in a complaint that should be treated as true and evaluated.

Additionally, in evaluating a plaintiff's claims, generally "a court looks only to the facts alleged in the complaint and its attachments without reference to other parts of the record."  Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).  However, "a document integral to or explicitly relied on in the complaint may be considered without converting the motion [to dismiss] into one for summary judgment."  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (internal quotations omitted, alteration in original).  Here, Plaintiff's Amended Complaint refers to a couple of statements made in analysts' conference calls with Prudential.  These statements are integral to some of Plaintiff's claims.  Therefore, the full text of those statements is properly considered by the Court for purposes of the present motions to dismiss.

### III.    DISCUSSION

### A.    Section 11 Claims

Section 11 imposes liability "if a registration statement, as of its effective date: (1) contained an untrue statement of material fact; (2) omitted to state a material fact required to be stated therein; or (3) omitted to state a material fact necessary to make the statements therein not misleading." In re Constar Int'l Inc. Sec. Litig., 585 F.3d 774, 782-83 (3d Cir. 2009) (internal quotations omitted).  Defendants[3] claim that Plaintiff's § 11 claims fail for the following reasons: (1) because any affect on net income due to a misstatement is not material to a debt investor; (2) because Plaintiff has not plead any compensable loss; and (3) because Plaintiff has not plead sufficient facts to support the various allegations of misstatements and/or omissions.  They also argue that the § 11 claims against the Individual Defendants should be dismissed because Plaintiff fails to allege that the Individual Defendants did not exercise sufficient diligence with respect to the Registration Statement.

### 1.    Materiality

"[A] fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision." Id., at 783 (internal quotations omitted).  Typically, materiality is a question of fact for the fact-finder. Adams Golf, 381 F.3d at 274.  "Only if the alleged misrepresentations or omissions are so *obviously unimportant* to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." Id., at 275 (emphasis in original) (quoting Shapiro v. UJB Fin. Corp., 964 F.2d 272, 281 n.11 (3d Cir. 1992)).

---

[3] The Prudential Defendants submitted comprehensive briefs on the issues.  The Underwriter Defendants joined in those arguments.  Quotations attributed to "Defendants" are from the Prudential Defendants' briefs.

Defendants argue that the alleged misstatements or omissions are immaterial for three reasons.  First, they argue that the corrective disclosures at issue had no effect on the price of the Notes, citing In re Burlington Coat Factory Securities Litigation, Inc., 114 F.3d 1410 (3d Cir. 1997).  This same argument was made to and rejected by the Third Circuit in Adams Golf.  In Adams Golf, the Third Circuit noted that "Burlington Coat Factory was a Rule 10b-5 case brought under the 1934 Act, which requires that plaintiffs plead loss causation," unlike a 1933 Act § 11 claim, which the court found to be "critically different" because pleading loss causation is not required.  381 F.3d at 276-77.

Second, Defendants argue that the alleged misstatements and/or omissions are obviously immaterial because Plaintiff purchased additional Notes months after the corrective statements which form the basis of the allegations in Plaintiff's Amended Complaint.  Aside from the fact that the subsequent purchase is outside the facts alleged in the Amended Complaint, the Court finds this fact not dispositive of the materiality challenge at the motion to dismiss stage, where all inferences are drawn in favor of Plaintiff.  While subsequent purchases may be evidence to be considered by a fact finder, a subsequent purchase of a security does not per se indicate that the information and statement at issue would not have been material to the decision of the original purchase.  The subsequent purchase was made not only with the new information but also with the knowledge that Plaintiff already had a committed investment position.  Therefore, the Court also finds this argument by Defendants unpersuasive at this stage.

Finally, Defendants argue that "non-cash charges of the sort Plaintiffs here claim should have been disclosed are immaterial to debt investors as a matter of law."  (Reply Mem. of Law in Further Support of the Prudential Defs.' Mot. to Dismiss the Consolidated Am. Class Action Compl. [hereinafter "Prudential Defs.' Reply"], at 29.)  They argue that debt investors are

