**LITE DEPALMA GREENBERG, LLC**
Joseph J. DePalma (jdepalma@litedepalma.com)
Katrina Carroll (kcarroll@litedepalma.com)
Two Gateway Center, 12th Floor
Newark, NJ 07102-5003
Telephone: (973) 623-3000
Facsimile: (973) 623-0858

*Liaison Counsel for Lead Plaintiff*

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

*DOCUMENT ELECTRONICALLY FILED*

| | | |
|---|---|---|
| KAREN M. BAUER, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. 09-1120-JLL |
| Plaintiff, | ) ) ) | **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| vs. | ) ) | <u>**JURY TRIAL DEMANDED**</u> |
| PRUDENTIAL FINANCIAL, INC., et al. | ) ) | |
| Defendants. | ) ) | |
| NOAH HADDOCK, Individually and on Behalf of all Others Similarly Situated, | ) ) ) | Civil Action No. 09-1771-JLL |
| Plaintiff, | ) ) | |
| Vs. | ) ) | |
| PRUDENTIAL FINANCIAL, INC., et al. | ) ) | |
| Defendants. | ) ) | |

Court-appointed Lead Plaintiff Paul J. Perry, Trustee of the Paul J. Perry Revocable Trust

("Plaintiff"), residing at 822 Springfield Drive, Northville, MI, alleges the following based upon

the investigation by Plaintiff's counsel.

242001 v1

## INTRODUCTION

1.      This is a securities class action for violations of the Securities Act of 1933 (the

"Securities Act").  Plaintiff brings this action on behalf of himself and all other persons who

purchased the 9% Junior Subordinated Notes of Prudential Financial, Inc. ("Prudential") (the

"Securities" or "Notes") pursuant to and/or traceable to a false and misleading registration

statement and prospectus issued in connection with Prudential's June 24, 2008 initial public

offering of the Securities.  The Securities Act claims asserted herein involve strict liability and

negligence claims, and do not sound in or arise from allegations of fraud.

2.      Prudential is a financial services company with operations in the United States and

around the world.  Prudential's businesses offer a variety of products and services, including life

insurance, annuities, retirement-related services, mutual funds, investment management, and real

estate services.

3.      On or about June 24, 2008, Prudential conducted an initial public offering of the

Securities (the "IPO" or the "Offering") that raised over $920 million by selling 36.8 million Notes

of the Securities at a price of $25 per Note.  As more particularly alleged below, Defendants sold

the Securities in the Offering by means of a false and misleading registration statement and

prospectus which, as alleged below, (i) contained material misrepresentations of present fact which

concealed and/or omitted the Company's involvement in and/or the existence of a contingent

liability arising from the February 2008 collapse of the market for action rate securities (*see* ¶¶42-

65 below); (ii) materially understated the actual amount of Prudential's $380 million liability in

connection with its annuity obligations and deferred acquisition costs (*see* ¶¶66-73 below); and

(iii) materially understated by approximately $205 million the amount of Prudential's "other than

temporary impairments" as of March 31, 2008, by failing to account for the decrease in the value of the Company's asset-backed fixed maturity securities that had decreased in value more than 50% (*see* ¶¶74-79 below).  As further alleged below, the material misrepresentations alleged in ¶¶66-73 and 74-79 below cumulatively resulted in an approximately $585 million overstatement of pre-tax income reported in the registration statement and prospectus at issue.  The financial statements reported net income of $69 million; had the financial statements not contained these material overstatements alleged in ¶¶66-73 and 74-79 below, the registration statement and prospectus would have reported a net *loss* of as much as ***$303 million***.

## JURISDICTION AND VENUE

4.      The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2) and 77o).

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 22 of the Securities Act (15 U.S.C. §77v).

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1381(b) and §22 of the Securities Act.  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  In addition, Prudential's principal executive offices are located within this District, and the Underwriter Defendants (as defined below) maintain offices in this District.

7.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

8.      As set forth in the Certification of Named Plaintiff previously filed with this Court, Lead Plaintiff Paul J. Perry, Trustee of the Paul J. Perry Revocable Trust, purchased Securities pursuant to or traceable to the registration statement and prospectus filed in connection with the Offering and has been damaged thereby.

9.      Defendant Prudential is a financial services company that offers a variety of products, including life insurance, annuities, retirement-related services, mutual funds, investment management and real estate services.  It is headquartered and maintains its principal executive offices at 751 Broad Street, Prudential Plaza, Newark, New Jersey.

