# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                                    )
KAREN M. BAUER, Individually and on    )        Civil Action No. 09-1120-JLL-MAH
Behalf of All Others Similarly Situated,        )
                                                    )
                        Plaintiff,            )
        vs.                                   )
                                                    )
PRUDENTIAL FINANCIAL, INC., et al.,    )
                                                    )
                        Defendants.           )
_____)

---

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES, AND MOTION FOR AWARD TO LEAD PLAINTIFF

---

**LITE DEPALMA GREENBERG, LLC**
Allyn Z. Lite
Joseph J. DePalma
Katrina Carroll
Mayra V. Tarantino
Two Gateway Center, Suite 1201
Newark, NJ 07102-5003
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
alite@litedepalma.com
jdepalma@litedepalma.com
kcarroll@litedepalma.com
mtarantino@litedepalma.com

*Liaison Counsel for Plaintiff,*
*Paul J. Perry, Trustee of the Paul J. Perry*
*Revocable Trust*
[Additional counsel on signature page]

294526 v1

## TABLE OF CONTENTS

I,      INTRODUCTION ...................................................................................................1

II.     RELEVANT FACTUAL BACKGROUND.........................................................2

        A.  The Litigation and the Appointment of Plaintiff .....................................2

        B.  The Original Complaint ...........................................................................2

        C.  The Motion to Dismiss the Original Complaint  ......................................3

        D.  Plaintiff's Amended ARS Claims............................................................3

        E.  The Motions to Dismiss the Amended Complaint....................................4

        F.  The Settlement Negotiations and Discovery Conducted by Class Counsel ...........4

                1.  The ARS Claims ...........................................................................6

                2.  The OTTI Claims...........................................................................9

                3.  The Annuity Claims.....................................................................11

        G.  The Settlement Stipulation and Motion for Preliminary Approval ......13

III.    ARGUMENT......................................................................................................14

        A.  Notice to the Settlement Class Complied with Due Process .................14

        B.  The Proposed Settlement is Fair, Reasonable and Adequate and Should
            Be Approved ...........................................................................................15

                1.  The Complexity, Expense and Likely Duration of the Litigation Support
                    the Settlement............................................................................16

                2.  The Reaction of the Settlement Class Supports the Settlement................17

                3.  The Stage of Proceedings and Amount of Discovery Completed Support
                    the Settlement............................................................................18

                4.  Plaintiff Faced Considerable Risk in Establishing Liability at Trial .........19

                5.  Plaintiff Faced Considerable Risk in Establishing Damages....................20

                6.  The Risk Of Maintaining the Class Action Through Trial ......................22

7.  The Ability of Prudential to Withstand a Greater Judgment ....................23

8.  The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and in Light of Litigation Risks ..................................23

9.  The Settlement is Presumed to be Fair ......................................................24

C.  The Proposed Plan of Allocation of the Net Settlement Fund is Fair, Reasonable and Adequate ..............................................................................................24

D.  Certification of the Settlement Class is Appropriate ..............................................25

E.  The Requested Attorneys' Fees are Fair and Reasonable and Should Be Approved..........................................................................................................25

1.  A Reasonable Percentage of the Fund Recovered is an Appropriate Approach to Awarding Attorneys' Fees in Common Fund Cases.............26

2.  The 25% Fee Requested By Class Counsel is Fair and Reasonable..........27

a.  The Size of the Fund Created and the Number of Persons Benefitted.......................................................................................27

b.  Absence of Settlement Class Member Objections to the Settlement and/or Fees Requested by Counsel .................................................28

c.  The Skill and Efficiency of the Attorneys Involved .....................29

d.  The Complexity and Duration of the Litigation ...........................29

e.  The Amount of Time Devoted to the Case by Class Counsel and the Risk of Nonpayment ...............................................................30

f.  The Fee Request is Fair and Reasonable When Compared to the Awards in Similar Cases................................................................31

F.  Class Counsel are Entitled to be Reimbursed for their Reasonable Litigation Expenses ........................................................................................................34

G.  The Lead Plaintiff Award is Reasonable and Should Be Approved......................34

IV.  CONCLUSION........................................................................................................36

# TABLE OF AUTHORITIES

## Cases

Abrams v. Lightolier, Inc.,
    50 F.3d 1204 (3d Cir. 1995) ................................................................................... 34

Asher v. Baxter Int'l, Inc.,
    505 F.3d 736 (7th Cir. 2007) .................................................................................. 22

Boeing Co. v. Van Gemert,
    444 U.S. 472 (1980) ................................................................................................ 26

Dewey v. Volkswagon of America,
    728 F. Supp. 2d 546 (D.N.J. 2010) ........................................................................ 19

Dura Pharm., Inc. v. Broudo,
    544 U.S. 336 (2005) .......................................................................................... 21, 22

Ehrheart v. Verizon Wireless,
    609 F.3d 590 (3d Cir. 2010) ................................................................................... 15

Eisen v. Carisle & Jacquelin,
    417 U.S. 156 (1974) ................................................................................................ 15

Girsh v. Jepson,
    521 F.2d 153 (3d Cir. 1975) ................................................................................... 16

Hall v. AT&T Mobility LLC,
    No. 07-5325, 2010 WL 4053547 (D.N.J. Oct. 13, 2010) ............................ 27, 31, 32

Hill Richards, Inc. v, Berner
    No. 472 U.S. 299(1985) ..................................................................................... 16, 26

In re Aetna, Inc. Sec. Litig.,
    MDL 1219, 2001 WL 20928 (E.D.Pa. Jan. 4, 2001) .............................................. 33

In re AremisSoft Corp. Sec. Litig.,
    210 F.R.D. 109 (D.N.J. 2002) ........................................................................... 32, 33

In re AT&T Corp. Sec. Litig.,
    455 F.3d 160 (3d Cir. 2006) ................................................................... 27, 32, 33, 34

In re Cardinal Health Inc. Sec. Litig.,
    528 F. Supp. 2d 752 (S.D. Ohio 2007) ...................................................................... 33

In re Cendant Corp. Sec. Litig.,
    264 F.3d 201 & n.22 (3d Cir. 2001) ........................................................................... 23

In re Charter Communications, Inc. Sec. Litig.,
    2005 WL 4045741 (E.D.Mo. June 30, 2005) ............................................................ 33

In re Computron Software,
    6 F. Supp. 2d 313 (D.N.J. 1998) .......................................................................... 26, 32

In re Constar Int'l, Inc. Sec. Litig.,
    585 F.3d 774 (3d Cir. 2009) ....................................................................................... 20

In re Corel Corp. Inc. Sec. Litig.,
    293 F. Supp. 2d 484 (E.D. Pa. 2003) ......................................................................... 32

In re Datatec Sys. Sec. Litig.,
    No. 04-525, 2007 WL 4225828 (D.N.J. Nov. 28, 2007) ................................. 17, 18, 24

In re Elec. Carbon Prods. Antitrust Litig.,
    447 F. Supp. 2d 389 (D.N.J. 2006) ....................................................................... 18, 27

In re Enron Corporation Securities, Derivative & "ERISA" Litigation,
    586 F. Supp. 2d 732 n.20 (S.D. Tex. 2008) ............................................................... 33

In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,
    55 F.3d 768 (3d Cir. 1995) ............................................................................. 15, 16, 18

In re Genta Sec. Litig.,
    No. 04-2123, 2008 WL 2229843 (D.N.J. May 28, 2008) ............................... 18, 32, 33

In re Gulf Oil/Cities Serv. Tender Offer Litig.,
    142 F.R.D. 588 (S.D.N.Y. 1992) ............................................................................... 28

In re IKON Office Solutions, Inc. Sec. Litig.,
    194 F.R.D. 166 (E.D. Pa. 2000) ............................................................................ 24, 32

In re Merck & Co. Inc. Vytorin ERISA Litig.,
    No. 08- 285, 2010 WL 547613 (D.N.J. Feb. 9, 2010) ............................................ 24, 32

In re Pet Food Products Liab. Litig.,
    No. 07-2867, 2008 WL 4937632 (D.N.J. Nov.18, 2008) ........................................... 31

In re Prudential Ins. Co. of Am. Sales Practices Litig.,
    177 F.R.D. 216 (D.N.J. 1997) ................................................................ 15

In re Prudential Ins. Co. of America Sales Practices Litig.,
    148 F.3d 283 (3d Cir. 1998) ........................................................... 17, 33

In re Remeron Direct Purchaser Antitrust Litig.,
    No. 03-0085, 2005 WL 3008808 (D.N.J. Nov. 9, 2005) ......................... 32

In re Rite Aid Corp. Sec. Litig.,
    396 F.3d 294 (3d Cir. 2005) ........................................................... 27, 31

In re Rite Aid Secs. Litig,
    362 F. Supp. 2d ....................................................................................... 33

In re RJR Nabisco, Inc. Sec. Litig.,
    No. 88-7905, 1992 WL 210138 (S.D.N.Y. Aug. 24, 1992) ..................... 34

In re Safety Components, Inc. Sec. Litig.,
    166 F. Supp. 2d 72 (D.N.J. 2001) ..................................................... 16, 22

In re Schering-Plough/Merck Merger Litig.,
    No. 09- 1099, 2010 WL 1257722 (D.N.J. Mar. 26, 2010) ...................... 17

In re Sumitomo Copper Litig.,
    189 F.R.D. 274 (S.D.N.Y 1999) ............................................................. 30

In re Supreme Specialties, Inc. Sec. Litig.,
    No. 02-168, 2008 WL 906254 (D.N.J. Mar. 31, 2008) ........................... 24

In re U.S. Bioscience Sec. Litig.,
    155 F.R.D. 116 (E.D.Pa. 1994) ............................................................... 32

In re Warfarin Sodium Antitrust Litig.,
    212 F.R.D. 231 (D. Del. 2002) (Robinson, J.) .................................. 14, 15

In re Warfarin,
    391 F.3d ........................................................................................... 23, 24