focused on an issuer's ability to make interest and principal payments, and that Plaintiff makes no allegations that there was a concern about repayment of the Notes.  They cite to various cases to support their position that debt and equity investors have different interests which affects how a court should approach the materiality analysis.  For example, Defendants cite to J&R Marketing, SEP v. General Motors Corporation, an Eastern District of Michigan case.  In J&R Marketing, the court dismissed § 11 and § 12 claims holding that "[w]hile the discrepancies in [the defendant's] net income numbers for these periods were off by as much as 5.5%, which would arguably be material to an equity investor, the fact that Plaintiffs in this action invested in debt securities convinces the Court that these misstatements would not be material to a reasonable investor in Plaintiffs' position."  No. 06-10201, 2007 WL 655291, at *12 ( E.D. Mich. Feb. 27, 2007), aff'd on other grounds, 549 F.3d 384 (6th Cir. 2007).  The court also stated that "in theory, all of a company's equity value would have to be eroded before [a] debt holders' principal would be at risk."  Id., at *2;  see also Kusner v. First Penn. Corp., 531 F.2d 1234, 1237 (3d Cir. 1976) (discussing the injury requirement of a 10(b)-5 claim and stating that "[a] prospectus containing representations about earnings potential which might be of material interest to a stockholder would, in all likelihood, be of no interest to [a] bondholder").  Thus, Defendants argue that since Plaintiff has not plead that the company's cash flow was affected or that its repayment on the Notes was affected by any alleged misstatements or omissions, then such misstatements or omissions are obviously immaterial.

The Registration Statement showed net income of $69 million for the quarter ended March 31, 2008.  (Am. Compl. ¶ 68.)  Plaintiff's Amended Complaint alleges that

> These financial results were materially false because they overstated Prudential's pre-tax income by $820 million.  Had the financial statements not contained these material overstatements, the Registration Statement would have reported a net loss of as much as $454 million for the quarter ended March 31, 2008.

(Id.)  Thus, here, Plaintiff alleges not merely that the net income numbers were off, as in J&R Marketing, but that, if correctly reported, net income would have been completely wiped out and Prudential would have been in a significant loss position for the quarter.

Plaintiff argues that the bond prices of a profitable company are worth more than of a company that is losing money.  And, while Plaintiff does not allege that there were any repayment issues, it is reasonable to infer that a reasonable investor may have concerns about repayment by a company posting significant losses versus income in making its decision to invest in the Notes.  While it may be true that debt and equity investors generally have different focuses, as noted above, Plaintiff is not merely alleging some change in net income; Plaintiff is alleging that each of the alleged misstatements alone would have wiped out the reported net income for the quarter, and that, taken together, they would have resulted in a loss of hundreds of millions of dollars for the March quarter.  As the Third Circuit stated in Adams Golf, "[m]indful of [the] . . . dismissal standard for immateriality, and our obligation to draw reasonable inferences in the plaintiff's favor," 381 F.3d at 277, this Court finds that the potential affect on net income as alleged by Plaintiff is not obviously unimportant to a debt investor.  Therefore, the Court finds that Plaintiff has adequately pled that any misstatements or omissions were not immaterial as a matter of law.

2.    Compensable Loss

Defendants also argue that no compensable loss has been pled by Plaintiff because the Notes at issue are currently trading above the offering price.  They argue that Plaintiff has not alleged that the price of the Notes declined due to any of the alleged misrepresentations.  However, "[s]ection 11 does not require a showing of individualized loss causation."  Constar, 585 F.3d at 785; see also 15 U.S.C. § 77k(e).  "[D]amages are calculated as the difference

between the purchase price of a security and the price at the time suit was filed or the security

was sold, and any decline in value is presumed to be caused by the misrepresentation." Constar,

585 F.3d at 785.  A defendant may assert a lack of causation as an affirmative defense, but a

plaintiff is not required to affirmatively plead or prove causation.  Id., at 783.  And, "[w]hile a

defendant may be able to prove this 'negative causation' theory, an affirmative defense may not

be used to dismiss a plaintiff's complaint under Rule 12(b)(6)." Adams Golf, 381 F.3d at 277.

Here, Plaintiff has pled that, at the date of the original filing, the price of the Notes were

trading at 48% below the offering price.  (Am. Compl. ¶ 78.)  Defendants, in their reply, do not

address this allegation or the plain language of § 11(e) as interpreted by the Third Circuit.