10.     Defendant Arthur F. Ryan ("Ryan") was, at relevant times, Chairman, Chief Executive Officer and a director of the Company.  Ryan signed the false and misleading Registration Statement.

11.     Defendant Richard J. Carbone ("Carbone") was, at relevant times, Senior Vice President and Chief Financial Officer of the Company.  Carbone signed the false and misleading Registration Statement.

12.     Defendant Peter B. Sayre ("Sayre") was, at relevant times, Controller of the Company.  Sayre signed the false and misleading Registration Statement.

13.     Defendant Dennis G Sullivan ("Sullivan") was, at relevant times, Vice President (Principal Accounting Officer) of the Company.  Sullivan signed the false and misleading Registration Statement.

14.     Defendant Frederic K. Becker ("Becker") was, at relevant times, a director of the Company.  Becker signed the false and misleading Registration Statement.

15.     Defendant Gordon M. Bethune ("Bethune") was, at relevant times, a director of the Company.  Bethune signed the false and misleading Registration Statement.

16.     Defendant Gaston Caperton ("Caperton") was, at relevant times, a director of the Company.  Caperton signed the false and misleading Registration Statement.

17.     Defendant Gilbert F. Casellas ("Casellas") was, at relevant times, a director of the Company.  Casellas signed the false and misleading Registration Statement.

18.     Defendant James G. Cullen ("Cullen") was, at relevant times, a director of the Company.  Cullen signed the false and misleading Registration Statement.

19.     Defendant William H. Gray III ("Gray") was, at relevant times, a director of the Company.  Gray signed the false and misleading Registration Statement.

20.     Defendant Jon F. Hanson ("Hanson") was, at relevant times, a director of the Company.  Hanson signed the false and misleading Registration Statement.

21.     Defendant Constance J. Horner ("Horner") was, at relevant times, a director of the Company.  Horner signed the false and misleading Registration Statement.

22.     Defendant Karl J. Krapek ("Krapek") was, at relevant times, a director of the Company.  Krapek signed the false and misleading Registration Statement.

23.     Defendant James A. Unruh ("Unruh") was, at relevant times, a director of the Company.  Unruh signed the false and misleading Registration Statement.

24.     The defendants referenced above in ¶¶10-23 are referred to herein as the "Individual Defendants."

25.     Defendant Citigroup Global Markets Inc. ("Citigroup Global") is the brokerage and securities arm of Citigroup.  Citigroup Global was an underwriter for the Offering.

26.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") provides capital markets services, investment banking and advisory services, wealth management, asset management, insurance, banking, and related products and services on a global basis.  Merrill Lynch was an underwriter for the Offering.

27.    Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") is a global financial services firm that, through its subsidiaries and affiliates, provides its products and services to customers, including corporations, governments, financial institutions and individuals.  Morgan Stanley assists public and private corporations in raising funds in the capital markets (both equity and debt), as well as in providing strategic advisory services for mergers, acquisitions and other types of financial transactions.  Morgan Stanley was an underwriter for the Offering.

28.    Defendant UBS Securities LLC ("UBS") provides a range of financial products and services worldwide.  UBS was an underwriter for the Offering.

29.    Defendant Wachovia Capital Markets, LLC ("Wachovia") provides a range of financial products and services worldwide.  Wachovia was an underwriter for the Offering.

30.    Defendant Banc of America Securities LLC ("Banc of America") is the investment banking arm of Bank of America.  Banc of America offers trading and brokerage services, debt and securities underwriting, debt and equity research, and advice on public offerings, leveraged buyouts, and mergers and acquisitions.  Banc of America was an underwriter for the Offering.

31.    Defendant RBC Capital Markets Corporation ("RBC") is the corporate and investment banking division of Royal Bank of Canada.  RBC was an underwriter for the Offering.

32.    Defendant J.P. Morgan Securities Inc. (J.P. Morgan") is a subsidiary of JPMorgan Chase & Co., a leading global financial services firm with assets of $2.2 trillion.  The firm is a leader in investment banking, financial services for consumers, small business and commercial

banking, financial transaction processing, asset management and private equity.  J.P. Morgan was

an underwriter for the Offering.

33.     The defendants referenced in ¶¶25-32 above are referred to herein as the

"Underwriter Defendants."