In re WorldCom, Inc. Sec. Litig.,
    388 F. Supp. 2d 319 (S.D.N.Y, 2005) ..................................................... 29

In re Xcel Energy, Inc. Sec., Derivative & ERISA Litig.,
    364 F. Supp. 2d 980 (D. Minn. 2005) ..................................................... 35

Lucent Techs., Inc. Sec. Litig.,,
   327 F. Supp. 2d 426 ................................................................................................ 29

Maley v. Del Global Technologies Corp.,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002) .................................................................. 34

McGee v. Continental Tire North Am.,
   No. 06-6234, 2009 WL 539893 (D.N.J. Mar. 4, 2009)......................... 17, 23, 24, 31

Miller v. Woodmoor Corp.,
   Nos. 74-988,76-567,1978 WL 1146 (D. Colo. Sept. 28, 1978) ................................. 30

Milliron v. T-Mobile USA, Inc.,
   No. 08-4149, 2009 WL 3345762 (D.N.J. Sept. 14, 2009) ................................. passim

Oh v. AT&T Corp.,
   225 F.R.D. 142 (D.N.J. 2004) ............................................................................. 34

Polonski v. Trump Taj Majal Assocs.,
   137 F.3d 139 (3d Cir. 1998) ................................................................................. 26

Prudential Ins. Co. of America Sales Practices Litig.,
   962 F. Supp. 450 (D.N.J. 1997) ........................................................................... 16

Roberts v. Texaco, Inc.,
   979 F. Supp. 185 (S.D.N.Y. 1997) ...................................................................... 34

Stoetzner v. U.S. Steel Corp.,
   897 F.2d 115 (3d Cir. 1990) ................................................................................. 18

Varacallo v. Massachusetts Mut. Life Ins. Co.,
   226 F.R.D. 205 (D.N.J. 2005) ................................................................. 16, 19, 35

Weiss v. Mercedes-Benz,
   899 F. Supp. 1297 (D.N.J. 1995) ........................................................................ 17

Williams v. First Nat'l Bank,
   216 U.S. 582 (1910) ............................................................................................ 15

**Statutes**

15 U.S.C. § 77k(e) .......................................................................................................... 20

15 U.S.C. § 78u-(a)(4) ................................................................................................... 34

## **Rules**

Fed. R. Civ. P. 23 ................................................................................................................ 15, 25

Fed. R. Civ. P. 23(e) .................................................................................................................. 14

I.  **INTRODUCTION**

Plaintiff  Paul J. Perry, Trustee of the Paul J. Perry Revocable Trust ("Plaintiff"),

individually and on behalf of a class of all purchasers of the 9% Junior Subordinated Notes of

Prudential Financial, Inc. ("Prudential") (the "Notes") from June 24, 2008 through March 12,

2009, inclusive (the "Settlement Class"), pursuant to and/or traceable to a Registration Statement

and Prospectus (the "Prospectus") issued in connection with Prudential's June 24, 2008 Initial

Public Offering (the "Offering"), respectfully submits this Memorandum in support of:  (i)

Plaintiff's Motion for Final Approval of the $16.5 million class action settlement (the

"Settlement")[1] (the "Approval Motion"),[2] (ii) the Motion for Award of Attorneys' Fees and

Reimbursement of Costs and Expenses (the "Fee and Expense Motion"),[3] and (iii) the Motion for

Award to Lead Plaintiff (the "Lead Plaintiff Award Motion").[4]

The Settlement should be approved as fair, reasonable and adequate.  The Settlement

provides the Settlement Class with an excellent recovery, and represents a substantial percentage

of the maximum amount of damages that could have reasonably been recovered.  It is

particularly outstanding in light of the substantial hurdles that would have to be overcome in

order to defeat a likely motion for summary judgment and to establish damages.  Additionally,

---

[1]  The terms of the Settlement are set forth in a Stipulation of Settlement, executed by counsel for the parties on or about August 4, 2011 (the "Stipulation").  A copy of the Stipulation [Dkt. No. 115-2] was previously filed with the Court concurrently with the Motion for Preliminary Approval of Class Action Settlement [Dkt. No. 115].

[2]  The Approval Motion has been filed with the Court simultaneously herewith.  A [Proposed] Order and Final Judgment is attached as Exhibit A to the Approval Motion.

[3]  The Fee and Expense Motion has been filed with the Court simultaneously herewith.  The [Proposed] Order Awarding Attorneys' Fees and Reimbursement of Costs and Expenses is attached as Exhibit A to the Fee and Expense Motion.

[4]  The Lead Plaintiff Award Motion has been filed with the Court simultaneously herewith.  The [Proposed] Lead Plaintiff Award Order is attached as Exhibit B to the Lead Plaintiff Award Motion.

the expense and delay of further litigation would have been substantial, with little likelihood of producing a better result.

The Fee and Expense Motion should also be approved.  Court-appointed Lead and Liaison Counsel ("Class Counsel") respectfully request attorneys' fees equal to twenty-five percent (25%) of the Settlement Fund.  The requested fees are reasonable given the results achieved, the substantial risks, the complexity of the issues and the effort expended by Class Counsel.  Class Counsel also seeks reimbursement of $179,973.63 in litigation costs and expenses, which also is reasonable and should be approved.  Finally, the Lead Plaintiff Award Motion seeking $5,000 should be granted in recognition of the time and effort spent by Plaintiff on this litigation (the "Litigation").  No Settlement Class Member has objected to any of these Motions.

## II.   RELEVANT FACTUAL BACKGROUND

### A.   The Litigation and the Appointment of Plaintiff

This class action litigation was initiated in March 2009 to recover for the damages suffered by investors pursuant and/or traceable to an allegedly false and misleading registration statement (the "Registration Statement") and prospectus (the "Prospectus") issued in connection with the Offering of the Notes.  *See* [Dkt. No. 1].  By Order dated May 22, 2009, the Court appointed Paul J. Perry, Trustee of the Paul J. Perry Revocable Trust, as Lead Plaintiff, and approved Plaintiff's selection of Izard Nobel LLP as Lead Counsel and Lite DePalma Greenberg LLC (formerly Lite DePalma Greenberg & Rivas LLC) as Liaison Counsel.  *See* [Dkt. No. 29].

### B.   The Original Complaint

On July 21, 2009, Plaintiff filed his Consolidated Class Action Complaint (the "Original Complaint") [Dkt. No. 43].  The Original Complaint alleged three claims.  First, it alleged that

the Registration Statement contained material misrepresentations concerning Prudential's

involvement in, and liability from litigation arising out of, the February 14, 2008 collapse of the

market for auction rate securities ("Auction Rate Securities" or "ARS") (the "ARS Claims").[5]

Second, it alleged that the Registration Statement contained misrepresentations of present fact

understating both (i) the actual costs of funding Prudential's obligations to annuity account

holders, and (ii) the proper amortization of Prudential's deferred policy acquisition costs

(collectively, the "Annuity Claims").  Finally, it alleged that the Registration Statement

contained material misrepresentations of present fact concerning the amount of the "other than

temporary impairment" category of Prudential's reported assets (the "OTTI Claims").

### C.      The Motion to Dismiss the Original Complaint

Defendants served Motions to Dismiss all three claims in the Original Complaint on

September 21, 2009 [Dkt. Nos. 72-73].  Plaintiff served his Oppositions to Defendants' Motions

to Dismiss on December 8, 2009 [Dkt. No. 74].  Defendants served Reply briefs on January 26,

2010 [Dkt. Nos. 75-76].  Plaintiff filed a Sur-Reply brief on February 5, 2010 [Dkt. No. 82].  On

June 29, 2010, this Court issued its Opinion granting in part and denying in part Defendants'

Motions [Dkt. No. 87].  In particular, the Court sustained the Annuity and OTTI Claims, but

dismissed the ARS Claims.

### D.      Plaintiff's Amended ARS Claims

On July 19, 2010, Plaintiff filed an Amended Consolidated Class Action Complaint [Dkt.

No. 91] (the "Amended Complaint") in an attempt to remedy the pleading deficiencies

concerning the ARS claims.  *See generally* Amended Complaint, ¶¶43-56.  However, Plaintiff

was unable to present any direct evidence of any Defendants' knowledge of the Joint Venture

---

[5]  Auction Rate Securities are municipal bonds, corporate bonds and preferred stock with interest
rate or dividend yields that are re-set through periodic actions.

Litigations (as defined in the Amended Complaint) at the time of the Offering.  Accordingly, Plaintiff dropped one aspect of his claim (alleging that Defendants had improperly failed to quantify the potential liability of the Joint Venture Litigations).

       **E.**      **The Motions to Dismiss the Amended Complaint**

       Defendants served new Motions to Dismiss directed at the amended ARS claims on September 2, 2010.  *See* [Dkt. Nos. 104-05].  Plaintiff served its Oppositions to Defendants' Motions to Dismiss on October 18, 2010 [Dkt. No. 106].  Defendants served Reply briefs on November 17, 2010 [Dkt. Nos. 107-08], at which point, pursuant to this Court's practices, all briefs were filed with the Court.  This case settled while those new motions were pending.

       **F.**      **The Settlement Negotiations and Discovery Conducted by Class Counsel**

       In March 2011, while Defendants' renewed Motions to Dismiss were pending, the parties agreed to a multi-step settlement process that would include document review, factual and legal presentations and mediation.  First, counsel for Defendants provided Class Counsel with internal Prudential documents concerning the Annuity and OTTI claims, as well as information prepared by Defendants' damages expert purporting to show the lack of any damages attributable to the Annuity, OTTI claims, and ARS Claims.[6]

       Next, on April 7, 2011, Class Counsel and counsel for the Prudential Defendants participated in a settlement conference in Boston, Massachusetts.  Prior to the conference, Class Counsel requested and received evidence supporting Defendants' contentions.  During the settlement conference, counsel for the Prudential Defendants made a factual and legal

---

[6] Defendants' counsel originally took the position that internal Prudential documents concerning the ARS claims would not be produced to Class Counsel prior to the mediation because the Court had dismissed those claims in the June 29, 2010 Opinion.  However, counsel for the Defendants agreed that, in the event that a settlement was reached through mediation, Class Counsel would be permitted to conduct discovery concerning the merits of the ARS claims, as well as the OTTI Claims and the Annuity Claims.

presentation concerning, *inter alia,* the merits (or lack thereof) of the claims and allegations asserted in the Amended Complaint, and presented the Prudential Defendants' damages analysis.