Rather, they emphasize that the Notes are currently trading above their offering price and rely on

a Southern District of New York case, Blackmoss Investments v. ACA Capital Holding, Inc.,

that dismissed a complaint where it found that the absence of loss causation was apparent on the

face of the complaint.  No. 07-10528, 2010 WL 148617, at *11 (S.D.N.Y. Jan. 14, 2010).  This

Court does not find Blackmoss persuasive in light of Third Circuit law.  Plaintiff's Amended

Complaint pleads that, as of the filing date, the Notes had lost value.  Pursuant to § 11(e),

causation is then presumed at this stage of the litigation.  Therefore, the Court finds that Plaintiff

has adequately pled a compensable loss.

     3.    Insufficient Pleading

     a.    *Alleged Misstatements Concerning Annuity Obligations and Deferred Policy Acquisition Costs*

Plaintiff alleges that pre-tax income in the Registration Statement was understated

because Prudential's costs of its annuity obligations and its deferred policy acquisition costs

were higher than stated.  (Am. Compl. ¶ 59.)  For the quarter ended March 31, 2008, "the

Registration Statement reported that the Company earned approximately $54 million in pre-tax

income (from continuing operations before equity in earnings of joint ventures)."  (Id., at ¶ 55.)
This amount was "calculated after establishing a reserve to provide for Prudential's annuity
obligations . . . and its deferred policy acquisition costs."  (Id., at ¶ 56.)  Although the reserve
was calculated using a future rate of return assumption, "[t]he Registration Statement represented
that the amount of Reserves would have to be $30 million higher if the *actual* performance of the
Company's investments had been used to calculate the needed Reserves."  (Id., at ¶ 57 (emphasis
in original).)

Four months after the Offering, Prudential reported that it recorded a $380 million
annuity-related charge for the third quarter.  During an October 30, 2008, conference call with
analysts, Defendant Carbone stated that approximately two thirds of the charge "came almost
entirely from the substantial market-related decline in account values over the past year."  (Oct.
30, 2008 Call, at 2; see also Am. Compl. ¶ 58.)  Plaintiff focuses on this statement by Defendant
Carbone and argues that the Registration Statement misstated the March quarter numbers
because using the actual performance as of the date of the offering would have required more
than an additional $30 million as stated in the statement.

Defendants argue that Prudential disclosed in the Registration Statement that the reserve
amount would increase if market conditions worsened, and that market conditions worsened.
They state that a "decline in the financial markets . . . was evident earlier in the year, but . . .
worsened precipitously in late September 2008." (Mem. of Law in Support of the Prudential
Defs' Mot. to Dismiss the Consolidated Am. Class Action Compl. [hereinafter "Prudential Defs.'
Br."], at 14 (citing to a S&P 500 index chart).)  They state that the $380 million charge resulted
from reviewing the assumptions used in setting reserves and evaluating the deferred acquisition
costs during the annual review process, post-Offering.   They argue that "Plaintiffs have not

alleged one fact that would make it plausible to conclude that these market-related declines occurred six months earlier in the first quarter of 2008." (Id.)  Defendants argue that, instead of specific factual allegations, Plaintiff relies on a subsequent write-down to presume that the Registration Statement was misstated.  But, Plaintiff does not rest simply on the fact of a subsequent write-down to state the claim; Plaintiff points to Defendant Carbone's statement that about two thirds "of the charge came almost entirely from substantial market-related decline in account values over the past year," approximately eight months of which were prior to the Offering date.  Defendants argue that this statement is taken out of context, and that Defendant Carbone made other statements that "Prudential's business operations were 'substantially impacted by various discrete items . . . closely tied to the unfavorable market conditions of the past few months.'"  (Prudential Defs.' Br., at 14.)  Plaintiff does not allege that the $30 million amount necessarily was misstated by the full $380 million subsequent charge, but rather, that the portion of Defendant Carbone's statement pointed to by Plaintiff is sufficient to raise a question of how much of the $380 million charge had already declined by the time the Registration Statement was issued.  Plaintiff argues that the contradiction between the express statement in the Registration Statement and Defendant Carbone's explanation is a question to be resolved after discovery and expert analysis.  The Court agrees.  In evaluating a motion to dismiss, inferences are drawn in favor of the plaintiff; to the extent there are contradictory statements of fact, such contradictions are not to be resolved at this stage of the litigation.