## CLASS ACTION ALLEGATIONS

34.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

of Civil Procedure, individually and on behalf of a class consisting of all purchasers of the

Securities pursuant or traceable to the Company's false and misleading Registration Statement for

the Offering and who were damaged thereby, exclusive of Defendants, all officers and directors of

any of the Defendants or their subsidiaries, members of Defendants' immediate families, any entity

in which any Defendant has a controlling interest, and the legal representatives, heirs, successors,

or assigns of any such excluded person, including all of the underwriters in the IPO when acting in

such capacity (hereinafter, the "Class")

35.     The members of the Class are so numerous that joinder of all members in

impracticable.  The Securities were actively traded on the NYSE.  Plaintiff believes that there are

at least hundreds of members in the proposed Class.  Members of the Class may be identified from

records maintained by Prudential or its transfer agent and may be easily notified of the pendency

of this action.

36.     Plaintiff's claims are typical of the claims of the other members of the Class,

because the damages suffered by Plaintiff and all other Class Members arise from and were caused

by the same misrepresentations and omissions made by or chargeable to Defendants as alleged

herein.

37.     Common questions of law or fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law or fact common to the Class are:

        a.     whether the federal securities laws were violated by Defendants' acts as alleged herein;

        b.     whether the Defendants misrepresented and/or failed to disclose material facts in the Registration Statement and Prospectus, as described below;

        c.     whether the Individual Defendants are "controlling persons" of Prudential within the meaning of Section 15 of the Securities Act;

        d.     whether the members of the Class have sustained damages, and, if so, the proper measure of such damages.

38.     Plaintiff will fairly and adequately protect the interests of the other members of the Class, Plaintiff does not have interests antagonistic to, or in conflict with, the Class, and Plaintiff has retained counsel competent and experienced in class and securities litigation to further ensure such protection and intend to prosecute this action vigorously.

39.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Class is so numerous and geographically dispersed that it would be impracticable for each member of the Class to bring a separate action or to be joined in an individual action.  The individual damages of any member of the Class may be relatively small when measured against the potential costs of bringing this action, and thus make the expense and burden of this litigation unjustifiable for individual actions.  In this class action, the Court can determine the rights of all members of the Class with judicial economy.

## SUBSTANTIVE ALLEGATIONS

### The Registration Statement

40.     On or about March 16, 2006, Prudential filed a form S-3 Registration Statement and Prospectus with the SEC (the "Form S-3") using a "shelf registration" or continuous offering process.  Under this process, Prudential was allowed to sell securities described in future prospectus supplements in future offerings.  The Form S-3, the prospectus supplement and any documents incorporated by referenced therein would constitute the registration statement for a given offering.

41.     On or about June 24, 2008 (only four business days before the end of Prudential's second fiscal quarter on June 30, 2008), Prudential filed its prospectus supplement for the Offering (the "Prospectus Supplement") in connection with the Form S-3 and the "shelf registration" process discussed above, pursuant to which Prudential sold 36.8 million Notes of the Securities to the public at $25 per Note.  The Prospectus Supplement expressly incorporated by reference Prudential's quarterly report for the quarter ended March 31, 2008 filed on form 10-Q with the SEC (the "Form 10-Q") and Prudential's annual report for the year ended December 31, 2007 filed on form 10-K with the SEC (the "Form 10-K").  The Form S-3, Prospectus Supplement, Form 10-K and Form 10-Q (along with other documents incorporated by reference into the Prospectus Supplement) jointly formed the registration statement for the Offering (the "Registration Statement").

### Material Misrepresentations Arising From The
### Collapse Of The Auction Rate Securities Market

42.     The Registration Statement contained material misrepresentations of present fact which concealed and/or omitted the Company's involvement in and/or the existence of a

contingent liability arising from the February 2008 collapse of the market for action rate securities ("Auction Rate Securities" or "ARS").

### The Joint Venture

43.    In July 2003, pursuant to a Retail Brokerage Company Formation Agreement (the "Joint Venture Agreement"), Prudential and the Wachovia Corporation formed a joint venture, known as Wachovia Securities Financial Holdings LLC, which did business through Wachovia Securities LLC, its wholly owned subsidiary (the "Joint Venture").  From the inception of the Joint Venture through December 31, 2009, Prudential owned 38% of the Joint Venture.

44.    The financial results of the Joint Venture were an important component of Prudential's financial results.  For example, for the fiscal year ended December 31, 2007, Prudential recognized approximately $300 million of earnings from the Joint Venture.

### Prudential's Management of the Joint Venture Prior to the Offering

45.    Prior to the Offering, and at all times relevant to this litigation, Prudential closely monitored the Joint Venture's business and operations.  For example, since the inception of the Joint Venture, and pursuant to the Amended and Restated Limited Liability Agreement between Prudential and Wachovia which governed, *inter alia,* the management of the Joint Venture (the "Management Agreement"), two (2) senior Prudential officers served on the Joint Venture's five (5) person Board of Managers.  Under the terms of the Management Agreement, the Board of Managers was given "sole responsibility for managing the business and affairs" of the Joint Venture and had "the power, discretion and authority on behalf and in the name of the [Joint Venture] to carry out any and all of the objects and purposes of the" Joint Venture.