Then, on May 3, 2011, Class Counsel and counsel for the Prudential Defendants participated in an approximately 12 hour mediation session with Professor Eric D. Green in Boston, Massachusetts.  At the mediation session, the Parties agreed to the Settlement and executed a Memorandum of Understanding ("MOU"), under which this litigation would be settled for $16,500,000 in cash.

One of the MOU conditions was that Class Counsel be permitted to conduct discovery prior to entering any final settlement agreement. Accordingly, Class Counsel conducted discovery concerning the merits of the ARS, OTTI and Annuity Claims, and various factual defenses asserted by Defendants.  As part of this discovery, Defendants produced numerous categories of documents.  After Class Counsel reviewed these documents, they interviewed certain Prudential employees concerning the contents of the documents produced and the allegations in the Amended Complaint.[7]

As a result of their work, Class Counsel believe that the proposed Settlement is fair, reasonable and adequate, and provides the Settlement Class with an excellent result.  As extensively discussed below, through their participation in the mediation and discovery, Class Counsel thoroughly evaluated the evidence underlying each of the ARS, Annuity and OTTI Claims.  Specifically, Class Counsel evaluated specific and significant facts that, if credited by the ultimate factfinder, would undermine the Settlement Class' ability to prove that there were

---

[7]  The documents produced by Defendants and discussed below are covered by a confidentiality agreement and so have not been submitted as part of this filing.  However, the documents are all available for *in camera* review upon request by the Court.

material misrepresentations in the Registration Statement or that the Settlement Class was damaged thereby.

### 1. The ARS Claims

Defendants presented substantial evidence from which a factfinder could reasonably conclude that, prior to the Offering, Defendants did not know or believe that the Joint Venture Litigations were material.[8]  For example, on July 21, 2008 – nearly a month after the Offering – a senior member of Prudential management received information that Wachovia would not be taking any reserves for the Joint Venture Litigations in the quarter ended June 30, 2008.  A group of at least six Prudential officers and managers agreed with the reasonableness of Wachovia's determination and communicated that conclusion to Prudential's outside auditor, who also agreed.[9]

It was not until August 2008 – two months after the Offering – that the situation with regard to the Joint Venture Litigations (and, in particular, the Joint Venture Regulatory Actions) began to rapidly change.  Starting with CitiGroup on August 7, 2008, government regulators began reaching large settlements with *other* banks involved in the ARS market.  Immediately thereafter, government regulators and Wachovia (on behalf of the Joint Venture) conducted

---

[8] As discussed above, the Amended Complaint dropped the allegation from the Original Complaint that Defendants at the time of the Offering should have quantified the exposure Prudential faced from the Joint Venture Litigations.

[9] In its Form 10-Q filed on July 31, 2008, Prudential did disclose that the Joint Venture "has become the subject of customer complaints, legal actions, including a putative class action, and investigations by securities regulators."  As discussed below, the price of the Notes did not decrease upon this disclosure.

settlement negotiations that progressed quickly.  As a result, Wachovia disclosed on August 11, 2008 that it was reserving $500 million in connection with a "potential settlement."[10]

Following Wachovia's announcement, the senior Prudential manager again communicated with Prudential's outside auditor to confirm in writing that Prudential's decision not to establish a reserve related to the Joint Venture Litigations had been consistent with the state of the Joint Venture Litigations as of July 31, 2008, and that only subsequent events in early August 2008 (specifically, sudden developments in the Joint Venture's negotiations with government regulators following the unexpected settlements those regulators reached with other banks during the week of August 4, 2008) led to the need to establish a reserve.  Various Prudential officers and managers agreed with this understanding of events.

Consistent with these facts, other documents from meetings of senior management in April 2008 and on June 18, 2008, analyze the Joint Venture in depth, but do not contain any discussion of the Joint Venture Litigations or of any potential liability from the ARS collapse. Moreover, although the Amended Complaint relied on the fact that government regulators raided the Joint Venture's headquarters to raise the inference that Prudential must have recognized the significance of the Joint Venture Litigations before the Offering, in fact, the raid did not occur until July 17, 2008, several weeks *after* the Offering, and therefore the raid could not have informed Prudential's understanding of the significance of the Joint Venture Litigations at the time of the Offering.

The Settlement Class also faced a substantial risk that they would be unable to establish damages due to the (lack of) reaction of the prices of the Notes in response to various

---

[10] Notably, the price of the Notes fell only $0.27 from $25.65 to $25.38.  Thus, the price of the Notes did not drop in a material amount, or even decrease below the $25 Offering price, following Wachovia's disclosure of its reserve for the Joint Venture Litigations.

disclosures.  Prudential first disclosed the existence of the Joint Venture Litigations on July 31, 2008, in Prudential's Form 10-Q for the quarter ended June 30, 2008; following this disclosure, the Note price did not decrease at all (but rather stayed at $25.11).  Next, after the close of the market on August 12, 2008 (and after Wachovia's announcement that it was taking a $500 million reserve on August 11, 2008), Prudential disclosed that it was going to record charges to income of $125 million related to ARS litigation; the next trading day, the Note price dropped only $0.03, from $25.38 to $25.35.[11]  Similarly, after the close of the market on August 15, 2008, Prudential disclosed that, rather than $125 million, it was going to record charges to income of $185 million related to the ARS litigation; in response, the Note price *increased* $0.03, from $25.46 to $25.49, on the next trading day.  Finally, when Prudential disclosed another $120 million charge related to the ARS litigation after the close of the market on February 4, 2009, the price of the Notes dropped only $0.21, from $19.93 to $19.72 on February 5, 2009.  The evidence concerning the impact on the price of the Notes in response to these disclosures presented a substantial risk that the Settlement Class suffered no damages on this claim.[12]

---

[11] Notably, §11(e) does not allow for the recovery of damages due to any decreases in the price of a security *above* "the price at which the security was offered to the public" (here, $25).  As a result, losses attributable to Note purchases above $25.00 are not recoverable.

[12]  The price of the Notes did drop by a significant amount on October 9, 2008, from an opening price of $17.65 to a closing price of $13.75 per Note.  At approximately 3:20 pm, Eastern time on October 9, 2008 (after the price of the Notes had already decreased to just over $14 per Note), Prudential issued a press release announcing that Prudential would be taking charges of $1.045 billion to account for a wide variety of financial issues.  Included in the $1.045 billion were $615 million of charges wholly unrelated to any allegations in this litigation; $380 million of charges related to the Annuity Claims (discussed below); and only $50 million in charges relating to the Joint Venture Litigations.  Following the issuance of the press release, the price of the Notes only dropped by an additional $0.30.  Defendants vigorously argued that, given the lack of price drops in response to the prior ARS-related disclosures, the factfinder would attribute the Note price decrease on October 9, 2008, to the other matters disclosed on that date.

## 2.      The OTTI Claims

The evidence arguably demonstrates that Defendants did not misrepresent the amount of "other-than-temporary" impairments of Prudential's assets.  Plaintiff alleged that Prudential failed to recognize $205 million of impairments for the quarter ended March 31, 2008, but instead improperly waited to do so until the quarter ended June 30, 2008 (*i.e.,* after the Offering). This allegation was primarily based upon a comparison of the $247 million in assets reported in the Registration Statement as being in the "pipeline" to be recognized as other-than-temporary impaired in the quarter ended June 30, 2008, with the $452 million in assets that Prudential actually recognized as other-than-temporary impaired in that quarter ($452 million - $247 million = $205 million) and comments made by Defendant Carbone on July 31, 2008.  The evidence arguably demonstrates that the components of the $452 million charge do not support Plaintiff's claim that an additional $205 million in OTTI should have been recognized in the March 31, 2008 quarter.

First, a substantial portion of the $452 million of OTTI charges that Prudential took for the quarter ended June 30, 2008, were not related to Plaintiff's allegations.  Specifically, of the $452 million in OTTI charges, $110 million included impairments such as $52,167,776 of asset impairment due to compliance with the GAAP rule set forth in EITF Issue No. 99-20 ("Recognition of Interest Income and Impairment on Purchased Beneficial Interests and Beneficial Interests That Continue to Be Held by a Transferor in Securitized Financial Assets"), $42,257,900 of asset impairment due to adverse projected cash flows, $8,018,252 of asset impairment due to lack of intent to hold and $7,463,997 of asset impairment due to issuer-specific credit events.

Of the remaining $342 million of the $452 million OTTI charge, the evidence arguably demonstrates that $207 million was due to declines in asset value that should not have been recognized in the quarter ended March 31, 2008 because it was not sufficiently impaired under Prudential's disclosed impairment criteria to be recorded as OTTI until the quarter ended June 30, 2008. The remaining $135 million of OTTI charges reported for the second quarter (*i.e.,* $452 million, minus $110 million, minus $207 million), arguably should not have been reported until the second quarter because it resulted from precipitous (*i.e.,* over 50%) declines in the value of assets in that quarter.