Defendants also argue that, in any case, an adjustment as described by Plaintiff was not required to be disclosed earlier because the necessity of the adjustment was only discovered as part of the third quarter annual review process which was disclosed in its annual report to investors.  While the general annual review process may have been disclosed in the annual

report, this Court agrees with Plaintiff that, at the present stage of litigation, dismissal is premature in light of the fact that the Registration Statement expressly stated that the reserves would have been higher had actual performance been used and Defendant Carbone remarked that the actual performance had been declining for a year.  A reasonable investor could have believed that a reference to "actual performance" implied that the amount represented actual performance to some interim date, close in time to the quarter end.  Therefore, this Court finds that Defendants' motions to dismiss this claim are denied.  Additionally, because this Court finds that dismissal is inappropriate at this time for the reasons discussed above, it need not reach Plaintiff's FAS 97 and Item 303 arguments.

      b.    *Auction Rate Security Market Allegations*

During the period relevant to Plaintiff's claims, "Prudential and the Wachovia Corporation were partners in a joint venture known as Wachovia Securities Financial Holdings LLC that, among other activities, underwrote, sold, and participated in auctions with regard to Auction Rate Securities (the "Joint Venture")."  (Am. Compl. ¶ 43.)   Although the actual percentage ownership share appears to be disputed, both parties assert that Prudential had at least a 25% ownership interest in the Joint Venture.

As noted above, after the collapse of the ARS market, various lawsuits were filed against the Joint Venture.  (Id., at ¶ 45.)  "In addition, prior to the Offering, the SEC and other regulatory agencies commenced an investigation into the Joint Venture's misconduct in connection with the collapse of the ARS market, and formally requested internal documents and other information in furtherance of that investigation."  (Id.)  "Both the Form 10-K and Form 10-Q contained sections entitled 'Litigation and Regulatory Matters' and 'Legal Proceedings,' which [Plaintiff asserts] purported to list all of the material lawsuits and regulatory matters concerning Prudential."  (Id.,

at ¶ 48.)  However, the Registration Statement did not contain any disclosure of the Joint Venture Litigations or Regulatory Investigations nor did it disclose any contingent liability of Prudential related to the litigation.  The Joint Venture Litigations were first disclosed by Prudential in its quarterly report for the quarter ended June 30, 2008.  (Id., at ¶ 46.)  Then, "[o]n October 29, 2008, Prudential disclosed that it was taking a pre-tax charge of $235 million to resolve the claims asserted in connection with the Joint Venture Regulatory Investigations."  (Id.)

Plaintiff argues that the inclusion of litigation and legal proceeding sections in the Registration Statement "constituted representations of present fact to a reasonable investor that, as of the Offering, there were no other material lawsuits or regulatory matters" concerning Prudential.  (Pl.'s Mem. of Law in Opp'n to the Prudential Defs.' And the Underwriter Defs.' Mots. to Dismiss the Consolidated Am. Class Action Compl. [hereinafter "Pl.'s Opp'n"], at 13; see also Am. Compl. ¶ 42.)  Plaintiff argues that "Prudential was required under GAAP to disclose 'loss contingencies' resulting from 'pending or threatened litigation' in its financial statements," and that the ARS litigation represented such a loss contingency.  (Id., at 14 (citing portions of the Amended Complaint discussing Financial Accounting Standards Board Statement No. 5 ("FASB 5").)  Alternatively, Plaintiff argues that Defendants violated Item 303 by failing to disclose a "known trend or uncertain[y]."  (Id., at 15.)  Defendants argue that it had no obligation to make a disclosure of the Joint Venture Litigations for the quarter ended March 31 under SEC Regulation Item 103, Legal Proceedings, because it was not a party to the litigation. Item 103 requires that issuers "[d]escribe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant or any of its subsidiaries is a party or of which any of their property is the subject."  17 C.F.R. 229.103.

Plaintiff counters that it is not arguing that disclosure was required under Item 103, but that it

was required pursuant to FASB 5.  Plaintiff asserts that

> GAAP expressly requires that financial statements accrue a charge for the
> contingent loss where the "[i]nformation available prior to the issuance of the
> financial statements indicates that it is probable [that] an asset had been impaired
> or a liability had been incurred at the date of the financial statements" and the
> "amount of loss can be reasonably estimated."

(Am. Compl. ¶ 50 (citing FASB 5).)  FASB 5 also requires disclosure in some instances where

an accrual is not required.  See, e.g., FASB 5, ¶ 10 (requiring disclosure of loss contingencies

"when there is at least a reasonable possibility that a loss . . . may have been incurred").