46.    At the time of the Offering and at all times relevant to this litigation, Prudential's senior officers on the Joint Venture's Board of Managers were John R. Strangfeld ("Strangfeld")

and Mark B. Grier ("Grier").  On January 1, 2008, Strangfeld, while serving on the Joint Venture's Board of Managers, was promoted from Vice Chairman of United States operations to Chief Executive Officer, and on May 13, 2008, Strangfeld became Chairman of the Board of Directors. Similarly, On January 1, 2008, while serving on the Joint Venture's Board of Managers, Grier (employed as Prudential's Vice Chairman for International Insurance and Investments and Global Marketing and Communications divisions) became a member of Prudential's Board of Directors. As of the date of the filing of this Complaint, Strangfeld and Grier remain on the Joint Venture's Board of Managers.

### *The Notice and Cooperation Requirements Under the Joint Venture Agreement*

47.     The Joint Venture Agreement provided that Prudential would receive prompt notice of any claims against the Joint Venture.  Specifically, the Joint Venture Agreement includes a detailed notice procedure to address "all matters or circumstances that may result in a Loss by reason of a Claim brought by a Third Party, including but not limited to a Claim that may be asserted by a Governmental Authority."   Under the terms of the Joint Venture Agreement, each party was required to "[p]romptly" provide the other with "written notice of any matter or circumstance [concerning the Joint Venture] that may reasonably be expected to result in a Loss . . . ."  The parties were also required to "mutually determine in good faith" the potential liability that each faced, with the party subject to the greatest potential liability becoming the "Controlling Party" to direct defense of the matter.  The "Controlling Party" was also required to update the other Joint Venture partner "at least monthly" on the "status, including any significant developments, with respect to Third Party Claims."  The Joint Venture Agreement was in force at the time of the Offering.

### *The Involvement of the Joint Venture in the Collapse of the ARS Market*

48.     Auction Rate Securities are municipal bonds, corporate bonds and preferred stocks with interest rate or dividend yields that are periodically re-set through periodic auctions.  The Joint Venture, *inter alia,* underwrote, sold and participated in auctions with regard to Auction Rate Securities.

49.     The Joint Venture was one of the largest participants in the ARS market. In fact, by February 2008, the Joint Venture had sold at least *$8.5 billion* of Auction Rate Securities to individual retail customers and other small entities – more than CitiGroup, Morgan Stanley, JPMorgan, Merrill Lynch, Goldman Sachs, Deutsche Bank, Fidelity Investments, Credit Suisse Group, Bank of America, or RBC.

50.     Prior to February 2008, the Joint Venture and other banks participating in the ARS market ensured the liquidity of the market by making purchases for their own accounts at the periodic auctions in the absence of other buyers.  However, according to a complaint filed by the SEC, the Joint Venture was aware of significant weaknesses in the ARS market by late 2007. Specifically, according to the SEC complaint, by the end of 2007, the Joint Venture knew that interest rates for certain ARS were trending upward, indicating a weakening in the market.  By the last two weeks of January 2008, Joint Venture employees learned that certain other banks (Lehman Brothers, Bank of America, and Piper Jaffray) had allowed specific ARS auctions to fail, rather than stepping in to make purchases for their own accounts.  As a result, the Joint Venture began closely monitoring developments in the ARS market, and, by January 30, 2008, the Joint Venture knew the Lehman Brothers intended to stop purchasing ARS for its own account altogether – and thus stop supporting the liquidity of the ARS market – in February.  As a result of learning this information, the Joint Venture considered whether to step in to support the liquidity of the Auction

Rate Securities previously supported by Lehman, but concluded there was limited financial upside to doing so and decided not to.

51.     On February 13, 2008, the formerly liquid market for ARS became almost entirely illiquid when various broker-dealers, including the Joint Venture, ended their participation as market-makers in the ARS market.

### The Litigation and Regulatory Actions Against the Joint Venture Prior to the Offering Arising From the Collapse of the ARS Market

52.     The February 2008 collapse of the ARS market immediately resulted in various complaints, lawsuits and investigations against the Joint Venture prior to the Offering.