Moreover, evidence concerning Prudential's internal accounting systems enhanced the credibility of the reports. Prudential follows a rigorous, multi-step process for assessing the other-than-temporary impairment of assets, based upon asset prices provided by an independent, outside vendor and subject to multiple levels of oversight and review, which would make any attempt to manipulate the figures to shift impairments from one quarter to another exceedingly difficult, if not impossible. Moreover, the process arguably demonstrates that OTTI calculations are not finalized for a given quarter until several weeks after the close of that quarter, and that senior Prudential management are not involved in the analysis or presented with quarterly OTTI figures until those final numbers are calculated.[13] Near the end of the third month of each

---

[13] Specifically, during the second month of each quarter, Prudential's asset managers provide Prudential's Investment Operations Team with preliminary numbers concerning the performance of individual assets. Because many of Prudential's assets are not traded in liquid, efficient markets, Prudential receives pricing data for those assets from an independent, third-party pricing company. Reviewing and compiling the reports from individual asset managers is a very time- and labor-intensive process; however, by the end of the second month of each quarter, the Investment Operations Team assembles the reports it receives from the asset managers into a series of interim spreadsheets (compiled by asset category). These reports are then sent to Prudential's Asset Liability Management finance group and also back to individual asset managers for review and verification. However, as these numbers are preliminary, they are *not* sent to senior management.

quarter, the Investment Operations Team receives updated numbers from individual asset managers.[14]  The asset managers and Asset Liability Management group review, update and comment upon these second interim reports, and the Investment Operations Team then prepares the final quarterly OTTI reports.  Preparation and verification of the final report is a lengthy process that generally takes 2-3 weeks after the end of the quarter to complete.  Only at this point are the OTTI numbers considered valid and provided to senior Prudential management.  Accordingly, the evidence concerning Prudential's internal process arguably demonstrates that Defendants would not have known the amounts of OTTI for the second quarter ended June 30, 2008, until at least mid-July (*i.e.,* after the Offering).

Plaintiff also faced substantial hurdles to establishing damages on this claim.  Prudential disclosed the complete $452 million in OTTI charges after the market closed on July 30, 2008, and then further discussed them in a conference call at noon on July 31, 2008.  The price of the Notes did not decrease at all on July 31, 2008 in response to this disclosure, but remained at $25.11.  Given the lack of decrease in the price of the Notes in response to the disclosure of the OTTI amounts, the Settlement Class would arguably encounter substantial difficulties attempting to establish that they suffered any damages pursuant to this claim.

### 3. The Annuity Claims

Defendants also presented substantial evidence from which a factfinder could reasonably conclude that Defendants did not misrepresent that only an additional $30 million in Reserves would be necessary to pay for Prudential's annuity obligations and deferred policy acquisition

---

[14] Once again, assembling these figures is a time- and labor-intensive process, but by the end of the month the Investment Operations Team prepares a second preliminary report, which is again circulated to asset managers and the Asset Liability Management group for further review.  And as with the initial interim reports, these second interim reports contain only preliminary figures and are *not* circulated to senior management.

costs if the "actual" return on account holders' investments to date were used (rather than "future rate of return assumptions"). Specifically, the evidence arguably demonstrated that approximately $230 million of the $380 million that Carbone referenced on October 30, 2008 did not have anything to do with the actual return on investments that formed the basis of the Annuity Claims.[15] Moreover, the evidence arguably demonstrates that the remaining $150 million portion of the $380 million was attributable to declines in the value of account holder investments after the Offering.[16]

The Settlement Class also faced substantial hurdles in establishing damages on this claim. Prudential disclosed the full extent of the $380 million charge in its October 9, 2008, press release. As discussed above, the price of the Notes dropped only $0.30 after the issuance of that press release. Moreover, a reasonable factfinder could conclude that disclosure of the $380

---

[15] $100 million of the $230 million relates to Prudential's "dynamic lapse assumptions." These have nothing to do with the actual return on investments of account holders, but instead concern estimates of how much Prudential will have to pay to individual annuity policy holders based upon actuarial assumptions concerning account holder mortality and how many people will purchase or hold on to their annuity contracts. The $130 million component of the $230 million resulted from a decision made by Prudential in the third quarter to increase its reserves to address future, anticipated shortfalls in the market returns of annuity holders' accounts given the sudden deterioration of the stock market in September 2008.

[16] This Reserve was necessary to pay for Prudential's annuity obligations and deferred policy acquisition costs if the actual rather than the estimated return on account holders' investments were used. The evidence arguably demonstrates that this entire $150 million charge should not have been recorded prior to the Offering. Prudential's internal, contemporaneous documents arguably demonstrate that only $30 million (and not more) in additional Reserves were necessary as of March 31, 2008, if actual performance of the annuity accounts were used to establish Reserves, rather than actuarial assumptions, and that only an additional $30 million was necessary for the second quarter ended June 30, 2008 (for a cumulative total of approximately $60 million), so that only $60 million in additional Reserves (*i.e.,* only $30 million beyond what was disclosed in the Registration Statement) was necessary as of June 30, 2008. Moreover, the evidence arguably demonstrates that this $60 million number was not calculated until approximately mid-July 2008 (and thus after the Offering). Finally, the evidence arguably demonstrate that the remaining $90 million of the $150 million in additional Reserves discussed by Carbone on October 30, 2008 (*i.e.,* the amount beyond the $60 million that had already been disclosed at the end of the second quarter ended June 30, 2008) did not arise until the third quarter ended on September 30, 2008.

million annuity charge did not cause the full $0.30 drop, but that the drop was instead due to the disclosure of the many other matters disclosed in the press release.

### G.      The Settlement Stipulation and Motion for Preliminary Approval

After extensive negotiations, on August 4, 2011, following the completion of the settlement discovery, counsel for the parties executed a Stipulation of Settlement, including exhibits (the "Settlement Stipulation"), which, *inter alia,* formally documents the terms of the Settlement reached between the parties.  *See* [Dkt. No. 115-2].  On August 4, 2011, Plaintiff filed a Motion for Preliminary Approval [Dkt. No. 115].  On August 5, 2011, the Court entered an order granting preliminary approval of the Settlement ("Preliminary Approval Order").  *See* [Dkt. No. 116].  The Preliminary Approval Order:  1) approved the Notice; 2) approved a proposed Summary Notice for publication; 3) approved the proposed Proof of Claim form to be submitted by Settlement Class members; 4) appointed FRG Information Systems ("FRG") as claims administrator; 5) directed that Notice be given to the Settlement Class in the time and manner set forth therein; 6) set further dates for the litigation, including the dates by which Settlement Class members could either opt-out of or object to the Settlement, the Fee and Expense Motion, and/or the Lead Plaintiff Award Motion; and 7) scheduled a fairness hearing on these matters for November 14, 2011.  Settlement Class Members have been given until October 31, 2011 to assert any objections.

In accordance with the Preliminary Approval Order, over 39,000 copies of the "Notice of Pendency of Proposed Settlement of Class Action and Settlement Hearing" (the "Notice") were mailed to potential Settlement Class Members or their representatives, and a Summary Notice was published in *The Wall Street Journal*.  *See* Declaration of Jeffrey S. Nobel dated October 21,

2011 (the "Nobel Declaration") at ¶5;[17] Affidavit of Mailing of Notice and Proof of Claim,

Publication of Summary Notice and Receipt of Requests for Exclusion (the "Affidavit of

Notice") (attached to the Nobel Declaration as Exhibit A) at ¶¶4-8.[18]  The Notice also was posted

on Class Counsel's website at www.izardnobel.com.  Nobel Declaration, ¶5; Affidavit of Notice,

¶9.  The Notice described the Litigation, the Settlement (including the proposed Plan of

Allocation), and stated that Class Counsel intended to apply for an award of attorneys' fees of

25% of the Settlement Fund (plus interest), plus reimbursement of costs and expenses not to

exceed $196,000, and for an award to Plaintiff not to exceed $5,000 relating to Plaintiff's

representation of the Settlement Class.  In accordance with the Preliminary Approval Order, the

Notice also informed Settlement Class Members of their right to object to the Settlement and to

Class Counsel's request for a fee and expense award and an award to Plaintiff on or before

October 31, 2011.  To date, no opposition to any of these items has been received.  Nobel

Declaration, ¶5; Affidavit of Notice, ¶10.[19]

## III.   <u>ARGUMENT</u>

### A.  **Notice to the Settlement Class Complied with Due Process**

Fed. R. Civ. P. 23(e) provides that "notice of the proposed dismissal or compromise [of a

class action] shall be given to all members of the class in such manner as the court directs." *See*

*In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 252 (D. Del. 2002) (Robinson, J.) *aff'd*

391 F.3d 516 (3d Cir. 2004) ("*In re Warfarin*").  The notice program approved by the Court and

---

[17]  The Nobel Declaration has been filed simultaneously herewith.

[18]  The Affidavit of Notice detailing the steps taken by the claims administrator to provide notice to Settlement Class Members and to administer requests for exclusion is submitted as Exhibit A to the Nobel Declaration in accordance with ¶13 of the Preliminary Approval Order.

[19]  Should any Settlement Class Member file an objection between the date of this filing and the November 14, 2011 deadline for objections, Class Counsel will file a response by November 7, 2011 pursuant to ¶17 of the Preliminary Approval Order.

implemented by Class Counsel clearly meets the requirements of Fed. R. Civ. P. 23, which calls for "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  *See Eisen v. Carisle & Jacquelin*, 417 U.S. 156, 173 (1974) (emphasis omitted); *see also In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 177 F.R.D. 216, 233 (D.N.J. 1997) (mailing and publication sufficient); *In re Warfarin*, 212 F.R.D. at 253 (notice found adequate because it provided "potential class members with the information necessary to make an informed and intelligent decision whether to participate in the class and whether to object to the Proposed Settlement.") (internal quotations omitted).[20]

### B. The Proposed Settlement is Fair, Reasonable and Adequate and Should Be Approved

It is well-settled that "compromises of disputed claims are favored by the courts." *Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910).  This is especially true in complex class action litigation. *See Ehrheart v. Verizon Wireless*, 609 F.3d 590, 595 (3d Cir. 2010) ("[t]he strong judicial policy in favor of class action settlement contemplates a circumscribed role for the district courts in settlement review and approval proceedings"); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) ("[t]he law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation").  In reviewing a settlement, the Third Circuit has counseled that "[t]he evaluating court must, of course, guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a

---

[20]  Actual notice is not required.  *Prudential*, 177 F.R.D. at 231-32 ("Courts have consistently recognized that due process does not require that every class member receive actual notice so long as the court reasonably selected a means likely to apprise interested parties [….]  Similarly, Rule 23 does not require the parties to exhaust every conceivable method of identifying the individual class members").

compromise, a yielding of the highest hopes in exchange for certainty and resolution." *Id*. at 806. "Thus, the issue is whether the settlement is adequate and reasonable, not whether one could conceive of a better settlement." *In re Prudential Ins. Co. of America Sales Practices Litig.*, 962 F. Supp. 450, 534 (D.N.J. 1997).