Defendants argue that "not only was any future loss not Prudential's (it was Wachovia

Securities' loss), but the Complaint does not allege a single fact that would permit the inference

that as of the end of the first quarter or the Offering date any ARS-related liability of any entity

was both probable and reasonably estimable as to amount."  (Prudential Defs.' Reply, at 27.)

The Court finds that Defendants' assertion that no loss was attributable to it unpersuasive.  Even

by Defendants' own calculation, Prudential owned 25% of the Joint Venture.  Additionally, as a

result of this ownership interest, Prudential did, in fact, record a substantial charge related to the

resolution of the Joint Venture Litigations.  But, this Court agrees with Defendants that Plaintiff

has not alleged facts to support a claim that, for the quarter ended March 31, 2008, or even as of

the date of the Offering, Prudential knew that losses related to the Joint Venture Litigations were

probable, or even possible, and that Prudential had information from which it could reasonably

estimate any contingency.[4]  Therefore, this Court finds that Plaintiff has failed to sufficiently

---

[4] In the briefs, the parties discuss the effect of settlement negotiations of the Joint Venture on this analysis.  First,
there were no allegations related to any settlement negotiations in the Amended Complaint.  Second, even assuming
there were general allegations regarding negotiations of the Joint Venture, such allegations do not speak directly to
what was known by Prudential at the time of issuance of the Registration Statement.

plead this claim.  It will be dismissed without prejudice.  Defendants' motions related to this

claim are granted.

      c.    *Impairment of Prudential Assets*

Plaintiff argues that Prudential understated other-than-temporary impairments by $205

million in its March 31, 2008 Form 10-Q.  For the quarter ended March 31, 2008, Prudential

"recognized $539 million in 'other-than-temporary impairment' losses on fixed maturity

securities."  (Am. Compl. ¶ 63.)  "The Registration Statement represented that Prudential

recognized 'other-than-temporary impairments' on its asset-backed fixed maturity securities

when the value of those securities had decreased in amount (i) by 20% or more for six months or

(ii) by 50%."  (Id.)  On a July 31, 2008, conference call with analysts, "Defendant Carbone

reported that the Company was recognizing '$452 million in fixed maturity impairments' in the

quarter ended June 30, 2008."  (Id., at ¶ 65.)  He stated:

> The 452 million of fixed maturity impairments for the [second] quarter compares
> to 247 of unrealized losses of 20% or greater at March 31 that we disclosed in our
> first quarter 10-Q in the three to six month band.  Now if nothing else changed,
> you would have expected this to be the impairment for fixed income securities in
> the second quarter.  Our general guideline is that for 20% or greater declines due
> to spread widening, we impair at six months.  The increase in impairments to 452
> million *came primarily from declines in value of 50% or more that were in the
> zero to three month category at March 31.*

(Dec. of Katherine G. McKenney in Support of the Prudential Defs.' Mot. to Dismiss, Ex. 5,

Prudential's Earnings Conference Call July 31, 2008, at 3 (emphasis added); see also Am.

Compl. ¶ 65.)

Plaintiff focuses its argument on the emphasized language in Mr. Carbone's statement.

Plaintiff argues that a "plain reading" of this statement supports its allegations that at least $205

million of additional asset-backed fixed maturity securities were already impaired by more than

50% in the quarter ended March 31 over the $539 million that Prudential reported in the

Registration Statement. (Am. Compl. ¶ 64; Pl.'s Opp'n, at 33.)  In the alternative, Plaintiff

argues that "even assuming . . . that the $205 million at issue only became impaired by 50%

during the quarter ended June 30, 2008 . . ., Defendants are liable under Item 303 because the

Registration Statement failed to disclose this clearly known trend that would have a materially

unfavorable impact on income from continuing operations."  (Pl.'s Opp'n, at 32.)