53.     For example, prior to the Offering, a securities class action was filed against the Joint Venture on or about March 19, 2008 (the "Joint Venture Class Action") alleging, *inter alia,* that the Joint Venture was liable for misrepresenting that Auction Rate Securities were effective cash alternatives when the Joint Venture knew, but failed to disclose, that ARS were complex, long-term financial instruments with 30 year or longer maturity dates, and further that ARS would only be liquid so long as the Joint Venture (and other broker dealers) artificially supported the liquidity of the market.

54.     Also prior to the Offering, the SEC and other regulatory agencies commenced investigations into the Joint Venture's misconduct in connection with the collapse of the ARS market (the "Joint Venture Regulatory Actions") (together with the Joint Venture Class Action, the "Joint Venture Litigations").  By April 11, 2008, the SEC had begun an investigation of the Joint Venture's involvement in the collapse of the ARS market, and had demanded documents from the Joint Venture.  Similarly, by April 18, 2008, state securities regulators in New York, Florida, Georgia, Illinois, Massachusetts, Missouri, New Hampshire, New Jersey, Texas and Washington

(the "Multi-State Group") had served subpoenas on the Joint Venture concerning its involvement in the ARS market.

55.     Pursuant to Joint Venture Agreement, Wachovia and Prudential, as set forth above, were required to consult with each other "[p]romptly" upon the initiation of the Joint Venture Litigations, to assess their potential liability, and to consult regularly thereafter.  Upon information and belief, the Joint Venture complied with the terms of the Joint Venture Agreement and Prudential was consulted promptly concerning the Joint Venture Litigations.

56.     On May 1, 2008, one-and-a-half months after the filing of the Joint Venture Class Action and several weeks after the initiation of the Joint Venture Regulatory Actions, Prudential filed its Form 10-Q for the quarter ended March 31, 2008.  In sections of this Form 10-Q entitled "Litigation and Regulatory Matters" and "Legal Proceedings," which purported to list all of the material lawsuits and regulatory matters concerning Prudential, Defendants did not disclose the existence of the Joint Venture Litigations.  Instead, the Form 10-Q disclosed the status of several other class action litigations and governmental investigation on diverse subjects ranging from alleged violations of market timing regulations, to alleged violations of federal wage and hour laws, to alleged improper alternative dispute resolution requirements for employees, and stated that Prudential did not believe that those actions were "likely to have a material adverse effect on our financial position."

57.     On June 24, 2008, the effective date of the Offering, and over three months after the commencement of the Joint Venture Class Action and over two months after commencement of the Joint Venture Regulatory Actions (including the demands for documents), Prudential filed its Prospectus Supplement to the Registration Statement to update the information in the Registration Statement.  The Prospectus Supplement contained no disclosure whatsoever concerning the Joint

Venture Litigations, the Joint Venture's contingent liability arising out of the collapse of the ARS market and/or the Joint Venture Litigations and/or the potential impact on Prudential's income from continuing operations.

58.    On July 17, 2008, the Multi-State Group investigating the Joint Venture (alleged in ¶54, above) conducted a widely publicized raid of the Joint Venture's headquarters due to the Joint Venture's refusal to comply with subpoenas issued in April 2008.

59.    On July 31, 2008 – approximately one month after the Offering –Prudential finally acknowledged its contingent liability with respect to the Joint Venture Litigations, disclosed the existence of the Joint Venture Litigations in its Form 10-Q for the quarter ended June 30, 2008, and admitted that the Joint Venture had been subject to the Joint Venture Investigations *prior to* the Offering on June 24, 2008:

> *In recent months* . . . Wachovia Securities [i.e., the Joint Venture] has become the subject of customer complaints, legal actions, including a putative class action, and investigations by securities regulators and agencies relating to Wachovia Securities' role in the underwriting, sale and auction of auction rate securities. (emphasis added)

60.    Just two weeks later, on August 15, 2008, the Joint Venture reached a settlement with the Multi-State Group under which the Joint Venture agreed to repurchase up to the entire $8.5 billion in ARS that the Joint Venture had sold to smaller investors (*i.e.,* individual investors and charities and small business who had invested less than $10 million).  The Joint Venture also agreed, *inter alia,* to compensate investors damaged by the period of ARS illiquidity (*i.e.,* who had been forced to sell their ARS at tremendous discounts or who had taken loans to cover the period of illiquidity), and to pay civil penalties of $50 million.  Subsequently, the SEC and the Joint Venture reached a settlement with the Joint Venture that required Wachovia to repurchase ARS

held by large investors (*i.e.,* large business and account holders who had invested more than $10 million), as well as smaller investors covered by the settlement with the Multi-State Group.