The Third Circuit has adopted a set of nine factors to be considered in determining whether a proposed settlement is fair, reasonable and adequate:

1) the complexity, expense and likely duration of the litigation;
2) the reaction of the class to the settlement;
3) the stage of the proceedings and the amount of discovery completed;
4) the risks of establishing liability;
5) the risks of establishing damages;
6) the risks of maintaining a class action through trial;
7) the ability of the defendants to withstand a greater judgment;
8) the range of reasonableness of the settlement fund in light of the best possible recovery; and
9) the range of reasonableness of the settlement fund in light of all the attendant risks of litigation.

*Girsh v. Jepson,* 521 F.2d 153, 156-57 (3d Cir. 1975). Courts in this Circuit look to these factors as "a guide and the absence of one or more does not automatically render the settlement unfair." *See, e.g., In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 93 (D.N.J. 2001). Moreover, the "decision of whether to approve a proposed settlement of a class action [or the like] is left to the sound discretion of the district court." *Girsh*, 521 F.2d at 156. This Settlement easily satisfies the applicable criteria.

## 1. The Complexity, Expense and Likely Duration of the Litigation Support the Settlement

The complexity and expense of continued litigation strongly support the Settlement. This "factor is 'intended to capture 'the probable costs, in both time and money, of continued litigation.'" *Varacallo v. Massachusetts Mut. Life Ins. Co.*, 226 F.R.D. 205, 236 (D.N.J. 2005). This case is based on alleged violations of federal securities laws – a complex area of legal

practice. *See In re Datatec Sys. Sec. Litig.*, No. 04-525, 2007 WL 4225828, at *7 (D.N.J. Nov. 28, 2007) ("securities fraud class actions involving alleged violations of accounting principles are complex actions to prosecute"). The accounting issues underlying the Plaintiff's claims in particular are tremendously complex. Indeed, continued litigation would entail extensive expert discovery and evidence concerning GAAP accounting rules. A trial of this case would require substantial time simply to educate the jury as to the complicated mechanical details of Defendants' Annuity and OTTI accounting. Substantial expert testimony would also be required to assess the amount of any damages. Accordingly, full litigation through trial and appeals would be expensive, lengthy, and risky. *See, e.g.*, *Weiss v. Mercedes-Benz*, 899 F. Supp. 1297, 1300 (D.N.J. 1995); *McGee v. Continental Tire North Am.*, No. 06-6234, 2009 WL 539893, at *4 (D.N.J. Mar. 4, 2009) (Brown, J.).

### 2. The Reaction of the Settlement Class Supports the Settlement

The reaction of the Settlement Class to the Settlement also weighs strongly in favor of the Settlement. "This factor attempts to gauge whether members of the class support the settlement." *In re Prudential Ins. Co. of America Sales Practices Litig.*, 148 F.3d 283, 318 (3d Cir. 1998). Pursuant to the Preliminary Approval Order, the deadline for Settlement Class members to object to the Settlement is October 31, 2011. Although FRG disseminated 39,391 Notices to potential class members, not a single Settlement Class Member has objected to the Settlement to date. "Generally, silence constitutes tacit consent" to a class action settlement. *Milliron v. T-Mobile USA, Inc.*, No. 08-4149, 2009 WL 3345762, at *6 (D.N.J. Sept. 14, 2009) (Linares, J.). Indeed, the absence of objectors provides a strong indication that the settlement is fair, reasonable and adequate. *Prudential*, 148 F.3d at 254-55; *see also In re Schering-Plough/Merck Merger Litig.*, No. 09- 1099, 2010 WL 1257722, at * 9 (D.N.J. Mar. 26, 2010); *In*

*re Datatec Sys., Inc. Sec. Litig.*, 2007 WL 4225828 at *3 ; *In re Elec. Carbon Prods. Antitrust Litig.*, 447 F. Supp. 2d 389, 399 (D.N.J. 2006); *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990).

### 3. The Stage of Proceedings and Amount of Discovery Completed Support the Settlement

The work performed by Class Counsel to evaluate the strength of the claims and the size of potential damages weighs in favor of approval.  As this Court has previously held, even where "little discovery has taken place" and "the action settled at a relatively early stage," a settlement should be approved if "counsel on both sides of the table are experienced and able litigators" and "the parties have each assessed the settlement value of the case" and "sufficiently apprised themselves of the relevant facts and law to make a knowledgeable decision as to settlement." *Milliron,* 2009 WL 3345762 at *6; *see In re Genta Sec. Litig.* No. 04-2123, 2008 WL 2229843, at *6 (D.N.J. May 28, 2008) (approving settlement where the "action had developed sufficiently to allow the Parties to discern the strengths and weaknesses of their respective positions" and "the case had progressed through the filing and resolution of a motion to dismiss, the production of certain documents, and several mediation sessions") (Greenaway, J.); *see also Gen. Motors*, 55 F.3d at 813.

Here, there can be little doubt that Class Counsel "sufficiently apprised themselves" of the case's merits in connection with the Settlement.[21]   As detailed above, Class Counsel participated in numerous settlement conferences with Defendants.  They received and analyzed extensive documentary evidence and interviewed senior Prudential employees concerning each

---

[21] Moreover, as discussed below, Class Counsel (and Defendants' Counsel) are extremely seasoned and capable class action securities attorneys.

of Plaintiff's claims to confirm and expand upon the information from Defendants' document production.

Accordingly, as discussed in detail above, Class Counsel had a thorough understanding of the merits of the claims before Settlement.  Moreover, as this Court has also recognized, "Class Counsel's approval of the Settlement also weighs in favor of the Settlement's fairness." *Varacallo,* 226 F.R.D. at 240 (Linares, J.); *see Dewey v. Volkswagon of America,* 728 F. Supp. 2d 546, 572 (D.N.J. 2010).

### 4.  Plaintiff Faced Considerable Risk in Establishing Liability at Trial

This factor strongly supports approval of the Settlement.  Courts routinely note that where a case "involves difficult factual and legal issues which would have translated into protracted litigation and accumulating expenses, in both time and money . . . this *Girsh* factor strongly weighs in favor of settlement."  *In re Ins. Brokerage Antitrust Litig.,* MDL 1663, 2009 WL 411877, at *6 (D.N.J. Feb. 17, 2009) *amended,* MDL 1663, 2009 WL 2255513 (D.N.J. July 24, 2009) *aff'd sub nom. In re Ins. Brokerage Antitrust Litig. (MDL 1663),* 374 Fed.Appx. 263 (3d Cir. 2010).  This is such a case.

As discussed above, this Court previously dismissed the ARS claims.  Although Plaintiff attempted in the Amended Complaint to allege other factual bases for Defendants' knowledge of potential liability from the Joint Venture Litigations at the time of the Registration Statement (*see generally* Amended Complaint, ¶¶43-56), Plaintiff was unable to allege that Defendants had any direct knowledge of the Joint Venture Litigations prior to, or that any settlement negotiations had occurred by the date of, the Offering.   Indeed, the evidence reviewed by Class Counsel (as discussed above) arguably demonstrates that the opposite is true.  Accordingly, Plaintiff faced a genuine risk that this Court could again dismiss his ARS claim in ruling on Defendants' motions

to dismiss the Amended Complaint.  Moreover, even assuming this Court sustained the *prima facie* sufficiency of Plaintiff's ARS claim, evidence produced by Defendants arguably demonstrates that Plaintiff could not prove damages (as also discussed above).[22]

Similarly, Plaintiff and the Settlement Class also faced the real risk that they would be unable to prove liability concerning the Annuity and OTTI Claims.  Plaintiff primarily based these claims upon statements by Defendant Carbone that the Court agreed in its Opinion were ambiguous.   As discussed above, the evidence arguably demonstrates the Defendants' innocent explanations of what Carbone meant in each of these statements (which arguably would defeat liability) are correct.

### 5.   Plaintiff Faced Considerable Risk in Establishing Damages

This factor strongly supports approval of the Settlement, as Plaintiff faced a substantial risk that he would be unable to establish damages at trial.  Although, as a *prima facie* matter, the measure of damages in a § 11 claim is "the difference between the price paid for a security pursuant to the registration statement, and the price at the time suit was filed or the security was sold[,] defendants may assert, as an affirmative defense, that a lower share value did not result from any nondisclosure or false statement."  *In re Constar Int'l, Inc. Sec. Litig.* 585 F.3d 774, 782-83 (3d Cir. 2009); *see* 15 U.S.C. § 77k(e).  Here, Defendants have vigorously argued that they could establish the affirmative defense under §11(e) that none of the alleged

---

[22]  Moreover, in its Opinion dismissing Plaintiff's original ARS Claims, this Court noted that "Plaintiff is not merely alleging some change in net income; Plaintiff is alleging that each of the alleged misstatements alone would have wiped out the reported net income for the quarter . . . . [T]his Court finds that the potential effect on net income as alleged by Plaintiff is not obviously unimportant to a debt investor."  Opinion [Dkt. No. 87] at 12-13 (citing Original Complaint, ¶68).  Accordingly, the Court left open the possibility that, if Plaintiff's claims (jointly or individually) would *not*  have "wiped out" Prudential's reported net earnings, the Court would agree with Defendants that such claims were immaterial as a matter of law.

misrepresentations caused the price of the Notes to drop, and Plaintiff faced a substantial risk that the ultimate factfinder in this litigation could agree.