On the other hand, Defendants argue that "Mr. Carbone's remarks can plausibly be

interpreted in one way–that the 50% or more declines in value that resulted in the additional

impairment charges occurred *after* the first quarter." (Prudential Defs.' Reply, at 22 n.11

(emphasis in original).)  Defendants appear to acknowledge that if the statement was "susceptible

to different, but plausible, interpretations," dismissal would not be appropriate, but they argue

that there are not two plausible interpretations.  (Id.)  Defendants also argue that they warned

investors that if conditions did not improve that impairments would increase, and that that is

exactly what happened—conditions worsened and, as a result, impairments increased.  This

Court agrees with Plaintiff in two respects.  First, the Court agrees that, at a minimum, this

statement is ambiguous as to whether additional assets were already impaired by more than 50%

at the time the Registration Statement was issued.  Because this Court finds that the statement is

susceptible to different plausible interpretations, dismissal of this claim is not appropriate at this

time.  Also, the Court agrees with Plaintiff that warnings do not insulate Defendants from

allegations that assets were already impaired, which Plaintiff clearly alleges.  Finally, because

this Court finds that Plaintiff has adequately pled affirmative misstatements based on Defendant

Carbone's statement, it is unnecessary to address Plaintiff's Item 303 argument for this claim.

Defendants' motions to dismiss this claim are denied.

4.   <u>Individual Defendant Liability</u>

"A Section 11 claim may be brought against the issuer of securities, its directors or partners, underwriters, and accountants who prepared or certified the registration statement." <u>Suprema Specialties</u>, 438 F.3d at 269; <u>see also</u> 15 U.S.C. § 77k(a).  All Individual Defendants named in this lawsuit signed the Registration Statement.  (<u>See</u> Am. Compl. ¶¶ 10-23.)  All of the Underwriter Defendants underwrote the Offering.  (<u>See id.</u>, at ¶¶ 25-32.)  Section 11, however, exempts individual officers and directors where they can demonstrate due diligence.  <u>See</u> 15 U.S.C. § 77k(b); <u>see also</u> <u>Herman & Maclean v. Huddleston</u>, 459 U.S. 375, 382 (1983).  Defendants cite to a Central District of California case for the proposition that a claim may be dismissed when "there are no factual allegations that [the defendants] failed to conduct sufficient diligence with respect to the offering."  (Prudential Defs.' Br., at 39 (citing <u>In re Countrywide Fin. Corp. Sec. Litig.</u>, 588 F. Supp. 2d 1132, 1181-82 (C.D. Cal. 2008).)  However, as this Court noted above with regard to the compensable loss issue, a plaintiff in a § 11 case is not required to plead around a defendant's affirmative defenses.  <u>See</u> <u>Adams Golf</u>, 381 F.3d at 277.  Therefore, the claims against the Individual Defendants will not be dismissed at this time; the motions to dismiss the claims against the Individual Defendants are denied.

**B.   Section 15 Claims**

Plaintiff's final claim against Defendants is for control person liability under § 15.  Defendants first argue that, because § 15 claims are derivative of § 11 claims, the § 15 claim fails because Plaintiff has failed to sufficiently plead a primary violation under § 11.  However, as this Court has found that some of Plaintiff's § 11 claims are sufficiently pled, this argument fails.

Defendants also argue that Plaintiff must "allege that each individual defendant had control over or involvement in the specific statements of the issuer being challenged"—that a

showing of mere position and signing of the Registration Statement is insufficient.  (Prudential

Defs.' Br., at 39-40.)  "To establish a defendant is [a] control person, a plaintiff must

demonstrate the defendant had actual power or influence over the allegedly controlled person."

In re MobileMedia Sec. Litig., 28 F. Supp. 2d 901, 940 (D.N.J. 1998) (internal quotations

omitted); see also In re PMA Capital Corp. Sec. Litig., No. 03-6121, 2005 WL 1806503, at *20

(E.D. Pa. July 27, 2005) (finding that the plaintiffs sufficiently plead a § 15 violation where the

plaintiffs pled that the individual at issue was an officer of the corporation and signed the

financial statements).  Here, Plaintiff pleads each Individual Defendants' position of influence

with Prudential and that each signed the Registration Statement.  The Court finds this sufficient

to plead a § 15 violation.  Defendants' motions to dismiss Plaintiff's § 15 claim are denied.

## IV.    CONCLUSION

For the foregoing reasons, the Prudential Defendants' and the Underwriter Defendants'

motions to dismiss are granted in part and denied in part.  They are granted with respect to

Plaintiff's § 11 claim related to pending litigation statements; this claim is dismissed without

prejudice.  The motions are denied in all other respects.  An appropriate Order accompanies this

Opinion.


DATED: June 29, 2010                        /s/ Jose L. Linares
                                            JOSE L. LINARES
                                            UNITED STATES DISTRICT JUDGE