61.     As a result of its liability from these settlements, Prudential took pre-tax charges within adjusted operating income and income from continuing operations before income taxes of $235 million in the quarter ended September 30, 2008, and an additional $120 million in the quarter ended December 31, 2008, for a total of $355 million.  The amount of this charge was material to Prudential.  For example, but for the $235 million charge in the third quarter of 2008, Prudential would have reported a $50 million pre-tax *profit* from continuing operations for that quarter.  However, because of the $235 million charge, Prudential was forced to report a $185 million pre-tax *loss*.   Similarly, the $355 million in charges that Prudential took as a result of the settlements caused Prudential to report total *losses* of *$351 million* from the Joint Venture for the fiscal year ended December 31, 2008, which results were significantly worse than Prudential's earnings of $300 million from the Joint Venture in fiscal 2007, alleged in ¶44 above.

62.     Defendants are liable for their misrepresentations and/or omissions concerning the existence of the Joint Venture Litigations for three separate reasons, each of which is a sufficient, independent basis for liability under the Securities Act of 1933. First, the Registration Statement contained statements which constituted affirmative misrepresentations that, as of the Offering, there were no material lawsuits or regulatory matters affecting Prudential other than those matters listed.  As alleged above, the Form 10-K and Form 10-Q were expressly incorporated into the Registration Statement.  Both the Form 10-K and Form 10-Q contained sections entitled "Litigation and Regulatory Matters" and "Legal Proceedings," which purported to list all of the material lawsuits and regulatory matters concerning Prudential; those statements constituted affirmative representations of present fact that, as of the Offering, there were no material lawsuits

or regulatory matters concerning Prudential other than the matters listed.  These representations of

present fact were materially false or misleading due to the failure to disclose the existence of the

Joint Venture Litigations.

63.    Second, the financial statements in the Registration Statement violated GAAP by

failing to disclose the existence of the Joint Venture Litigations.  GAAP specifically requires

financial statements to disclose "loss contingencies" resulting from "pending or threatened

litigation."  FASB 5, ¶4(b).  Regardless of whether "the amount of loss cannot be reasonably

estimated" or the entity filing a financial statement with the SEC believes that an "unfavorable

outcome" is "not probable," the entity is still "required" to make "disclosure" of "pending or

threatened litigations" as contingent liabilities (FASB 5, ¶¶4(b) and 37), which must set forth "the

nature of the contingency and shall give an estimate of the possible loss or range of loss or state

that such an estimate cannot be made."  FASB 5, ¶10.  In violation of this GAAP requirement, the

Registration Statement was materially false or misleading because it misrepresented the

Company's financial results by failing to disclose the Joint Venture Litigations and to either (1)

estimate the Company's contingent liability from the Joint Venture Litigations or (2) explain why

such an estimate could not be made.

64.    Third, Defendants were obligated to disclose the existence of the Joint Venture

Litigations in the Registration Statement pursuant to Item 303(a)(3)(ii) of SEC Regulation S-K, 17

C.F.R. Section 229.303(a)(3)(ii) ("Item 303").  Section 11 of the Securities Act is violated if the

Registration Statement "omitted to state a material fact required to be stated therein."  Item 303 is

an SEC regulation that requires disclosure in the Registration Statement of "any known trends *or*

*uncertainties* that have had or that the registrant reasonably expects will have a material favorable

or unfavorable impact on net sales or revenues or income from continuing operations" (emphasis

added).  Defendants were required to disclose the existence of the Joint Venture Litigations under Item 303 because, as of the Offering, the Joint Venture Litigations were a known uncertainty that Prudential could reasonably expect to have a materially unfavorable impact on Prudential's income from continuing operations.

65.     In addition, Defendants' misrepresentations and/or omissions of the adverse information concealed by Defendants' failure to comply with Item 303, were especially material because the Registration Statement became effective on June 24, 2008, only four business days before the end of Prudential's second fiscal quarter on June 30, 2008.

<b>Material Misrepresentations Concerning the Costs Of<br>Prudential's Annuity Obligations And Its Deferred Policy Acquisition Costs</b>

66.     The Registration Statement also contained material misrepresentations of present fact concerning the actual costs of funding the Company's obligations to annuity account holders and by understating amortization of deferred policy acquisition costs.

67.     Specifically, the Registration Statement reported that the Company earned approximately $54 million in pre-tax income (from continuing operations before equity in earnings of joint ventures) for the quarter ended March 31, 2008.