Here, as discussed above, Defendants made disclosures concerning each of the claims at issue in this litigation on various dates throughout the Class Period, but most of those disclosures did not cause any drop in the price of the Notes.  Specifically, the Note price did not drop in response to (i) the sole disclosure concerning Plaintiff's OTTI Claims, on July 31, 2008; or (ii) four of the five disclosures concerning Plaintiff's ARS Claims, on July 31, 2008; August 12, 2008; August 15, 2008; or February 4, 2009.  The only date on which relevant disclosures occurred *and* on which the Note price even arguably decreased in a statistically significant fashion is October 9, 2008, on which date, Prudential disclosed – among substantial other information – that (i) it would be recording $50 million in charges related to ARS litigation (beyond the $185 million that had already been disclosed at that point, as discussed above); and (ii) the $380 million charge for annuity reserves and deferred acquisition costs.  But Plaintiff faced substantial hurdles proving damages from this drop.  First, the fact that the press release was not issued until approximately 3:20 p.m. Eastern time means that most of the drop in the Note's price that day occurred prior to the issuance of the press release, with only a further thirty cents ($0.30) after the press release was issued.[23]  Accordingly, the factfinder could accept that the Settlement Class can, at most, recover damages for the very small fraction that occurred after issuance of the press release.  *Cf. Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 342-46 (2005) (loss causation requires truth about prior misrepresentation to come out to remove inflation from price of security).

---

[23] While the price of the Notes decreased by another $1.05 to close at $12.70 on October 10, 2008, the price of Notes significantly increased two trading days later to close at $18.01 per Note on October 13, 2008, which was well above the closing price of the Notes on October 8 and October 9, 2008.

Second, even assuming that the adverse information disclosed in the October 9 press release somehow "leaked out" earlier in the day (*see Dura,* 544 U.S. at 342), Defendants vigorously argued that the entire $3.90 drop is not attributable to the misrepresentations alleged in the Amended Complaint when other factors are taken into account, such as the impact of general decreases in the stock market and Prudential-specific events beyond the scope of the Amended Complaint.  After conducting a thorough analysis, Plaintiff's damages expert concluded that, at most, only $1.19 of the $3.90 drop on October 9 can properly be attributed to Prudential's disclosure concerning the misrepresentations alleged in the Amended Complaint. Accordingly, Plaintiff faced a substantial risk that the *maximum* damages that the Class could recover are $43,792,000 (36.8 million Notes at $1.19 per Note).  Moreover, Defendants vigorously argued that the Settlement Class would be able to recover at most only a portion of the $0.30 drop that occurred after the press release was issued at 3:20 pm Eastern time, which would undoubtedly result in damages under $10 million.

**6.   The Risk Of Maintaining the Class Action Through Trial**

Plaintiff had not yet filed a Motion for Class Certification at the time the Settlement was reached.  Class Counsel believe that the Court would have granted the Motion for Class Certification.  Nonetheless, as in any case, certification was not guaranteed.  *See, e.g., Asher v. Baxter Int'l, Inc.,* 505 F.3d 736, 741 (7th Cir. 2007) (noting that the district court denied class certification three times).  Moreover, even where (unlike here) a class has already been certified, courts routinely approve settlement pursuant to the other *Girsh* factors in light of the constant risk that the class may present "intractable management problems" that warrant decertification of the class.  *See Safety Components Int'l,* 166 F. Supp. 2d at 91.

**7.   The Ability of Prudential to Withstand a Greater Judgment**

Plaintiff does not rely on this factor to support the fairness of the Settlement.  However, the mere fact that a defendant could pay more does not militate against approval of a settlement when other factors all strongly support the settlement.  *See In re Warfarin*, 391 F.3d at 538; *McGee*, 2009 WL 539893 at *6 (noting that "'to withhold approval of a settlement of this size because the defendants could withstand a greater judgment would make little sense'") (citation omitted).

**8.   The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and in Light of Litigation Risks**

The $16,500,000 cash Settlement is an outstanding result in light of the litigation risks and the realistic best possible recovery.  The "last two *Girsh* factors evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case." *In re Warfarin*, 391 F.3d at 538.  Here, as discussed above, the Settlement Class would face substantial hurdles proving liability in light of the facts uncovered during discovery; moreover, even if Plaintiff could establish liability, he would face substantial hurdles proving damages in light of the lack of material movement in the price of the Notes on most of the relevant dates on which disclosures were made (and the substantial issues surrounding the drop even on October 9, 2008).  The $16.5 million Settlement that Class Counsel was able to obtain for the Settlement Class – which constitutes approximately 38% of Plaintiff's maximum reasonable damages – is well-within the range of securities class actions approved by the courts.  *See, e.g., In re Cendant Corp. Sec. Litig.,* 264 F.3d 201, 242 & n.22 (3d Cir. 2001) (approving settlement that amounted to 9.25% of total damages, and citing studies showing average recoveries in securities fraud litigation ranging from 9-14% of total damages); *In re Datatec Sys., Inc. Sec. Litig.,* 2007 WL

4225828 at *4 (citing *Cendant* and approving settlement constituting 10.87% of maximum damages).

### 9.   The Settlement is Presumed to be Fair

The Third Circuit has held that a settlement is entitled to a presumption of fairness if the following are satisfied:  "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *In re Warfarin,* 391 F.3d at 516.  The facts demonstrating that the Settlement satisfies factors (1), (2) and (4) are discussed above. With regard to factor (3), counsel for the Settlement Class are highly qualified and experienced in prosecuting securities class action litigations.  *See* Nobel Declaration, ¶¶7 and 9 and Exhibits B and C thereto.  Accordingly, Plaintiff respectfully submits that the Court should find the Settlement is entitled to a presumption of fairness.  *See, e.g.*, *McGee,* 2009 WL 539893, at *7 .

### C.   The Proposed Plan of Allocation of the Net Settlement Fund is Fair, Reasonable and Adequate

The "approval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole:  the distribution plan must be fair, reasonable and adequate."  *In re Merck & Co. Inc. Vytorin ERISA Litig.,* No. 08- 285, 2010 WL 547613, at *6 (D.N.J. Feb. 9, 2010) (internal quotation marks and citations omitted).  "A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable."  *In re Supreme Specialties, Inc. Sec. Litig.,* No. 02-168, 2008 WL 906254, at *7 (D.N.J. Mar. 31, 2008) (internal citations and quotation marks omitted); *In re IKON Office Solutions, Inc. Sec. Litig.,* 194 F.R.D. 166, 184 (E.D. Pa. 2000) (same).

Here, the proposed Plan of Allocation is fair, reasonable and adequate.  Under the proposed Plan of Allocation (set forth in Exhibit A-1 to the Settlement Stipulation, previously

submitted to the Court as [Dkt. No. 115-4] at pages 8-9), all Settlement Class Members will

recover from the Settlement Fund through the uniform application of a single formula for

measuring their Recognized Losses. The formula in the proposed Plan of Allocation was

formulated by Class Counsel with the assistance of their damages expert, and measures

Recognized Losses based upon the purchase and sale dates of Settlement Class Members.  No

member of the Settlement Class has objected to the Plan of Allocation to date.

      **D.**      **Certification of the Settlement Class is Appropriate**

On August 5, 2011, this Court entered an Order preliminarily certifying the following

Settlement Class:

> all purchasers of the 9% Junior Subordinated Notes of Prudential Financial, Inc.
> ("Prudential") (the "Notes") from June 24, 2008 through March 12, 2009,
> inclusive (the "Settlement Class Period"), pursuant to and/or traceable to the
> Registration Statement and Prospectus for the Offering, exclusive of Defendants,
> all officers and directors of any of the Defendants during the Settlement Class
> Period, members of the immediate family of each individual Defendant, any
> entity in which any Prudential Defendant has a controlling interest, any entity in
> which any Underwriter Defendant has a majority interest, and the legal
> representatives, heirs, successors, or assigns of any such excluded person.  Also
> excluded from the Settlement Class are those Persons who timely and validly
> make Requests for Exclusion.

Preliminary Approval Order at ¶ 3(i).  For all of the reasons already set forth in detail in the

Plaintiff's Memorandum in Support of Motion for Preliminary Approval [Dkt. No. 115-8] at 23-

31, this Settlement Class meets all prerequisites for certification.  Circumstances have not

changed, and no objection has been filed as to the certification of such a Settlement Class.  As

such, the Settlement Class should now be finally certified under Rule 23.

      **E.**      **The Requested Attorneys' Fees are Fair and Reasonable and Should Be
Approved**

Class Counsel respectfully move the Court for an award of attorneys' fees of 25% of the

$16,500,000 Settlement Fund.  As discussed above, the Settlement here constitutes an

outstanding result for the Settlement Class, especially in light of the significant hurdles that

Plaintiff and the Settlement Class faced in establishing both liability and damages.  Class

Counsel developed this case through their own analysis and investigation, without the benefit of

a formal restatement by Prudential or a prior regulatory action.  Class Counsel then expended

significant time and advanced significant funds to pursue the Settlement Class' claims, all on a

contingency basis and with no guarantee of success of ever being paid.  The fee requested is

manifestly fair and reflects the tremendous risk undertaken by Class Counsel and the substantial

benefit they conferred on the Settlement Class.  Moreover, the 25% fee sought by Class Counsel

is well within the range of attorneys' fees routinely awarded by courts in this Circuit.

### 1. A Reasonable Percentage of the Fund Recovered is an Appropriate Approach to Awarding Attorneys' Fees in Common Fund Cases

When a representative plaintiff establishes a common fund for the benefit of the members

of a class, his attorneys are entitled to recover attorneys' fees and costs from the common fund.

*Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).  This rule, referred to as the "common

fund doctrine," is firmly rooted in Third Circuit case law.  *See, e.g., Polonski v. Trump Taj Majal

Assocs.,* 137 F.3d 139, 145 (3d Cir. 1998); *In re Computron Software*, 6 F. Supp. 2d 313, 321

(D.N.J. 1998).  The "heart" of the common fund doctrine "is a concern for fairness and unjust

enrichment; the law will not reward those who reap the substantial benefits of litigation without

participating in its costs."  *Polonski,* 137 F.3d at 145.[24]

The Third Circuit has held that "[i]n common fund cases . . . the percentage-of-recovery

method is generally favored because it allows courts to award fees from the fund in a manner

---

[24] The justification for compensating class counsel out of the class' recovery is particularly strong in securities class actions, as private securities actions are "a most effective weapon in the enforcement" of the securities laws and are "a necessary supplement to [SEC] action." *Bateman Eichler, Hill Richards, Inc, v, Berner,* 472 U.S. 299, 310 (1985) (citation omitted).

that rewards counsel for success and penalizes it for failure." *In re AT&T Corp. Sec. Litig.,* 455 F.3d 160, 164 (3d Cir. 2006) (citations and quotation marks omitted); *see Hall v. AT&T Mobility LLC,* No. 07-5325, 2010 WL 4053547, at *15 (D.N.J. Oct. 13, 2010) (Linares, J.); *In re Electrical Carbon Products Anti-Trust Litig.,* 447 F. Supp. 2d at 405.  The Third Circuit has also articulated certain factors that a court may consider in evaluating a percentage-of-recovery fee in a common fund class action settlement:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

*AT&T,* 455 F.3d at 165 (quoting *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 301 (3d Cir. 2005)).  However, this list is "not intended to be exhaustive," and the factors "should not be applied in a formulaic way;" rather, "what is important is that the district court evaluate what class counsel actually did and how it benefitted the class."  *Id.* at 165-66.

### 2. The 25% Fee Requested By Class Counsel is Fair and Reasonable

As discussed below, consideration of the relevant factors supports a fee award of 25% of the Settlement Fund.

#### a. The Size of the Fund Created and the Number of Persons Benefitted

Class Counsel's vigorous prosecution of this Litigation succeeded in obtaining a $16.5 million cash settlement for the Settlement Class, which is a substantial and impressive recovery in light of the very substantial hurdles Plaintiff faced in establishing both liability and damages. Notably, Class Counsel here litigated this case without the benefit of any "efforts by other groups, such as government agencies, conducting investigations."  *AT&T,* 455 F.3d at 165.

"This is not a case where plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made the kill." *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 597 (S.D.N.Y. 1992).  As discussed above, the $16.5 million Settlement that Class Counsel was able to obtain for the Settlement Class constitutes approximately 38% of the maximum damages the Settlement Class was likely to recover under Plaintiff's most reasonable damages theory, even if the Settlement Class was able to fully recover on all of its liability theories.  Moreover, as discussed above, Defendants vigorously argued that, regardless of liability, the Settlement Class would be able to recover, at most, only a portion of the $0.30 drop that occurred after the October 9, 2008 press release was issued at 3:20 pm Eastern time, which would result in damages under $10 million.  Given the hurdles that the Settlement Class faced in establishing liability and damages, Class Counsel respectfully submit that they achieved an excellent recovery. The number of persons benefited by the Settlement also supports the fee award requested.  Defendants sold 36.8 million Notes in the Offering, and each of the purchasers of these Notes may be eligible to share in the Settlement Fund and obtain immediate compensation for their losses.

### b.   Absence of Settlement Class Member Objections to the Settlement and/or Fees Requested by Counsel

In the Notice, Class Counsel notified Settlement Class Members that Class Counsel would seek attorneys' fees of up to 25% of the Settlement Fund.  To date, no Settlement Class Member has objected to date to Class Counsel's attorneys' fees request (or to the Settlement as a whole).  Accordingly, this factor strongly supports approval of the requested fees. *See, e.g.*, *Milliron,* 2009 WL 3345762, at *10 (absence of class member objection "is strong evidence that the requested fee is reasonable) (Linares, J.).

### c.    The Skill and Efficiency of the Attorneys Involved

Class Counsel are extremely experienced and capable class action lawyers with extensive experience in securities class action litigation.  (The resumes of Class Counsel are attached to the Nobel Declaration as Exhibits B and C.)  Class Counsel vigorously litigated this action, including extensive investigation, the drafting of both the Original and Amended Complaints, regular consultation with experts, litigation of two separate rounds of motions to dismiss filed by Defendants, defeating motions to dismiss the Annuity and OTTI Claims and substantial discovery.  Moreover, "[t]he quality of opposing counsel is also important in evaluating the quality of Class Counsel's work."  *Milliron*, 2009 WL 3345762, at *10  (Linares, J.). Here, Defendants were represented by four national law firms with substantial experience in securities class actions.

However, the best evidence of the quality of class counsel's representation is the result achieved, as the $16.5 million cash Settlement is a testament to Class Counsel's skill and expertise. *See In re WorldCom, Inc. Sec. Litig.,* 388 F. Supp. 2d 319 at 357-58 (S.D.N.Y, 2005) (evaluating quality of representation by reference to the substantial risks faced by counsel, which "obtained remarkable settlements for the Class while facing formidable opposing counsel from some of the best defense firms in the country"); *In re Lucent Techs., Inc. Sec. Litig.*, 327 F. Supp. 2d 426, 437 ("the result itself evidences counsel's skill and efficiency").

### d.    The Complexity and Duration of the Litigation

Courts have long recognized that the complexity and difficulty of the issues in a case are significant factors in determining a fee award.[25]  Moreover, Courts are ever mindful of the fact

---

[25] Prosecution of any class action in the securities area presents inherently complex and novel issues:

that securities class action litigation "is notably difficult and notoriously uncertain." *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y 1999).  From the outset, this action was a difficult and highly uncertain securities case, with no assurance that it would survive motions to dismiss or motions for summary judgment or that it would succeed at trial or on appeal. In addition, there was no governmental investigation or company restatement providing a road-map.  Rather, Class Counsel had to ferret out the evidence that made the case through its own detailed research, analysis and consultation with experts.  As part of this process, Class Counsel had to analyze and dissect Prudential's extraordinarily complex accounting practices.

### e.    The Amount of Time Devoted to the Case by Class Counsel and the Risk of Nonpayment

From the commencement of this litigation, Class Counsel have been paid nothing for their substantial efforts.  Class Counsel have spent 2,121.4 hours on this litigation (and incurred $179,973.63 in unreimbursed costs).[26]  Nobel Declaration, ¶¶10-11.  The significant outlay of cash and commitment of personnel by Class Counsel has been completely at risk, as payment for their services was wholly dependent on prevailing in this litigation.  As discussed above, there was a significant possibility that the Settlement Class would not prevail in this litigation; in that

---

> Despite years of litigation, the area of securities law has gained little predictability. There are few "routine" or "simple" securities actions. Courts are continually modifying and/or reversing prior decisions in an attempt to interpret the securities laws in such a way as to follow the spirit of the law while adapting to new situations which arise. Indeed, many facets of securities law have taken drastically new directions during the pendency of this action. . ..

*Miller v. Woodmoor Corp.,* Nos. 74-988,76-567,1978 WL 1146, at *4 (D. Colo. Sept. 28, 1978).

[26] In addition to the attorney time devoted to date, Class Counsel will also be required to spend additional time in connection with the administration of the claims received from the Settlement Class Members and the distribution of the Settlement fund, but do not seek any additional compensation for these efforts.  Although the attorney time required to perform these tasks necessary for the proper distribution of a settlement fund varies in each case, Class Counsel reasonably estimate that these tasks may generate additional lodestar approaching $100,000.

event, Class Counsel would recover *nothing* for their substantial efforts.  As this Court recently

recognized, "the risk associated with taking a case on contingency is a real and important factor

to consider."  *Hall,* 2010 WL 4053547, at *20.  Indeed, courts have routinely recognized that this

risk is an important factor in determining a fair fee award.  *See McGee*, 2009 WL 539893, at *15

("Class Counsel invested a substantial amount of time and effort to reach this point and obtain

the favorable Settlement.  Class Counsel accepted the responsibility of prosecuting this class

action on a contingent fee basis and without any guarantee of success or award.  Accordingly,

this factor weighs in favor of approval."); *In re Pet Food Products Liab. Litig.,* No. 07-2867,

2008 WL 4937632, at *22 (D.N.J. Nov.18, 2008) ("Courts have consistently recognized that the

risk of receiving little or no recovery is a major factor in considering an award of attorneys'

fees").

       Here, Class Counsel know from experience that, despite the most vigorous and competent

efforts, their success in contingent litigation is never guaranteed.  Accordingly, this factor favors

the requested fee.