68.     The Registration Statement stated that the $54 million amount had been calculated after establishing a reserve to provide for Prudential's annuity obligations (*i.e.,* the amount of Prudential's obligations under the annuity contracts it sold to customers) and its deferred policy acquisition costs (*i.e.,* the amount of Prudential's upfront commissions to sales agents, underwriting costs, and other costs incurred in connection with the sale of annuities) (the "Reserves").  The Registration Statement also stated that Prudential calculated its Reserves by

using statistically generated "future rate of return assumptions" about the Company's investments in the Reserves.

69.    The Registration Statement represented that the amount of Reserves would have to be $30 million higher if the ***actual*** performance of the Company's investments had been used to calculate the needed Reserves (instead of the "future rate of return assumptions").

70.    The representations alleged in ¶¶67 and 69 above were materially false or misleading because, in order to provide for Prudential's annuity obligations and deferred policy acquisition costs as of the Offering, Prudential needed to add as much as ***$380 million*** in additional Reserves based on the actual performance of the Company's investments, not $30 million.  During a conference call with analysts on October 30, 2008, Defendant Carbone admitted that the decline in the actual performance of the Company's investments necessitating additional Reserves had occurred "over the past year."

71.    Had this $380 million amount been added to the Reserve and accounted for at the time of the Offering, the charge would have ***completely eliminated*** the Company's reported $54 million in pre-tax income (from continuing operations before equity in earnings of joint ventures) as reported in the Registration Statement and in fact would have resulted in a ***loss*** of $326 million.

72.    In addition, Defendants violated Item 303 by failing to disclose the "known trend or uncertainty" that, as a result of the actual performance of the Company's investments as of the Offering, the amount of additional Reserves necessary to provide for Prudential's annuity obligations and deferred policy acquisition costs based on the actual performance of the Company's investments required as much as a $380 million addition to the Reserves, which would result in a materially unfavorable impact on income from continuing operations.

73.     Defendants' misrepresentations and omissions discussed above and the adverse information concealed by Defendants' failure to comply with Item 303 were especially material because the Registration Statement became effective on June 24, 2008, only four business days before the end of Prudential's second fiscal quarter on June 30, 2008.

### Misrepresentations Concerning The Amount Of Prudential's Asset-Backed Fixed Maturity Securities That Were Impaired As Of March 31, 2008

74.     The Registration Statement also contained material misrepresentations concerning the amount of "other than temporary impairments" of the Company's assets.

75.     The Registration Statement represented that Prudential recognized "other-than-temporary impairments" on its asset-backed fixed maturity securities when the value of those securities had decreased in amount (i) by 20% or more for six months or (ii) by 50%.  The Registration Statement further represented that Prudential had recognized $539 million in "other-than-temporary impairment" losses on fixed maturity securities for the quarter ended March 31, 2008.

76.     The representations in the Registration Statement alleged in ¶75 above were materially false or misleading.  Contrary to the representations in the Registration Statement, as Prudential subsequently disclosed during the Company's July 31, 2008 earnings conference call with analysts (the "July 31 Conference Call"), the amount of Prudential's properly recognized "other than temporary" impairments was actually $744 million as of March 31, 2008, due to an *additional $205 million* of asset-backed fixed maturity securities that were *already* impaired *by more than 50%* in the quarter ended March 31, 2008.

77.     Specifically, during the July 31 Conference Call, Defendant Carbone reported that the Company was recognizing "$452 million of fixed maturity impairments" in the quarter ended

June 30, 2008, and that $247 million of that amount consisted of asset-backed fixed maturity securities that had been impaired by at least 20% for at least six months as of June 30, 2008.  As to the other $205 million in fixed maturity impairments, Defendant Carbone disclosed that the $205 million represented impairments to asset-backed fixed maturity securities that "came primarily from declines in value of 50% or more that were in the zero to three month category at March 31[, 2008]."

78.    In the alternative, Defendants violated Item 303 by failing to disclose the "known trend" that, as of the Offering, the amount of Prudential's asset-backed fixed maturity securities that were impaired by 50% or more had increased by approximately $205 million, and that this trend would have a materially unfavorable impact on income from continuing operations.

79.    Defendants' misrepresentations and omissions discussed above and the adverse information concealed by Defendants' failure to comply with Item 303 were especially material because the Registration Statement became effective on June 24, 2008, only four business days before the end of Prudential's second fiscal quarter on June 30, 2008.