                **f.**      **The Fee Request is Fair and Reasonable When Compared to the Awards in Similar Cases**

       The requested fee is fair and reasonable in comparison to the awards made in similar

cases.  Class Counsel's request for attorneys' fees constituting 25% of the Settlement Fund is

well-within – or even below – the range of attorneys' fees typically awarded by courts in this

Circuit.  *See, e.g., In re Rite Aid Corp. Sec. Litig.,* 396 F.3d at 303 ("one study of securities class

action settlements over $10 million … found an average percentage fee recovery of 31%," and "a

second study by the Federal Judicial Center of all class actions resolved or settled over a four-

year period . . . found a median percentage recovery range of 27-30%.").  As this Court recently

recognized, "most fees appear to fall in the range of nineteen to forty-five percent."  *Hall,* 2010

WL 4053547, at *21 (awarding 33 1/3% fee) (quotations marks and citations omitted) (Linares, J.).  For example, in *In re AremisSoft Corp. Sec. Litig.,* 210 F.R.D. 109, 131, 135 (D.N.J. 2002), the court awarded class counsel in a securities class action a 28% fee (constituting a 4.3 multiple of class counsel's lodestar).  Indeed, courts in this District routinely award percentage-of-recovery fees that equal or exceed 25% of a common settlement fund.  *See Milliron,* 2009 WL 3345762, at *14 (awarding 33 1/3% fee) (Linares, J); *In re Merck & Co. Inc. Vytorin ERISA Litig.,* 2010 WL 547613 at *9-14 (awarding 33 1/3% fee) (Cavanugh, J.); *Aviva Partners LLC v. Exide Tech.,* No. 05- 03098 (D.N.J. Jun. 23, 2009) ("Order Awarding Lead Plaintiffs' Counsel's Attorneys' Fees and Expenses") (awarding 30% fee) (Cooper, J.) (attached to the Nobel Declaration as Exhibit D); *In re Genta Sec. Litig.,* 2008 WL 2229843 at *8-13 (awarding 25% fee) (Greenaway, J.); *In re Remeron Direct Purchaser Antitrust Litig.,* No. 03-0085, 2005 WL 3008808, at *12-18 (D.N.J. Nov. 9, 2005) (awarding 33 1/3% fee) (Hochberg, J.); *In re Computron Software, Inc.,* 6 F. Supp. 2d at 322 (awarding 25% fee and noting that "[a]wards utilizing the percentage of recovery method can reasonably range from nineteen percent to forty-five percent of a settlement fund") (Lechner, J.); *see also In re Corel Corp. Inc. Sec. Litig.,* 293 F. Supp. 2d 484, 498 (E.D. Pa. 2003) (awarding 33 1/3% fee); *Nichols v. SmithKline Beecham Corp.* No. 03-0085, 2005 WL 3008808, at *24 (E.D. Pa. Apr. 22, 2005) (awarding 30% fee).[27]

---

[27]  Additionally, a 25% attorneys' fee is entirely consistent with fees typically negotiated in the private marketplace between attorneys and their clients.  *Accord AT&T,* 455 F.3d at 165 (district court may consider "the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement").  If this were a non-class action litigation, the customary contingent fee would likely range between 30 and 40 percent of the recovery. *See, e.g., Hall,* 2010 WL 4053547, at *21 (requested fee of 33 1/3% is "consistent with a privately negotiated contingent fee in the marketplace"); *Ikon,* 194 F.R.D. at 194 ("[I]n private contingency fee cases, particularly in tort matters, Plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery."); *In re U.S. Bioscience Sec. Litig.*, 155 F.R.D. 116,119 (E.D.Pa. 1994) (adopting Special Master's conclusion that 30% would likely have been negotiated in securities action).

The requested fees are also reasonable if the Court uses the "lodestar method" as a

"crosscheck."  *See AT&T,* 455 F.3d at 164 ("the lodestar cross-check, while useful, should not

displace a district court's primary reliance on the percentage of recovery method").  In common

fund cases, courts routinely award counsel percentage fess that represent a multiple of their

lodestar to compensate for the litigation risks discussed above.  Here, Class Counsel have spent

2,121.4 hours on this litigation, for a combined lodestar of $1,146,937.50.  *See* Nobel

Declaration, ¶¶7, 9-10.  As a result, the requested 25% fee constitutes a 3.597 multiple of

lodestar, which is well within the range of multiples approved, and used, by courts in this Circuit.

*In re Prudential*, 148 F.3d 283, 341 (3d Cir.1998) (based on a review of common fund cases, that

multipliers of up to four are "frequently awarded in common fund cases when the lodestar

method is applied") (quoting 3 Herbert Newberg & Alba Conte, Newberg on Class Actions, §

14.03 at 14–5 (3d ed.1992); *In re AremisSoft Corp. Sec. Litig.,* 210 F.R.D. at 135 (4.3 multiplier

and 28% fee justified by "high risk of non-payment" and "excellent result achieved") (Pisano,

J.); *In re Genta Sec. Litig.,* 2008 WL 2229843 at *8-13 (awarding 25% fee constituting 3.72

multiple) (Greenaway, J.); *In re Rite Aid Secs. Litig*, 362 F. Supp. 2d at 588-90 (multiplier of

6.96 confirmed reasonableness of percentage fee awarded); *In re Aetna, Inc. Sec. Litig.,* MDL

1219, 2001 WL 20928, at *15 (E.D.Pa. Jan. 4, 2001) (awarding 30% fee representing a 3.6

multiplier).  Courts in other jurisdictions also routinely award multiples greater than, the 3.597

multiple sought by Class Counsel here.  *See, e.g., In re Enron Corporation Securities, Derivative

& "ERISA" Litigation*, 586 F. Supp. 2d 732, 751 n.20 (S.D. Tex. 2008) (awarding percentage fee

equal to a multiple of 5.2 times lodestar); *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d

752, 752, 767, 769 (S.D. Ohio 2007) (percentage fee equal to lodestar multiplier of 5.9); *In re

Charter Communications, Inc. Sec. Litig.,* 2005 WL 4045741, at *18 (E.D.Mo. June 30, 2005)

(multiplier of 5.6); *Maley v. Del Global Technologies Corp.,* 186 F. Supp. 2d 358, 368-69

(S.D.N.Y. 2002) (multiplier of 4.65); *Roberts v. Texaco, Inc.,* 979 F. Supp. 185, 198 (S.D.N.Y.

1997) (multiplier of 5.5); *In re RJR Nabisco, Inc. Sec. Litig.,* No. 88-7905, 1992 WL 210138, at

*5, 8 (S.D.N.Y. Aug. 24, 1992) (multiplier of 6).

### F.   Class Counsel are Entitled to be Reimbursed for their Reasonable Litigation Expenses

Class Counsel also request that the Court grant its application for reimbursement of

$179,973.63 in litigation costs incurred in connection with the prosecution of this litigation.  The

Third Circuit has expressly approved of the awarding of costs – in addition to fees – to counsel

who obtain a recovery for the class.  *In re AT&T Corp.*, 455 F.3d at 169; *Abrams v. Lightolier,*

*Inc.*, 50 F.3d 1204, 1225 (3d Cir. 1995); *Oh v. AT&T Corp.,* 225 F.R.D. 142, 154 (D.N.J. 2004) .

As described in detail in the Nobel Declaration (at ¶¶8-9, 11), the expenses of $179,973.63

incurred were customary, reasonable and necessary to achieve the significant result reached in

this litigation.  By far the largest single component of the expenses (totaling $165,620) arose

from Class Counsel's consultations with accounting and damages experts throughout the

litigation in order to best plead the Settlement Class' claims, review, analyze and evaluate

Defendants' defenses, arguments and documents, and, ultimately, mediate and settle this

litigation.  No objection to this request for reimbursement of expenses has been submitted to

date.

### G.   The Lead Plaintiff Award is Reasonable and Should Be Approved

The PSLRA provides for an award to class representatives to compensate them for their

efforts directing the litigation on behalf of the Settlement Class.  *See* 15 U.S.C. § 78u-(a)(4).

Indeed, important policy considerations to encourage enforcement of the federal securities laws

by shareholders underlie these awards:

> In granting compensatory awards to the representative plaintiff in PSLRA class actions, courts consider the circumstances, including the personal risks incurred by the plaintiff in becoming a lead plaintiff, the time and effort expended by that plaintiff in prosecuting the litigation, any other burdens sustained by that plaintiff in lending himself or herself to prosecuting the claim, and the ultimate recovery. Furthermore, courts consider not only the efforts of the representative plaintiffs in pursuing claims, but also the important policy role they play in the enforcement of the federal securities laws on behalf of persons other than themselves. Such enforcement is vital because if there were no individual shareholders willing to step forward and pursue a claim on behalf of other investors, many violations of law might go unprosecuted.

*In re Xcel Energy, Inc. Sec., Derivative & ERISA Litig.*, 364 F. Supp. 2d 980, 1000 (D. Minn. 2005) (citations omitted).

Here, the Notice informed the Settlement Class that Settlement Class Counsel would request an award for Plaintiff directly related to his representation of the Settlement Class in an amount not to exceed $5,000.  Plaintiff spent approximately 25-50 hours directing Class Counsel in the prosecution of this litigation, as set forth in the Declaration of Paul J. Perry (attached to the Lead Plaintiff Award Motion as Exhibit A).  This time was directly related to his work on behalf of the Settlement Class and is properly paid out of the Settlement Fund.  *See Varacallo,* 226 F.R.D. at 257-59 (awarding incentive awards of up to $10,000 to class representatives who "devoted a considerable amount of time and effort in assisting counsel in prosecuting this matter) (Linares, J.).

IV.     **CONCLUSION**

Based on the foregoing, Plaintiff respectfully requests that the Settlement be approved, and that this Court grant the Fee and Expense Motion and the Lead Plaintiff Award Motion.

Dated: October 21, 2011                    **LITE DEPALMA GREENBERG, LLC**

                                    By:     */s/ Joseph J. DePalma*
                                            Allyn Z. Lite
                                            Joseph J. DePalma
                                            Katrina Carroll
                                            Mayra V. Tarantino
                                            Two Gateway Center, Suite 1201
                                            Newark, NJ 07102-5003
                                            Telephone: (973) 623-3000
                                            Facsimile: (973) 623-0858
                                            alite@litedepalma.com
                                            jdepalma@litedepalma.com
                                            kcarroll@litedepalma.com
                                            mtarantino@litedepalma.com

                                            *Liaison Counsel for Plaintiff,*
                                            *Paul J. Perry, Trustee of the Paul J. Perry Revocable Trust*

                                            **IZARD NOBEL LLP**
                                            Robert A. Izard
                                            Jeffrey S. Nobel
                                            Mark P. Kindall
                                            Seth R. Klein
                                            Nancy A. Kulesa
                                            29 South Main Street, Suite 215
                                            West Hartford, CT  06107
                                            Telephone: (860) 493-6292
                                            Facsimile: (860) 493-6290
                                            jnobel@izardnobel.com

                                            *Lead Counsel for Plaintiff,*
                                            *Paul J. Perry, Trustee of the Paul J. Perry Revocable Trust*