**Material Misrepresentation of Prudential's Net Income**

80.    In the Registration Statement, Prudential reported, *inter alia,* net income of $69 million for the quarter ended March 31, 2008.  As more particularly alleged above (*see* ¶¶66-73, 74-79), these financial results were materially false or misleading because they overstated Prudential's pre-tax income by $585 million.  Had the financial statements not contained these material overstatements, the Registration Statement would have reported a net ***loss*** of as much as ***$303 million*** for the quarter ended March 31, 2008.

## CLAIMS FOR RELIEF

### First Claim For Relief

### Violations of Section 11 of the Securities Act against All Defendants

81.     Plaintiff incorporates by reference all preceding paragraphs as if set forth fully herein.  Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

82.     This Claim for Relief is asserted by Plaintiff against all Defendants under and pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class.

83.     As set forth above, the Registration Statement (i) contained untrue statements of material fact, (ii) omitted to state information required to be stated therein and (iii) omitted information necessary to make the statements contained in the Registration Statement not misleading.

84.     Prudential is the registrant of the Offering.  As issuer of the Securities, Prudential is strictly liable to plaintiff and the Class for the misstatements and omissions identified above pursuant to Section 11 of the Securities Act.

85.     Each of the Individual Defendants named in this Claim for Relief signed the Registration Statement, was responsible for the contents and dissemination of the Registrations Statement, and is liable to plaintiff and the Class for the misstatements and omissions identified above pursuant to Section 11 of the Securities Act.

86.     Each of the Underwriter Defendants was identified in the Registration Statement, was responsible for the contents and dissemination of the Registration Statement, and is liable to

Plaintiff and the Class for the misstatements and omissions identified above pursuant to Section 11 of the Securities Act.

87.     None of the Individual or Underwriter Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

88.     By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

89.     Plaintiff and all members of the Class purchased Securities which were issued pursuant to and directly traceable to the Registration Statement.

90.     Defendants' misrepresentations have caused Plaintiff and the Class to suffer damages.  For example, on March 4, 2009 (the date on which the first lawsuit was filed against Defendants), the Securities were trading at only $13.04 per Note, approximately *48%* below the $25.00 per Note offering price

91.     This action was brought within three years of the violations of Section 11 of the Securities Act and within one year of the date that any such violations could or should have been discovered through reasonable diligence.

## Second Claim For Relief

### Violations of Section 15 of the Securities Act against the Individual Defendants

92.     Plaintiff incorporates by reference all preceding paragraphs as if set forth fully herein.  Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act

93.     This Claim for Relief is asserted by Plaintiff against the Individual Defendants under and pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all members of the Class.

94.     In addition to the liability of the Individual Defendants as signatories of the Registration Statement under Section 11 of the Securities Act as set forth above, these Individual Defendants had the power to control, and did control, Prudential by reason of their positions as senior management and directors, and these Individual Defendants are therefore under Section 15 of the Securities Act, 15 U.S.C. § 77o, liable jointly and severally with Prudential for Prudential's violation of Section 11 of the Securities Act.

**WHEREFORE**, Plaintiff herein demands judgment:

(a)     Declaring this action to be a proper class action under Fed. R. Civ. P. 23;

(b)     Awarding Plaintiff and the Class money damages (including pre-judgment interest) against each Defendant, jointly and severally;

(c)     Awarding equitable relief, including but not limited to attaching, impounding, imposing a constructive trust upon or otherwise restricting Defendants' assets so as to assure that Plaintiff and the Class have an effective remedy;

(d)     Awarding Plaintiff and the Class their costs and expenses, including, without limitation, reasonable attorneys', accountants' and experts' fees; and

(e)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: July 19, 2010                              **LITE DEPALMA GREENBERG, LLC**

                                    By:     /s/ *Joseph J. DePalma*
                                            Joseph J. DePalma (jdepalma@litedepalma.com)
                                            Katrina Carroll (kcarroll@litedepalma.com)
                                            Two Gateway Center, 12th Floor
                                            Newark, NJ 07102-5003
                                            Telephone: (973) 623-3000
                                            Facsimile: (973) 623-0858

                                            *Liaison Counsel for Plaintiff*

                                            **IZARD NOBEL LLP**
                                            Robert A. Izard (rizard@izardnobel.com)
                                            Jeffrey S. Nobel (jnobel@izardnobel.com)
                                            Seth R. Klein (sklein@izardnobel.com)
                                            Nancy A. Kulesa (nkulesa@izardnobel.com)
                                            29 South Main Street, Suite 215
                                            West Hartford, CT  06107
                                            Telephone: (860) 493-6292
                                            Facsimile: (860) 493-6290

                                            *Lead Counsel for Plaintiff*